SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Sally McDonald Henry (SMH 0839)
J. Gregory Milmoe (JGM 0911)

Proposed Counsel for Debtors and
  Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FORTUNOFF FINE JEWELRY AND | : | Case No. 08-_____ (____) |
| SILVERWARE, LLC, et al. | : | |
| | : | |
| | : | |
| Debtors. | : | (Motion for Joint Administration Pending) |

- - - - - - - - - - - - - - - - - - - - - - - - - - x

## MOTION OF THE DEBTORS FOR (I) ORDER (A) APPROVING BID PROCEDURES FOR THE DEBTORS' ASSETS, (B) AUTHORIZING DEBTORS TO OFFER CERTAIN BID PROTECTIONS AND (C) SCHEDULING FINAL SALE HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (II) ORDER AUTHORIZING AND APPROVING (A) THE SALE OF ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO SUCCESSFUL BIDDER(S) AT AUCTION

       The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[1] hereby move this Court (the "Motion"), under sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for (i) entry of an order (the "Bid Procedures Order"), (a) approving bidding procedures (the "Bid Procedures") in

---

[1]      The Debtors are the following entities:  Fortunoff Fine Jewelry and Silverware, LLC, M. Fortunoff of Westbury, LLC and Source Financing Corp.

connection with the sale of substantially all of the Debtors' assets (the "Assets");[2] (b) authorizing

the Debtors to offer certain bidder protections; and (c) scheduling a final sale hearing (as defined

below) to consider entry of the Sale Order (as defined below) and approving the form and

manner of notice of the auction for the Assets and the Sale Hearing, including the form and

manner of service of the notice (the "Auction and Hearing Notice"); and (ii) an order authorizing

and approving (a) the sale of the Assets free and clear of liens and other interests and (b)

assumption and assignment of executory contracts and unexpired leases to the successful

bidder(s) at the Auction.  In support of the Motion, the Debtors rely upon and incorporate by

reference the declaration filed under Local Bankruptcy Rule 1007-2 and in support of the

Debtors' chapter 11 petitions and various first day applications and motions (the "Declaration"),

filed with the Court concurrently herewith.  In further support of the Motion, the Debtors, by and

through their undersigned proposed counsel, respectfully represent:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are Bankruptcy

Code sections 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006, and 9008.

## BACKGROUND

3.     On February 3, 2008 (the "Petition Date"), the Debtors filed voluntary

petitions in this Court for relief under chapter 11 of the Bankruptcy Code.  The factual

background regarding the Debtors, including their business operations, their capital and debt

---

[2]     The Assets will not include any of the Debtors' avoidance actions under the Bankruptcy Code.

structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in

the Declaration, filed concurrently herewith and fully incorporated herein by reference.[3]

4.      The Debtors continue to manage and operate their businesses as debtors in

possession under Bankruptcy Code sections 1107 and 1108.

## FACTS RELEVANT TO THIS MOTION

5.      A struggling economy, weakening home furnishing retail sales and the

Debtor's inability to access additional capital from its secured lenders or elsewhere, led the

Debtors to prepare for these Chapter 11 cases with the hope that they would be able to maximize

value for their creditors through a rapid sale of their business as a going concern, or failing that,

through a liquidation.

6.      At the end of January, discussions with an affiliate of NRDC Equity

Partners, LLC ("NRDC"), culminated in the execution of an Asset Purchase Agreement (the

"Agreement") between the Debtors and an affiliate of NRDC (the "Buyer"), whereby the Buyer

would acquire the Debtors' business as a going concern pursuant to a sale under Bankruptcy

Code section 363(b).  The Agreement is attached as Exhibit 1 to the Bid Procedures, which are

attached as Exhibit A.

7.      The Agreement contemplates, among other things, that subject to the

approval of this Court, (i) the Buyer will acquire substantially all of the assets of the Debtors

used in their business, (ii) the Buyer will assume certain liabilities of the Debtors, including

certain real estate leases (provided that certain terms of such leases are renegotiated to the

Buyer's satisfaction), and certain employee liabilities, (iii) an affiliate of the Buyer will make

available a $10 million Letter of Credit on or about February 4, 2008 to enable the Debtors to

---

[3]        Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Declaration.

continue to purchase inventory, and (iv) pay $80 million cash to the Debtors subject to

adjustment for inventory fluctuations.  In addition, the Buyer agreed in the Agreement to serve as

a classic "stalking horse" bidder in a section 363 auction sale so that the Debtors could test

whether they were receiving the highest and best price for their assets.  The solicitation of bids

for the auction are to be conducted pursuant to agreed upon Bid Procedures (attached as Exhibit

A hereto) which provide for customary bidder protections including a reasonable Break Up Fee

and Expense Reimbursement.

8.    The Debtors believe that the proceeds to be realized from the transactions

contemplated by the Agreement, including a possible auction if competing bidders materialize,

are likely to be substantially greater than those that would be realized from a going out of

business sale.  However, as a condition of obtaining the proposed DIP loan from its senior

secured creditor the Debtors have also solicited bids from liquidators.

9.    Given their extreme lack of liquidity, the Debtors were able to obtain

financing to continue their operations in Chapter 11 only for a short period of time.  Accordingly,

the Debtors respectfully request that the tight but not unreasonable timetable outlined below be

approved.  That timetable contemplates information being made available to prospective bidders

to permit due diligence to begin immediately, the approval of the bid procedures within 10 days

from today, the holding of an auction on or about February 26, 2008 and a hearing to approve the

sale of assets to the winning bidder, or if there are no higher bids to Buyer, on or about February

28, 2008.  While the Debtors seek to sell their Assets as a going concern, the Bid Procedures

contemplate the Debtors considering all types of bids (each, a "Bid") for all, or a portion of, the

Assets.  A copy of the Bid Procedures Order is annexed as Exhibit B hereto.

## EXTRAORDINARY PROVISIONS UNDER THE GUIDELINES

10.    This Motion provides for the following relief which may be considered Extraordinary Provisions under the Guidelines for the Conduct of Asset Sales (General Order M–331)[4] (the "Guidelines"):

(a)    <u>No Good Faith Deposit</u>.  The Bid Procedures provide that all parties seeking to bid on the Assets must provide a Good Faith Deposit, except that upon execution of a Confidentiality Agreement (as defined below), a secured creditor seeking to submit a bid under section 363(k) of the Bankruptcy Code or under section 6 of the Bid Procedures (each, a "Credit Bidder"), landlords shall be deemed to be Qualified Bidders with respect to those Assets in which the Credit Bidder maintains a valid and enforceable security interest or ownership interest.

(b)    <u>Successor Liability</u>.  As provided for herein, the Debtors believe their intended notice of this Motion, through publication and the Sale Notice, is adequate to put parties on notice of any limit of successor liability.  In addition, because the purchaser of the Assets is only buying the assets of the Debtors and assuming limited liabilities, a limitation on successor liability is warranted.

(c)    <u>Record Retention</u>.  The Debtors are seeking to sell substantially all of their Assets, however, the Bid Procedures require, in accordance with section I.D.9. of the Guidelines, that any bid that contemplates the purchase of the Debtors' books and records must include provisions allowing the Debtors reasonable access to such books and records to administer their bankruptcy cases.

---

[4]        The Debtor may separately file a motion concerning appointment of a consumer privacy ombudsman in accordance with Section I.A.4 of the Guidelines if and when such appointment may be necessary.

(d)    <u>Future Conduct</u>.  The Debtors anticipate that any bidders seeking to serve as agent in the liquidation of the Debtors' inventory will condition their bid upon the entry of an order approving such an arrangement and excusing the agent from compliance with certain state laws restricting going out of business sales.  As more fully described below, such provisions are customarily approved by this Court in similar circumstances and are necessary to maximize the value of the estate in the event that the Debtors determine that the liquidation of its inventory by a liquidation agent provides greater value to the Debtors' estates than any offer on a going concern basis.

(e)    <u>Relief from Bankruptcy Rule 6006(d) and Interim Bankruptcy Rule 6004(h)</u>.  The Debtors' lack of liquidity requires them to close on a transaction as soon as possible.  In addition, any purchaser of the Debtors' assets or liquidator of the Debtors' inventory will seek to commence sales as soon as possible after the entry of the Sale Order approving the relevant transaction.  Similarly, a purchaser is likely to request the assumption and assignment of executory contracts and unexpired leases as soon after the entry of an order approving such assignments as possible.  Therefore, the Debtors request that any Sale Order approving the sale of the Assets will contain a waiver of the stays imposed by Bankruptcy Rule 6006(d) and Interim Bankruptcy Rule 6004(h).

## THE AGREEMENT

11.    The principal terms of the Agreement are summarized as follows:[5]

(a)    <u>Purchase Price</u>. On the terms and subject to the conditions set forth in the Agreement, the purchase price for the Assets shall be $80 million in cash, subject to adjustment.

---

[5]    This summary of the Agreement is provided as a convenience only.  Terms used but not defined in this summary shall have the meanings given under the Agreement.  To the extent that the summary differs in any way from the terms of the Agreement, the terms of the Agreement shall control.

(b)    <u>Assets</u>.  Buyer will purchase substantially all of the Debtors' assets.

(c)    <u>Sale Free and Clear</u>.  The Assets are to be transferred free and clear of all mortgages, liens, security interests, charges, easements, leases, subleases, covenants, rights of way, options, claims, restrictions or encumbrances of any kind (collectively, "Liens"), other than Assumed Liens, and free and clear of all Excluded Liabilities.

(d)    <u>Assumed Liabilities</u>.  The Assumed Liabilities include, *inter alia*, (1) cure amounts for Assumed Contracts, (2) post Closing liabilities under Assumed Contracts, (3) liabilities for gift cards, merchandise credits and deposits incurred on or after January 1, 2003 (4) one half the transfer taxes, (5) transferred employees, (6) welfare plans and (7) claims for welfare plans.

(e)    <u>Excluded Liabilities</u>.  The Buyer shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of Sellers other than the Assumed Liabilities.

(f)    <u>Executory Contracts and Unexpired Leases</u>.  On the Closing Date, the Sellers shall assume and assign to the Buyer the Assumed Contracts.

(g)    <u>Bidding Protections</u>.  Under the terms of the Agreement, the Buyer is entitled to payment of the Break Up Fee and Expense Reimbursement (together, the "Bidding Protections").

    (i)    <u>Break Up Fee</u>.  Under certain conditions, upon termination of the Agreement, the Buyer may be entitled to a fee (the "Break Up Fee") in the amount of $2,250,000.

    (ii)    <u>Expense Reimbursement</u>.  Under certain conditions, the Buyer may be entitled to a fee (the "Expense Reimbursement") in an amount not to exceed $1 million for reimbursement of expenses.

This summary is incomplete in many respects and reference is made to the Agreement, annexed as <u>Exhibit 1</u> to the Bid Procedures, attached as <u>Exhibit A</u> hereto.

## PROPOSED BID PROCEDURES

12.    The Debtors are requesting that the Court approve expedited Bid Procedures for the Assets with a final sale hearing to occur by February 28, 2008.  The other key provisions of the Bid Procedures are as follows:

(a)    Qualification.  In order to perform due diligence and be allowed to submit a bid for some or all of the Assets, a party expressing an interest in the Assets (a "Potential Bidder") must provide to the Debtors (i) an executed confidentiality agreement, (ii) current audited financial statements or another acceptable form of financial disclosure, and (iii) a statement (a) demonstrating a bona fide interest in purchasing some or all of the Assets and (b) describing the Potential Bidder's proposed transaction.  The Debtors, in their reasonable discretion, shall determine whether a Potential Bidder is a "Qualified Bidder."  The Buyer is deemed to be a Qualified Bidder.

(b)    Bid Requirements.  A "Qualified Bid" must satisfy the requirements set forth in the Bid Procedures, including:

    (i)    That the bid be accompanied by written evidence that the Qualified Bidder has received debt and/or equity funding commitments or has available funds to consummate the transaction, including, without limitation, adequate assurance of future performance under Bankruptcy Code section 365;

    (ii)    That the bid fully discloses the identity of the bidding entities;

    (iii)    That the bid is irrevocable until the closing of the transaction, if such Qualified Bidder is designated as a Successful Bidder or a Backup Bidder; and

    (iv)    That the bid not contain any due diligence or financing contingencies of any kind.

(c)    Good Faith Deposit.  In order to participate in the Auction, a Qualified Bidder must accompany its bid with a good faith deposit equal to 10% of the bid.

(d)    Bid Deadline.  All Qualified Bids must be received prior to 12:00 p.m. (Eastern Time) on February 12, 2008 (the "Bid Deadline").  The Debtors shall determine whether a bid constitutes a Qualified Bid by no later than February 14, 2008 and notify each Qualifying Bidder.  If there are no Qualifying Bidders other than the Buyer, the Debtors shall not hold the Auction and instead shall request at the Sale Hearing that the Court approve the Agreement with the Buyer.

## BIDDING PROTECTIONS

13.    In this Motion, the Debtors seek immediate approval of payment in certain circumstances, a Breakup Fee and Expense Reimbursement payment as set forth in Section 5 of the Bid Procedures.

14.    To compensate the Buyer for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Debtors seek authority to pay the Buyer a Breakup Fee and an Expense Reimbursement in the event that the Buyer is not the Successful Bidder.  The Debtors believe that the Breakup Fee and Expense Reimbursement are fair and reasonable, given the benefits to the estates of having a definitive Agreement and the risk to the Buyer that a third-party offer ultimately may be accepted, and are necessary to preserve and enhance the value of the Debtors' estates.

15.    Bid incentives such as the Breakup Fee and Expense Reimbursement encourage a potential Buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts in this Circuit have approved bidding incentives similar to the Breakup Fee and Expense Reimbursement under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "'be legitimately necessary to convince a "white knight" to enter the bidding by providing some form of compensation for the risks it is undertaking'" (citation omitted)); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. February 15, 1992) ("Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking

horse' which attracts more favorable offers."); see also Integrated Resources, 147 B.R. at 657-58

(establishing three basic factors for determining whether to permit such fees in bankruptcy:

whether (1) the relationship of parties who negotiated breakup fee is tainted by self-dealing or

manipulation; (2) the fee hampers, rather than encourages, bidding; and (3) the amount of the fee

is unreasonable relative to the purchase price).  The Debtors submit that all requisite elements for

approval of the Breakup Fee and Expense Reimbursement are met here.

16.    The Debtors' ability to offer the Breakup Fee and Expense

Reimbursement enables the Debtors to ensure the sale of the Assets to a contractually-committed

bidder at a price the Debtors believe to be fair while, at the same time, providing the Debtors

with the potential of an even greater return to the estates. Thus, the Debtors believe that the

Breakup Fee and Expense Reimbursement should be approved.

17.    The Buyer has spent, and likely will continue to spend, considerable time,

money and energy pursuing the Sale and has engaged in extended and lengthy good faith

negotiations under extremely stressful time pressure.  In addition, the Buyer has contributed its

name and financial credibility to the Debtors' efforts to stabilize its business.  The Agreement is

the culmination of these efforts.

18.    In recognition of this expenditure of time, energy and resources, and the

benefits to the Debtors' estates of securing a "stalking horse" or minimum bid, the Sellers have

agreed to seek the Bid Protections for the Buyer.  Specifically, among other things, the Debtors

seek to provide to the Buyer a Breakup Fee in the amount of $2,250,000 plus up to $1,000,000

for expenses.

**THE AUCTION**

19.    Notice of the Auction.  If more than one Qualified Bid is received, the

Sellers will conduct an auction (the "Auction").  If no Qualified Bid (other than that of the Buyer)

10

is received by the Bid Deadline, the Sellers will report that to the Bankruptcy Court, the Buyer's

Bid will be deemed the highest and best offer for the Assets, and the Sellers will proceed directly

to the Sale Hearing.  The Auction, if required, will begin at 10:00 a.m. (Eastern Time) on the

date established by the Court in the Bid Procedures Order, at the offices of Skadden, Arps, Slate,

Meagher & Flom LLP (4 Times Square, New York, NY 10036) or at any other location in the

District the Debtors may later designate.  If another location is designated Debtors will notify all

Qualified Bidders who have submitted Qualified Bids.

        20.    <u>The Auction Process</u>.

        (a)    The Debtors and their designated professionals will direct and

conduct the Auction.  At the beginning of the Auction, the Debtors shall announce the Buyer's

Bid.  All bids made thereafter will be Overbids (as defined below), and will be made on an open

basis and all material terms of each bid shall be fully disclosed to all other bidders.  The Debtors

will maintain a transcript of all bids made and announced at the Auction, including the Buyer's

Bid, all Overbids and the Successful Bid.

        (b)    An Overbid is any bid made at the Auction after Debtors'

announcement of the Buyer's Bid.  To submit an Overbid for purposes of this Auction, a

qualified Bidder must comply with the following conditions.  The first Overbid after the Buyer's

Bid is announced shall be no less than: (i) the Buyer's Bid; plus (ii) at least $1 million; plus (iii)

the Break Up Fee; plus (iv) the Expense Reimbursement.  Any subsequent Overbids shall be

made in increments to be announced on the record at the Auction.  The value of any Overbid

made by the Buyer will be deemed to have been made in an amount equal to the Overbid plus the

Buyer's Bid Protection (solely for purposes of determining the highest and best bid).

21.     The Debtors, after consultation with the Creditors, reserve the right to consider successive Qualified Bids in any combination in determining whether any such Qualified Bid or Qualified Bids constitutes a higher or better offer than previous bids.

Identification of the Successful Bidder

22.     At the close of the Auction, the Debtors will identify which Qualified Bidder had the highest and best bid (the "Successful Bid," and the bidder or bidders being the "Successful Bidder"), which will be determined by considering, among other things:

(a)     the number, type and nature of any changes to the Assets requested by each Qualified Bidder and, whether such bids are for assets or on different terms from the Agreement;

(b)     the extent to which such requested modifications to the Assets are likely to delay the closing and the cost to the Debtors of any such modifications or delay;

(c)     the total consideration to be received by the Debtors;

(d)     the likelihood of each Qualified Bidder's ability to timely close a transaction and make any deferred payments, if applicable; and

(e)     the net benefit to the estate, taking into account Buyer's rights to the Buyer's Bid Protection.

23.     Next, the Debtors will announce the Backup Bidder(s) (as defined in the Bid Procedures). Each Backup Bid shall remain open and binding until the earlier of (i) two business days after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid have been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and (ii) fifteen days after the entry of an order of the Court approving a transaction for the transfer of Assets.

Acceptance of Bid From Successful Bidder

      24.     The Debtors presently intend to sell the Assets to the Successful Bidder,

pursuant to the form of the Agreement agreed to by the Debtors and the Successful Bidder.  The

Debtors' identification of a Successful Bid will not constitute the Debtors' acceptance of any

such bid (whether the Buyer's Bid or an Overbid, as the case may be) if the Successful Bidder is

not the Buyer.  If the Successful Bidder is the Buyer, however, then the Debtors' selection of the

Buyers' Bid or the Buyers' Overbid, as the case may be, as the Successful Bid shall constitute

the Debtors' acceptance thereof, subject to Court approval.  The Debtors will have accepted

another Qualified Bid or aggregate Qualified Bid only when that Bid has been approved by the

Court at the Sale Hearing.  Except as otherwise provided in the Agreement agreed to by the

Debtors and the Successful Bidder, all of the Debtors' right, title and interest in and to the Assets

will be sold free and clear of the Liens, with such Liens attaching to the proceeds of the Assets

with the same validity and priority as the Liens had on the Assets immediately prior to their sale.

      25.     Under the Agreement, the hearing (the "Sale Hearing") on whether to

grant the relief sought in the Sale Motion needs to be held on or before February 28, 2008.  At

the Sale Hearing, if no other Qualified Bid was received, the Debtors will seek entry of an order,

*inter alia*, authorizing the sale of the Assets to the Buyer pursuant to the Agreement, or, if a

Qualified Bid was identified as the Successful Bid, to the Successful Bidder pursuant to the form

of the Agreement agreed to by the Debtors and the Successful Bidder.

      26.     In connection with filing this Motion, the Debtors will serve a copy of this

Motion, the Agreement, the Proposed Bid Procedures Order, and all exhibits to such orders upon

the following persons electronically and by overnight delivery, for delivery no later than

February 5, 2008:  (a) the U.S. Trustee; (b) counsel for BoA and Trimaran, as agents under the

Debtors' prepetition credit facilities; (c) counsel for the agent under the Debtors' proposed

postpetition credit facility; (d) the parties included on the Debtors' list of thirty (30) largest

unsecured creditors; (e) all parties known to be asserting a lien in the Debtors' assets; (f) all

counterparties to unexpired real property leases potentially to be assumed and assigned; (g) all

entities known to have expressed an interest in acquiring any of the Assets; (h) the United States

Attorney's office; (i) all state attorney generals in states in which it does business; and (j) various

federal and state tax and environmental authorities, including the Internal Revenue Service and

the Environmental Protection Agency (collectively, the "Bid Procedures Parties").

27.     Assuming the Court enters the proposed Bid Procedures Order,

immediately after entry of the Bid Procedures Order, the Debtors will commence service of the

Auction and Hearing Notice, attached as <u>Exhibit B</u> to the Bid Procedures Order; including

causing such Auction and Hearing Notice to be: (i) published pursuant to Bankruptcy Rule

2002(l) in the national editions of The Wall Street Journal and The New York Times; (ii) served

upon (a) the Bid Procedures Parties; (b) all known creditors of the Debtors and (c) all vendors,

suppliers, customers, lenders, contract, license and lease counterparties and all other know

creditors of each of the Debtors; and (iii) posted on the website of the Debtors' claim agent at

http://loganandco.com, together with a copy of the Bid Procedures Order and the Agreement.

The Debtors submit that such notice, together with the other notice described herein, is good,

adequate, sufficient and proper notice to such interested parties.

28.     The Debtors believe that the foregoing notice is sufficient to provide

effective notice of the Bid Procedures, the Auction and the proposed Sale to potentially

interested parties in a manner designed to maximize the chance of obtaining the broadest

possible participation in the Sale process while minimizing costs to the estates. Accordingly, the

Debtors request that the Court find that notice in this manner is sufficient and that no further notice of the Auction, the Bid Procedures or the proposed Sale is required.

## ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES

29.    As part of the Motion, the Debtors seek authority under Bankruptcy Code sections 105(a) and 365 to (i) assume and assign the Assumed Contracts to the Buyer (or the Successful Bidder, as the case may be) and (ii) execute and deliver to the Buyer (or the Successful Bidder, as the case may be) such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer (or the Successful Bidder, as the case may be). With respect to the Assumed Contracts pursuant to the Agreement (collectively, the "Assumed Agreements"), the Assumption Date will be the Closing Date, unless otherwise specified.

## APPLICABLE AUTHORITY

**A.    The Proposed Sale is Within the Debtors' Sound Business Judgment**

30.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

31.    The Debtors' sale or use of property of the estate outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Ionosphere Clubs, Inc., 100 B.R. 670, 680 (Bankr. S.D.N.Y. 1989).

15

32.    The Debtors submit that there is more than adequate business justification to sell the Assets to the Buyer (or the Successful Bidder, as the case may be). Based upon the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and financial advisors have concluded that the best way to maximize the value of the Debtors' estates is to sell the Assets, thereby preserving the substantial goodwill of the businesses, maintaining customer and vendor relationships and avoiding a liquidation sale or sales at depressed prices.

33.    The Buyer has offered substantial value for the Assets and is anxious to consummate the transaction. As set forth above, the Agreement requires the Buyer (or the Successful Bidder, as the case may be) to pay $80 million for the Assets as of the closing. The Debtors respectfully submit that such consideration is both fair and reasonable. Furthermore, to dispel any doubt, the sale of the Assets to the Buyer is subject to competing bids, thereby enhancing the Debtors' ability to receive the highest and best value for their businesses. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors ultimately will be demonstrated by a "market check" through an auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

34.    Finally, all creditors and parties in interest will receive adequate notice of the Bid Procedures, the Auction and the proposed Sale as provided herein. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these cases, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by the proposed Sale. The Debtors submit that such notice is sufficient for entry of the Sale Order and satisfies requisite notice conditions for approval of the Sale under Bankruptcy Code section 363(b).

35.     Under these circumstances, sound business reasons exist that justify the immediate sale of the Assets outside the ordinary course of business and before the confirmation of a reorganization plan.  Accordingly, the Debtors submit that the proposed Sale to the Buyer pursuant to Bankruptcy Code section 363 should be approved.  Furthermore, in order to facilitate the Sale to the Buyer, the Debtors should be authorized to assume the Agreement under Bankruptcy Code section 365 as of the Closing Date.

36.     Similarly, Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Although there has not yet been a published decision interpreting Bankruptcy Rule 6003, the Second Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the court instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'"  Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002) (quoting N.Y. Pathological & X-Ray Labs., Inc. v. INS, 523 F.2d 79, 81 (2d Cir. 1975)).  Further, the "harm must be shown to be actual and imminent, not remote or speculative."  Id. at 214.  See also Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1998).  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm as defined by the Second Circuit.

**B.      The Buyer is Entitled to the Protections of Bankruptcy Code Section 363(m)**

37.     The Agreement has been negotiated at arms'-length and in good faith and, thus, the Buyer is entitled to the protections of Bankruptcy Code section 363(m). As set forth above, the Buyer was selected by the Debtors and their advisors, in consultation with BoA and Trimaran, only after screening other potential buyers (admittedly under stressful and time sensitive circumstances) determining that the Buyer's terms were likely to be the most favorable

submitted by any party. The Second Circuit has indicated that a party would have to show fraud

or collusion between the Buyer and the debtor-in-possession or trustee in order to demonstrate a

lack of good faith. See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs., 111 F.3d 269,

276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [Buyer]'s good faith status

at a judicial sale involves fraud, "collusion between the [Buyer] and other bidders or the trustee,

or an attempt to take grossly unfair advantage of other bidders." (quoting In re Rock Indus.,

Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978))); see also In re Angelika Films 57th, Inc.,

Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. May 29,

1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998). No such facts exist here.

   38.  Accordingly, the Debtors request that the Court make a finding at the Sale

Hearing that the Agreement reached with the Buyer was at arms'-length and is entitled to the

protections of Bankruptcy Code section 363(m).

## C. The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Claims

   39.  Under Bankruptcy Code section 363(f), a debtor-in-possession may sell

property free and clear of any interest in such property of an entity other than the estate only if,

among other things:

  (a)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

  (b)  such entity consents;

  (c)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

  (d)  such interest is in bona fide dispute; or

  (e)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive,
satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free
and clear" of Liens and Interests. See id.; In re Dundee Equity Corp., No. 89-B-10233,1992
Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive,
such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f)
have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Mich.
Employment Sec. Comm'n v. Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991),
(stating that Bankruptcy Code section 363(f) written in disjunctive; holding that court may
approve sale "free and clear" provided at least one of subsections of Bankruptcy Code section
363(f) is met).

41.     The Debtors submit that one of the subsections of Bankruptcy Code
section 363(f) applies to holders of liens and interests in or against the Assets. The lien and
interest holders will be adequately protected, because their liens and/or interests will attach to the
net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with
respect thereto. Accordingly, the sale should be approved under Bankruptcy Code section 363(f).

42.     In addition, the Debtors submit that the Assets may be sold free and clear
of claims, including successor liability claims, as neither the Buyer nor its affiliates, successors
or assigns will, as a result of any action taken in connection with the purchase of the Assets (a)
be a successor to the Debtors; (b) have, de facto or otherwise, merged with or into the Debtors;
or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the
Debtors. Several courts have held that notwithstanding the use of the term "interest" in the
statutory language of Bankruptcy Code section 363(f), that section grants bankruptcy courts the
power to convey assets free and clear of claims. See, e.g., In re Trans World Airlines, Inc., No.

19

01-0056 (PJW), 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale

[of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of

[Bankruptcy Code] section 363 intended by Congress."). Other courts, concluding that

Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of

claims, have nevertheless found that Bankruptcy Code section 105(a) provides such authority.

See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),

75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell

assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in

the court's equitable powers when necessary to carry out the provisions of title 11).

**D.      The Assumption and Assignment of Assumed Contracts and Assumed Leases
Should Be Authorized**

43.     Bankruptcy Code section 365(f)(2) provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor
only if–

(A)     the trustee assumes such contract or lease in accordance with the
provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract
or lease is provided, whether or not there has been a default in such
contract or lease.

11 U.S.C. § 365(f)(2).

44.     Under Bankruptcy Code section 365(a), a trustee, "subject to the court's

approval, may assume or reject any executory contract or unexpired lease of the debtor." 11

U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for

assuming an unexpired lease or executory contract of a debtor. This subsection provides:

(b)(1)  If there has been a default in an executory contract or unexpired lease of
the debtor, the trustee may not assume such contract or lease unless, at the
time of assumption of such contract or lease, the trustee

20

> (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

45.     The meaning of "'adequate assurance of future performance'" depends on the facts and circumstances of each case, but should be given "'practical pragmatic construction.'" EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); see Carlisle Homes, Inc. v. Azzari, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

46.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. at 605-06 (stating that adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

47.     In connection with the assumption and assignment of executory contracts and/or unexpired leases under any sale transactions for the Assets, the Debtors believe it is necessary to establish a process by which the Debtors and their counterparties to executory contracts and unexpired leases that will be assumed can establish the cure obligations, if any, to

be paid in accordance with section 365 of the Bankruptcy Code and for the counterparties of

such assumed contracts and leases to assert any objection they may have to such assumption and

assignment . As soon as practicable, but no later than ten days prior to the Sale Hearing, the

Debtors will file a schedule of such cure obligations (the "Cure Schedule") with the Court and

serve that schedule by first class mail on the parties to executory contracts and unexpired leases

that may be assumed and assigned in connection with a sale of the Assets.  The Debtors proposes

that any objections (other than objections to adequate assurance of future performance for

executory contracts and unexpired leases to be assumed and assigned under a Successful Bid) to

the assumption and assignment of any executory contract or unexpired lease identified on the

Cure Schedule, must be in writing, filed with the Court, and be actually received on or before

February 25, 2008 at 12:00 p.m. (Eastern Time) by (a) proposed counsel to the Debtors, Skadden,

Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Fax: (212) 735-

2000, Attn: Sally McDonald Henry; (b) proposed crisis manager to the Debtors, FTI Consulting,

125 High Street, Suite 1402, Boston, MA 02110, Fax: (617) 897-1510, Attn:  Kevin Regan;

(c) counsel to BoA, Riemer & Braunstein LLP, Three Center Plaza, 6th Floor, Boston, MA

02108, Fax: (617) 880-3456 Attn:  Kevin J. Simard and Jason S. DelMonico; (d) Counsel to

Trimaran, Sonnenschein Nath & Rosenthal LLP, 7800 Sears Tower, 233 South Wacker Drive,

Chicago, IL 60606-6404, Fax: (312) 876-7934, Attn:  Monika J. Machen; and (f) once appointed,

counsel to the Creditors' Committee (collectively, the "Notice Parties").

48.    The Debtors propose that objections to adequate assurance of future

performance on executory contracts and unexpired leases to be assumed and assigned under a

Successful Bid must be in writing, filed with the Court and be actually received by the Notice

Parties on or before February 26, 2008 5:00 p.m. ("Assignment Objection Deadline").

49.     The Debtors request that any counterparty under a contract or lease that

fails to object to the proposed transactions by the Assignment Objection Deadline shall be

deemed to consent to the treatment of its executory contract or unexpired lease under section 365

of the Bankruptcy Code (including the proposed cure amount) and this Sale Motion.  See

Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by

not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re

Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Moreover, the Debtors request that

each such party be deemed to consent to the assumption and assignment of its executory contract

and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on

assignment.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

**E.     The Court Should Waive Compliance with State and Local Laws,
Statutes, Rules and Ordinances Restricting Going Out of Business Sales**

50.     Many state and local laws, statutes, rules and ordinances require special

and cumbersome licenses, waiting periods, time limits and other procedures for store closing,

going out of business or similar sales conducted outside of bankruptcy.  In addition, some states

and localities have statutes or regulations requiring creditor notification before a company

conducts a bulk sale.  In the context of bankruptcy cases such as these, however, when creditors

receive notice of the proposed sale, as well as the opportunity to be heard in this Court,

enforcement of such statutes and regulations is redundant and unnecessary.  The Debtors request

that any order approving a Successful Bid at the Auction that involves going out of business

sales at any of the Debtors' stores should waive any state or local laws restricting store closing,

going out of business or similar sales.

51.     Debtors must generally comply with 28 U.S.C. § 959(b), which states that

a debtor in possession must "manage and operate the property . . . according to the requirements

of the valid laws of the state in which such property is situated . . . ."  Courts, however, have held

that a debtor in possession that is liquidating assets of the estate does not "manage and operate"

the property for the purposes of 28 U.S.C. § 959(b).  See Alabama Surface Mining Comm'n v.

N.P. Mining Co., 963 F.2d 1449, 1460-61 (11th Cir. 1992) (holding that 28 U.S.C. § 959(b) does

not apply when debtor-in-possession is liquidating property and not operating business);

Missouri Dept. of Natural Res. v. Valley Steel Prods. Co., 157 B.R. 442, 447-48 (Bankr. E.D.

Mo. 1993) (same); Ames Dep't Stores, Inc., 136 B.R. at 359 (noting that "going-out-of-business"

sales are governed by section 363(b) of the Bankruptcy Code); Matter of Borne Chem. Co., 54

B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that "[section] 959(b) is applicable only where the

property is being managed or operated for the purpose of continuing operations").

     52.    In the instant case, the Debtors may seek to liquidate merchandise from

some or all of its stores.  Because, however, the Debtors would be liquidating the merchandise

and closing such stores completely, 28 U.S.C. § 959(b) does not require compliance with these

state and local licensing procedures and other regulations, especially when the Debtors will

conduct any going out of business sales with the knowledge and oversight of the creditors and

this Court.  Bankruptcy courts routinely have excused compliance with state and local laws that

do not relate to public health and safety or consumer protection and interfere with store closing

sales by a retail chapter 11 debtor.  See, e.g., In re the Bombay Co., Case No. 07-44084-dml-1 1

(Bankr. N.D. Tex. Oct. 16, 2007); In re Musicland Holding Corp., Case No. 06-1064 (SMB)

(Bankr. S.D.N.Y. Feb. 1, 2006).  The Court should therefore waive the requirement that the

Debtors and/or the Buyer comply with state laws regulating going out of business sales, bulk sale

laws or other laws not related to public health and safety or consumer protection.

**F.      Unenforceability of Any Restrictions on Store Closing Sales in the Debtors' Leases**

53.      Certain of the Debtors' leases contain provisions purporting to restrict or

prohibit the Debtors from conducting store closing, liquidation or similar sales.  Such provisions

have been held to be unenforceable in chapter 11 cases because they constitute an impermissible

restraint on a debtor's ability to maximize the value of its assets under section 363 of the

Bankruptcy Code.  See Ames Dep't Stores, Inc., 136 B.R. at 359 (landlord could not recover

damages under section 365 of the Bankruptcy Code for debtor's conduct of store closing sale

because section 363(b) fosters the fundamental bankruptcy policy of maximizing estate assets

and "to enforce the anti-GOB sale clause of the Lease would contravene overriding federal

policy requiring Debtors to maximize estate assets"); In re Tobago Bay Trading Co., 112 B.R.

463, 467 (Bankr. N.D. Ga. 1990) (overruling objection of landlords to store closing program

based on lease provisions); In re Libson Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982)

(finding lease provisions restraining a going out of business sale were unenforceable in chapter

11).  Courts in retail chapter 11 cases have routinely approved orders preventing landlords from

interfering with store closing sales.  See, e.g., In re Movie Gallery, Inc., Case No. 07-33 849

(Bankr. E.D. Va. Oct. 17, 2007); In re the Bombay Co., Case No. 07-44084-dml-11 (Bankr. N.D.

Tex. Oct. 16, 2007); In re Musicland Holding Corp., Case No. 06-1064 (SMB) (Bankr. S.D.N.Y.

Feb. 1, 2006); In re CWT Specialty Stores, Inc., Case No. 00-10758 (JHG) (Bankr. S.D.N.Y.

Mar. 7, 2000); In re Caldor, Inc.-NY, Case No. 95-44080 (JLG) (Bankr. S.D.N.Y. Feb. 11, 1999);

In re The Wiz, Inc., Case No. 97-48257 (CB) (Bankr. S.D.N.Y. Dec. 18, 1997).

54.      As such, to the extent that such provisions or restrictions exist in any of

the Debtors' leases, the lessors may not interfere with or otherwise seek to restrict the Debtors

and/or its liquidating agent(s) from conducting any going out of business sales.  Accordingly, the

Debtors request that the Court authorize the Debtors and/or its liquidating agent(s) to conduct

any going out of business sales without such interference from any lessors or other persons

affected, directly or indirectly, by such sales.

## REQUEST FOR WAIVER OF STAY

55.     The Debtors also request that the Court waive the stay imposed by Interim

Bankruptcy Rules 6004(h) and 6006(d).  Interim Bankruptcy Rule 6004(h) provides that "[a]n

order authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 10 days after entry of the order, unless the court orders otherwise."  Under

Bankruptcy Rule 6006(d) "[a]n order authorizing the trustee to assign an executory contract or

unexpired lease under § 365(f) is stayed until the expiration of 10 days after entry of the order,

unless the court orders otherwise."

56.     Courts in this district have waived these ten-day stays upon a showing of

business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005)

("As I find that the required business need for a waiver has been shown, the order may provide

for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc.,

268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for

waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).  In general, courts will

grant waivers when doing so is important to the Debtor's financial health.  See Second Grand

Traverse School v. Boyd, 100 Fed. Appx. 430, 434-35 (6th Cir. 2004) (affirming decision

waiving ten-day stay because "time was of the essence"); In re Decora Indus., Inc., No. 00-4459

JJF, 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an

immediate closing is required to remedy Debtors' precarious financial and business position.

Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

57.     As described above, the Debtors are facing an immediate liquidity crisis.

In light of this, and a desire to maximize the value of the Debtors' assets (whether as a going

concern or in liquidation), the Debtors anticipate that the Successful Bidder(s) will seek to close

on the Agreement as soon as possible.  Imposition of the ten-day stays under Interim Bankruptcy

Rule 6004(h) and 6006(d) is likely to cause bidders to reduce the value of their bids for the

Assets, to account for the value that will evaporate during the stay.  Therefore, waiver of the ten-

day stays imposed by Interim Bankruptcy Rules 6004(h) and 6006(d) would help to maximize

the value of the Debtors' estates.

58.    Because the Debtors have demonstrated a need requiring the immediate

effectiveness of the Sale Order, this Court should exercise its authority under Interim Bankruptcy

Rules 6004(h) and 6006(d) and waive the ten-day stays that otherwise would apply to the

Amended Sale Order.

## MEMORANDUM OF LAW

59.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United State Bankruptcy Court for the Southern District of New York be deemed satisfied.

## NOTICE

60.    Notice of the Motion has been and will be given in accordance with the

notice procedures set forth herein. The Debtors respectfully submit that such notice is sufficient,

and request that this Court find that no further notice of the relief requested herein is required.

## NO PRIOR REQUEST

61.    No prior request for the relief requested herein has been made to this or

any other Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request this Court enter an order, substantially in the form annexed hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: New York, New York
      February 3, 2008

           SKADDEN, ARPS, SLATE, MEAGHER
            & FLOM LLP

           By:  /s/ Sally McDonald Henry
                Sally McDonald Henry (SMH 0839)
                J. Gregory Milmoe (JGM 0911)
                Shana A. Elberg (SE 4453)
           Four Times Square
           New York, New York 10036
           (212) 735-3000

           Proposed Counsel for Debtors and
            Debtors in Possession

1322947-New York Server 7A - MSW

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -    x
In re:                                          :    Chapter 11
                                                :
FORTUNOFF FINE JEWELRY AND                      :    Case No. 08-_____ (____)
SILVERWARE, LLC, et al.                         :
                                                :
                Debtors.                        :    (Motion for Joint Administration Pending)
- - - - - - - - - - - - - - - - - - - - - - - - - -    x

## ORDER (A) APPROVING BID PROCEDURES FOR THE DEBTORS' ASSETS, (B) AUTHORIZING DEBTORS TO OFFER CERTAIN BID PROTECTIONS AND (C) SCHEDULING FINAL SALE HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF

Upon the motion (the "Bid Procedures Motion") of the above-captioned debtors and

debtors-in-possession (the "Debtors") for entry of an *Order (A) Approving Bid Procedures for*

*The Debtors' Assets* (the "Assets")*, (B) Authorizing Debtors to Offer Certain Bid Protections*

*and (C) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof*

*Order* (the "Bid Procedures Order");[1] and it appearing that the Court has jurisdiction over the

Bid Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this is a

core proceeding pursuant to 28 U.S.C. § 157(a); the Court having considered the Bid Procedures

Motion; and it appearing that the relief requested in the Bid Procedures Motion, is in the best

interests of the Debtors' bankruptcy estates, their creditors and other parties-in-interest; and after

due deliberation and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.      Notice of the Bid Procedures Motion was adequate and sufficient under the

circumstances of these chapter 11 cases, and such notice complied with all applicable

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Bid Procedures
Motion or the form of Agreement (as defined below), as the case may be.

requirements of 11 U.S.C. §§ 102 and 363, Rules 2002, 6004, 6006, and 9008 of the Federal

Rules of Bankruptcy Procedure, and any other applicable provisions of title 11 of the United

States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure and the Local

Bankruptcy Rules.

B.    The bid procedures attached hereto as <u>Exhibit A</u> (the "Bid Procedures") are

reasonable and appropriate under the circumstances of these chapter 11 cases.

C.    The form of agreement attached hereto as <u>Exhibit 1</u> to the Bid Procedures (the

"Agreement") for the sale of the Assets shall serve as the basis for the negotiations contemplated

by the Bid Procedures, although a Qualified Bid may contain material modifications thereto.

D.    The Break-Up Fee and Expense Reimbursement (together, the "Bid Protections")

to be paid under the circumstances described herein and in the Agreement to H Acquisition, LLC

("Buyer") are (i) an actual and necessary cost and expense of preserving the Debtors' estates

within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) commensurate

to the real and substantial benefit conferred upon the Debtors' estates by Buyer, (iii) reasonable

and appropriate, in light of the size and nature of the proposed sale transaction and comparable

transactions, the commitments that have been made and the efforts that have been and will be

expended by Buyer, and (iv) necessary to induce Buyer to continue to pursue the sale transaction

and to continue to be bound by the Agreement.

E.    The Bid Protections also induced Buyer to submit a bid that will not only serve as

a minimum floor bid on which the Debtors, their creditors and other bidders may rely, but also

provide the Debtors with the opportunity to sell their businesses on a "going concern" basis for

the benefit of all parties.  Buyer has provided a material benefit to the Debtors and their creditors

by increasing the likelihood that the best possible price for the Assets will be received.

2

Accordingly, the Bidding Procedures and the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

F.      The Auction and Hearing notice substantially in the form attached hereto as Exhibit B provides adequate notice concerning the proposed sale of the Assets and the proposed assumption and assignment of the Assumed Contracts, as contemplated in the Agreement, that are the property of the Debtors, and is intended to provide due and adequate notice of the relief sought in the sale motion.

IT IS HEREBY ORDERED THAT:

1.      The relief requested in the Bid Procedures Motion is granted as set forth in this Bid Procedures Order.

2.      The Bid Procedures as set forth on the attached Exhibit A are approved in their entirety, and are incorporated herein by reference.

3.      The proposed sale of the Assets, the proposed assumption and assignment of the Assumed Contracts, the Auction (as defined below) and the Sale Hearing shall be conducted solely in accordance with the provisions of this Bid Procedures Order and the Bid Procedures.

4.      Immediately upon entry of this Bid Procedures Order, the provisions contained in Article V, Section 7.03 and Article VIII of the Agreement shall be binding on the Debtors.

5.      The Bid Protections as set forth in the Agreement are hereby approved. If Buyer becomes entitled to receive the Bid Protections in accordance with the terms of the Agreement, then Buyer shall be, and hereby is, granted an allowed administrative claim in the Debtors' chapter 11 case in an amount equal to the Bid Protections, under sections 503(b) and 507(a)(2) of the Bankruptcy Code and such Bid Protections shall be payable immediately upon termination of the Agreement and paid in accordance with the terms set forth therein.

6.    The Debtors are authorized and directed, without further action or order by the Court, to pay the Bid Protections in accordance with the terms and conditions of the Agreement and this Bid Procedures Order.

7.    Promptly after entry of this Bid Procedures Order, the Debtors shall serve, by facsimile, e-mail, or in the case of the U.S. Trustee, by hand, a copy of the Auction and Hearing Notice, or another notice substantially similar thereto, upon the following parties (the "Notice Parties"):

| | |
|---|---|
| Proposed Counsel for the Debtors | Counsel for BoA |
| Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, New York 10036<br>Attn: Sally McDonald Henry<br>    Shana A. Elberg<br>Fax: (212) 735-2000 | Riemer & Braunstein LLP<br>Three Center Plaza, 6th Floor<br>Boston, MA 02108<br>Attn: Kevin J. Simard<br>    Jason S. DelMonico<br>Fax: (617) 880-3456 |
| Counsel for H Acquisition, LLC, as Buyer | Counsel for Trimaran |
| Sidley Austin LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>Attn: Lee S. Attanasio<br>    Alex R. Rovira<br>Fax: (212) 839-5599 | Sonnenchein Nath & Rosenthal LLP<br>1221 Avenue of the Americas<br>New York, NY 10020-1089<br>Attn: Peter D. Wolfson<br>Fax: (212) 768-6800 |
| Counsel for the United States Trustee | The Official Committee of Unsecured Creditors |
| Office of the United States Trustee<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn: Alicia M. Leonhard | At the name and address provided after formation, with service to be made as soon as counsel is selected. |

8.      The Debtors shall publish a copy of the Auction and Hearing Notice, or an advertisement, substantially in the form thereof, in the national edition of The Wall Street Journal and the national edition of The New York Times as soon as possible after entry of the Bid Procedures Order.

9.      The Debtors shall commence service of the Auction and Hearing Notice on: (a) all known creditors of the Debtors; (b) all vendors, suppliers, customers, lenders, contract, license and lease counterparties and all other know creditors of each of the Debtors; and (c) all parties who have expressed an interest in purchasing some or all of the Assets as soon as possible after the entry of the Bid Procedures Order.

10.     In addition, the Debtors will have the Auction and Hearing Notice posted on the website of the Debtors' claim agent at http://loganandco.com together with a copy of the Bid Procedures Order and the Agreement.

11.     Compliance with the foregoing notice provisions shall constitute sufficient notice of the Debtors' proposed sale of the Assets, the contemplated assumption and assignment of the Assumed Contracts and proposed amount of any Cure Amount, and no additional notice of such contemplated transactions need be given.  Parties must object to any Cure Amount by February 25, 2008 at 12:00 p.m. (Eastern Standard Time).

12.     If the Debtors receive more than one Qualified Bid (as defined in the Bid Procedures), an auction (the "Auction") will be held on February 26, 2008 at 10:00 a.m. (Eastern Time), at the offices of Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times Square, New York, NY 10036 or at any such other location as the Debtors may hereafter designate.

13.     The proposed counsel to the Debtors is authorized to hold and conduct the Auction.

14.     The hearing regarding the acceptance of the Successful Bid(s) and Backup Bid(s) shall be held on [_____ __], 2008, at __:__ _.m. (Eastern Time) (the "Sale Hearing") in the Courtroom of the Honorable _____, and may be adjourned from time to time without further notice other than an announcement in open court at the Sale Hearing.

15.     Any objections to the relief requested at the Sale Hearing or to the proposed form of order (the "Sale Order") shall be in writing, shall state the basis of such objection with specificity, and shall be filed with the Court, and served in accordance with the Auction and Hearing Notice so as to be received by the Notice Parties on or before the seventh calendar day before the Sale Hearing, with a courtesy copy to Chambers.

16.     Notwithstanding the possible applicability of Interim Bankruptcy Rule 6004(h) and 7062 or otherwise, the terms and conditions of this Bid Procedures Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Bid Procedures Order.

17.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Bid Procedures Order.

Dated: New York, New York
        February __, 2008        _____
                                        United States Bankruptcy Judge

# EXHIBIT A

**Bid Procedures**

## BID PROCEDURES

These bid procedures (the "Bid Procedures") set forth the process by which Fortunoff Fine Jewelry and Silverware, LLC, M. Fortunoff of Westbury, LLC and Source Financing Corp. (collectively, the "Debtors") shall market their assets to interested parties and conduct a sale by auction (the "Auction").

On February 4, 2008, the Debtors filed the Motion of the Debtors for (I) Order (a) Approving Bid Procedures for the Debtors' Assets, (b) Authorizing Debtors to Offer Certain Bid Protections and (c) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof, and (II) Order Authorizing and Approving (a) the Sale of Assets Free and Clear of Liens and Other Interests and (b) Assumption and Assignment of Executory Contracts and Unexpired Leases to Successful Bidder(s) at Auction (the "Sale Motion") [Docket No. __], to be heard by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (i) on [_____ __], 2008 with respect to the Bid Procedures and the Bid Protections, and (ii) on [_____ __], 2008 (or at such other time as the Bankruptcy Court may determine) with regard to all other matters related to the Sale Motion (the "Sale Hearing"). On [_____ __], 2008, the Bankruptcy Court entered an *Order Approving the Bid Procedures for the Auction and Sale of the Debtors' Assets*, thereby approving these Bid Procedures.

The Debtors and H Acquisition, LLC (the "Buyer") entered into an asset purchase agreement (the "Purchase Agreement"), dated February 4, 2008 and attached as <u>Exhibit 1</u>, for the sale of substantially all of the Debtors' assets (the "Assets"). Capitalized terms used in these Bid Procedures and not otherwise defined shall have the meanings ascribed to such terms in the Purchase Agreement.

Any party desiring to obtain a copy of the Purchase Agreement may do so by contacting the Debtors' proposed counsel at:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attn:  Sally McDonald Henry
Tel:  (212) 735-3000
sally.henry@skadden.com

The Debtors provide these Bid Procedures for use by Potential Bidders (as defined below) in submitting bids proposing a transaction to purchase or otherwise acquire substantially all, or a portion, of the Assets, and, as necessary, qualifying for and participating in the Auction. The Debtors seek to enter into one or more transactions with one or more Qualified Bidders (as defined below) that will maximize the consideration received for the Assets.

1.    Important Dates

The Debtors shall, in consultation with (i) Bank of America, N.A. ("BoA"), the Debtors' senior secured lender, (ii) Trimaran Fund Management, L.L.C. ("Trimaran"), the agent for the Debtors' junior secured lenders and (iii) once appointed, the Official Committee of Unsecured Creditors (the "Official Committee," and collectively with BoA and Trimaran, the "Creditors"):

- Assist Qualified Bidders (as defined below) in conducting their respective due diligence investigations

- Accept Written Offers (as defined below) from Qualified Bidders (as defined below) until 12:00 p.m. (Eastern Time) on February 12, 2008;

- Negotiate with Qualified Bidders in preparation for an Auction, to begin at 10:00 a.m. (Eastern Time) on February 26, 2008; and

- Select the Successful Bidder(s) and Backup Bidder(s) (each as defined below) at the conclusion of the Auction and seek authority to sell assets to such Successful Bidder(s) at the Sale Hearing, to be held before the Bankruptcy Court on [_____], 2008 at _:__ _.m. (Eastern Time).

2.    Assets to be Sold

The Debtors seek to sell substantially all of their Assets. Although the Debtors are offering to sell the Debtors' business as a going concern, the Debtors reserve the right to sell separately any portion of the Assets, and the Debtors will entertain all such offers.

3.    Confidentiality Agreements and Access to Data Room

Any person or entity wishing to bid on some or all of the Assets (each a "Potential Bidder") must deliver (unless previously delivered) to the Debtors:

(a)    A confidentiality agreement in such form acceptable to the Debtors (such form is available upon request to FTI Consulting, Inc.);

(b)    Current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors and its advisors) of the Potential Bidder or of those entities who will guarantee the obligations of the Potential Bidder;

(c)    A preliminary (non-binding) proposal regarding: (i) the Assets sought to be acquired; (ii) the purchase price range; (iii) the structure and financing of the transaction; (iv) any anticipated regulatory or other approvals required to close the transaction as well as any other anticipated contingencies to closing, along with the anticipated time frame for obtaining or resolving the same and any anticipated impediments in obtaining or resolving the same; and (v) the nature and extent of additional due diligence it may wish to conduct.

2

A "Qualified Bidder" is a Potential Bidder that delivers the documents described in subsections (a) – (c) above, whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the proposed transaction for the desired Assets, and that the Debtors determine, in their reasonable discretion, is reasonably likely (based on availability of financing, experience and other considerations) to submit a bona fide offer for the Assets and be able to consummate such transaction if selected as the Successful Bidder (as defined below) within a time frame acceptable to the Debtors. As promptly as practicable after a Potential Bidder delivers all of the materials required by subsections (a) – (c) above, after consultation with the Creditors, the Debtors shall determine, and shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder.

Notwithstanding the foregoing or anything else in these Bid Procedures, (x) the Buyer is hereby determined to be a Qualified Bidder for all purposes at the Auction and (y) a party that seeks to submit a bid under section 363(k) of the Bankruptcy Code (a "Credit Bidder") shall be deemed a Qualified Bidder with respect to those Assets in which the Credit Bidder maintains a valid and enforceable security interest upon satisfying condition (a) above.

Potential Bidders seeking information about the qualification process, should contact FTI Consulting, Inc.

4.    Due Diligence

Only Qualified Bidders may conduct due diligence. The Debtors will afford any Qualified Bidder such due diligence access or additional information as may be reasonably requested by the Qualified Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. The Debtors may, if appropriate, coordinate due diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or on-site inspections. The Debtors shall not be obligated to furnish any due diligence information after the conclusion of the Auction; provided, however, Debtors will consult with the Creditors regarding any requests for additional due diligence. The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with due diligence. Notwithstanding anything contained herein to the contrary, the Debtors will decide what, if any, diligence information to make available to a particular Qualified Bidder in their business judgment, after consultation with the Creditors, and, subject to such consultation requirements, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever to any party.

Qualified Bidders requesting information in connection with their due diligence, should contact FTI Consulting, Inc.

5.    Bid Protections for the Buyer

Recognizing the Buyer's expenditure of time, energy and resources, the Debtors have agreed to provide certain bidding protections to the Buyer. As a result, the Debtors have agreed to provide the Buyer with the following bid protections: (i) a break up fee in an amount of $2,250,000 (the "Break Up Fee") and (ii) reimbursement of reasonable, documented out of pocket expenses in an amount not to exceed $1,000,000 (the "Reimbursement Amount," and together with the Break Up Fee, the "Bid Protections"). The Debtors are obligated to pay the Buyer the amount of the Bid Protections in accordance with the terms of the Purchase Agreement.

6.    Requirements for a Qualified Bid

In order to participate in the Auction, if any, a Qualified Bidder must deliver to the Debtors a written offer (each, a "Written Offer"), which in order to be deemed a "Qualified Bid," must meet each of the requirements listed below; provided, however, that the Debtors, after consultation with the Creditors may waive or modify any of these requirements:

(a)    State that the Qualified Bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisitions of the Assets, or a portion thereof, on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Purchase Agreement (as determined by the Debtors in their reasonable business judgment after consultation with the Creditors), including, without limitation, the purchase of the Assets and assumption of the Assumed Liabilities;

(b)    Be accompanied by a clean and duly executed Purchase Agreement or alternate purchase and sale agreement (a "Modified Agreement");

(c)    Be accompanied by a marked Modified Agreement reflecting any variations from the Purchase Agreement;

(d)    Be accompanied by a list of any executory contracts or unexpired leases that are to be assumed and/or assigned under such Written Offer and demonstrates the Qualified Bidder's adequate assurance of future performance under any such executory contracts or unexpired leases to be assumed and/or assigned pursuant to such Written Offer;

(e)    State that the Qualified Bidder is financially capable of consummating the transactions contemplated by the Purchase Agreement or Modified Agreement, and contain evidence that such Qualified Bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to consummate the transactions contemplated by

4

the Purchase Agreement or Modified Agreement including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code;

(f)    Fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, and if an entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such entity;

(g)    Be willing to consummate and fund the proposed transaction before March 3, 2008 (the "Closing Deadline");

(h)    State that the Written Offer is irrevocable until the closing of the transaction, if such Qualified Bidder is designated as a Successful Bidder or a Backup Bidder (each as defined below);

(i)    Not request or entitle the Qualified Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment, except, if approved by the Bankruptcy Court, the Bid Protections contemplated herein;

(j)    Result in a value to the Debtors, in the Debtors' business judgment and after consultation with the Creditors, that is satisfactory to the Debtors and is a higher and better offer;

(k)    Any agreement that provides for the purchase of the Debtors' books and records must contain provisions allowing the Debtors reasonable access to these books and records for the administration of their bankruptcy cases;

(l)    Not contain any due diligence or financing contingencies of any kind;

(m)    Include evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Purchase Agreement or Modified Agreement;

(n)    Include a good faith deposit (the "Good Faith Deposit") in the form of a certified check, wire transfer or such other form as is acceptable to the Debtors payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to ten percent (10%) of the bid value, in terms of cash and assumed debt; and

5

      (o)      In addition, all documentation submitted in support of the Written Offer must be submitted both in hard copy and electronically.

Written Offers submitted by Credit Bidders may constitute Qualified Bids notwithstanding the requirements of subsections (e) and (n) above. Written Offers submitted by landlords may constitute Qualified Bids notwithstanding the requirements of subsection subsections (e) and (n) above. The Purchase Agreement with the Buyer constitutes a Qualified Bid.

At their discretion, the Debtors, after consultation with the Creditors, may choose to disregard Written Offers for an insubstantial portion of the Assets. Any Good Faith Deposit accompanying a Written Offer that the Debtors, after consultation with the Creditors, determine not to be a Qualified Bid shall be returned promptly following such determination. Between the Bid Deadline and the Auction, the Debtors may, in their discretion and after consultation with the Creditors, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. Each Qualified Bidder shall provide to the Debtors and the Creditors any information reasonably required by such parties in connection with the evaluation of a Written Offer or Qualified Bid within one business day after such request is made. Without the consent of the Debtors, after consultation with the Creditors, a Qualified Bidder may not amend, modify or withdraw its Qualified Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Qualified Bid, during the period that such Qualified Bid is required to remain irrevocable and binding.

      7.      <u>Bid Deadline</u>

All Qualified Bids must be received prior to 12:00 p.m. (Eastern Time) on February 12, 2008 (the "Bid Deadline"), by each of the parties listed below. The Debtors may extend the Bid Deadline once or successively, in their reasonable discretion and after consultation with the Creditors, but are not obligated to do so. If the Debtors extend the Bid Deadline, they shall promptly notify all Qualified Bidders of such extension. As soon as practicable after the Bid Deadline, the Debtors shall distribute copies of each Qualified Bid to all Qualified Bidders submitting a Qualified Bid by the Bid Deadline.

      Debtors:      Source Financing Corp.
                    70 Charles Lindbergh Blvd.
                    Uniondale, NY 11553
                    Fax:
                    Attn: Pat Shanley
                    pshanley@fortunoff.com

Bid and (ii) notify each Qualified Bidder submitting a Written Offer whether that Written Offer is a Qualified Bid.

9.      "As Is, Where Is"

Except as otherwise provided in the applicable agreement, the sale of any or all of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates except to the extent set forth in the applicable agreement of the Successful Bidder(s) as approved by the Bankruptcy Court. Except as otherwise provided in the applicable agreement, all of the Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests") in accordance with sections 363 and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all desired due diligence regarding the Assets prior to making its Qualified Bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its Qualified Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, as to the Successful Bidder(s), the terms of the transaction(s) as set forth in the applicable agreement.

10.     Auction

In the event that, as the case may be, two or more Qualified Bids are received, the Debtors shall conduct an Auction of the Assets. The Auction shall begin on February 26, 2008 at 10:00 a.m. (Eastern Time) at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036 (or at any such other place, date and time as may be designated in writing by the Debtors) and continue thereafter until completed. The Debtors may, after consultation with the Creditors, adjourn the Auction at any time, continue the Auction from time to time and re-open the Auction at any time prior to the commencement of the Sale Hearing, as is appropriate in the Debtors' reasonable business judgment. Regardless of the number of Qualified Bids submitted, the Debtors may, in their business judgment and after consultation with the Creditors, withdraw the Assets (or any portion thereof) from sale. The Debtors may not cancel the Auction except in the circumstances described in section 11.

Only the Debtors, the Creditors, the U.S. Trustee, Qualified Bidders that submitted a Qualified Bid and their respective professionals shall be entitled to attend the Auction. Only a Qualified Bidder that submitted a Qualified Bid is eligible to participate in the Auction.

The Auction shall be governed by the following procedures:

8

(a)     Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

(b)     The Debtors, at their discretion, but after consultation with the Creditors may conduct the Auction, in the manner that they determine, in their reasonable business judgment, will result in the Successful Bid(s) that will maximize the overall value of the Debtors' estates, and may adopt rules for the Auction at the Auction that, in the Debtors' reasonable business judgment, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order. All such rules will provide that: (i) the Auction procedures must be fair and open, and not intended to cause any participating Qualified Bidder to be disadvantaged in any material way as compared to any other participating Qualified Bidder and (ii) all bids shall be made and received in one room, on an open basis, and the Creditors and all other participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder (i.e., the principals submitting each bid) shall be fully disclosed to all other participating Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction. Each bid at the Auction, if not inconsistent with the provisions of these Bid Procedures, shall be deemed to constitute a Qualified Bid. Notwithstanding the foregoing, any overbid by the Buyer will be credited with the sum of (i) the amount of the Bid Protections and (ii) the amount advanced under the DIP Facility that is supported by the Letter of Credit, for purposes of comparison with other bids (it being understood that, if the Buyer is the Successful Bidder at the Auction, it shall not be entitled to payment of the Bid Protections).

(c)     The Debtors will arrange for the actual bidding at the Auction to be transcribed.

(d)     Each Qualified Bidder participating in the Auction will be expected to confirm at the Auction that it has not engaged in any collusion regarding these Bid Procedures, the Auction or any proposed transaction relating to the Assets or a portion thereof.

(e)     At the Auction, the first bid for the Assets shall be considered only if it exceeds the amount of the highest or otherwise best Qualified Bid submitted by a Qualified Bidder prior to the Auction by a minimum of (i) the amount that would be owed if the Debtors would be required to pay the Break Up Fee and Expense Reimbursement to the Buyer *plus* (ii) consideration in an amount not less than $1,000,000. Subsequently, bidding will continue in

9

minimum increments to be announced on the record at the Auction (or such other increment announced by the Debtors, after consultation with the Creditors, at the Auction).

(f)     All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Purchase Agreement or Modified Agreement, as applicable, at the Auction, <u>provided, however,</u> that any such modifications to the Purchase Agreement or Modified Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors as determined by the Debtors in their business judgment, after consultation with the Creditors.

(g)     The Debtors, after consultation with the Creditors, reserve the right to consider successive Qualified Bids in any combination in determining whether any such Qualified Bid or Qualified Bids constitutes a higher or better offer than previous bids.

(h)     The Debtors, in their business judgment and after consultation with the Creditors, reserve the right to withdraw the Assets from the Auction at any time (subject to the Buyer's rights to the Bid Protections).

(i)     Upon conclusion of the bidding, the Auction shall be closed, and the Debtors, after consultation with the Creditors, shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the transaction process, including, without limitation, the maximization of the value of the Debtors' estates (including the value of any Assets not transferred pursuant to any Successful Bid(s), whether such Qualified Bid provides for financing the Debtors between the Sale Hearing and the close of such transaction(s), and factors affecting the speed and certainty of consummating the transaction(s), and (ii) as soon as practicable identify the highest or otherwise best Qualified Bids) for some or all of the Assets that would maximize the overall value of the Debtors' estates after payment of, among other things, the Break-Up Fee and Expense Reimbursement, if required, (each a "Successful Bid" and the entity or entities submitting such Successful Bid, each a "Successful Bidder") and advise the Qualified Bidders of such determination.

(j)     In addition, the Debtors, after consultation with the Creditors, will determine which Qualified Bid(s), if any, are the next highest or otherwise best Qualified Bid(s) and designate such Qualified Bid(s) as one or more "Backup Bids" in the event the Successful Bidder(s) fails to consummate the contemplated transaction(s). A Qualified Bidder that submitted a Qualified Bid that is designated a Backup

10

Bid is a "Backup Bidder". Each Backup Bid shall remain open and binding until the earlier of (i) two business days after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid have been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and (ii) fifteen days after the entry of an order of the Court approving a transaction for the transfer of Assets.

11.    Sole Qualified Bid

If the Purchase Agreement with the Buyer is the only Qualified Bid submitted by the Bid Deadline, the Debtors shall not hold an auction and instead shall request at the sale hearing that the Court approve the Purchase Agreement with the Buyer.

12.    Acceptance of Qualified Bids

The Debtors shall enter into one or more transactions with respect to the Assets applicable to the Successful Bidder(s) upon the approval of the Successful Bid(s) by the Court after the Sale Hearing. The Debtors' presentation of one or more Successful Bids and one or more Backup Bids to the Court for approval does not constitute the Debtors' acceptance of such Successful Bid(s) or such Backup Bid(s). The Debtors will be deemed to have accepted one or more Successful Bids and one or more Backup Bids only when such Successful Bid(s) and such Backup Bid(s) have been approved by an order of the Court at the Sale Hearing

13.    Sale Hearing

The Sale Hearing will be held before the Honorable [_____] on [_____ __], 2008 at _:__ _.m. (Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in One Bowling Green, [Room __], New York, NY 10004-1408. After consultation with the Creditors, the Debtors may adjourn or continue the Sale Hearing from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the Court's calendar on the date scheduled for the Sale Hearing or any adjourned date. At the Sale Hearing, the Debtors shall present the results of the Auction to the Bankruptcy Court and seek approval for the Successful Bid(s) and the Backup Bid(s).

Following the Sale Hearing approving the transaction with respect to the Assets to the Successful Bidder(s), if such Successful Bidder(s) fails to consummate an approved transaction for any reason, the appropriate Backup Bidder(s) shall be designated the Successful Bidder(s) and the Debtors shall be authorized to effect such transaction(s) without further order of the Court. The Successful Bidder and Backup Bidder (if any) should be represented by counsel at the Sale Hearing.

11

14.    Consummation of the Purchase

    (a)    Closing Deadline

The Successful Bidder shall consummate the sale transaction contemplated by the Successful Bid (the "Purchase") on or before the Closing Deadline. The Debtors may extend the Closing Deadline from time to time in their business judgment, after consultation with the Creditors. If a Successful Bidder successfully consummates an approved transaction by the Closing Deadline, such Successful Bidder's Good Faith Deposit shall be applied to the purchase price in such transaction.

If the Successful Bidder either fails to consummate the Purchase on or before the Closing Deadline, breaches the Purchase Agreement or Modified Agreement or otherwise fails to perform, the Debtors may, in their business judgment and after consultation with the Creditors, and without further order of the Bankruptcy Court, deem the Successful Bidder to be a "Defaulting Purchaser," at which time the Successful Bid shall be deemed rejected.

The Debtors shall be entitled to (i) retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Defaulting Purchaser, and (ii) seek all available damages from such Defaulting Purchaser occurring as a result of such Defaulting Purchaser's failure to perform.

    (b)    Back-Up Purchase

Upon a determination by the Debtors, after consultation with the Creditors, that the Successful Bidder is a Defaulting Purchaser, the Debtors will be authorized, but not required, to consummate a sale transaction with the Backup Bidder on the terms and conditions of the Backup Bid (the "Backup Purchase") without further order of the Bankruptcy Court.

If a Backup Bidder consummates a Backup Purchase, the Good Faith Deposit of such Backup Bidder will be applied to the purchase price in such transaction. On an as-needed basis, the Debtors, in the exercise of their business judgment and after consultation with the Creditors, shall determine an alternative Closing Deadline for the Backup Purchase. In the event that the Debtors seek to consummate a Backup Purchase with a Backup Bidder and such Backup Bidder fails to consummate the Backup Purchase on or before the alternative Closing Deadline, breaches the Purchase Agreement or Modified Agreement or otherwise fails to perform, the Debtors may, in their business judgment and after consultation with the Creditors, and without further order of the Bankruptcy Court, deem such Backup Bidder to be a Defaulting Purchaser and pursue the same remedies as under section 14(a) of these Bid Procedures.

15.    Return of Good Faith Deposits

Good Faith Deposits of all Qualified Bidders shall be held in an interest-bearing escrow account. Except for the Successful Bidder(s) and the Backup Bidder(s), the Debtors shall hold the Good Faith Deposits of all Qualified Bidders that submit Written

Offers until the earlier of (i) two business days after the closing of the sale by which all of the Assets that were the subject of such bid have been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and (ii) the Debtors announcing the cancellation of the Auction.

16.    <u>Fiduciary Duties</u>

Notwithstanding anything in these Bid Procedures, the Debtors shall comply with their fiduciary duties to maximize the overall value of the Debtors' estates in arriving at and effecting one or more transactions contemplated by these Bid Procedures.

## **EXHIBIT 1**

PURCHASE AGREEMENT

**EXECUTION COPY**

ASSET PURCHASE AGREEMENT

Dated as of February 4, 2008

Among

H ACQUISITION, LLC,

as Buyer

and

SOURCE FINANCING CORP.,

M. FORTUNOFF OF WESTBURY, LLC,

and

FORTUNOFF FINE JEWELRY AND SILVERWARE, LLC,

as Sellers

and the Additional Parties Identified on the Signature Pages Hereto

## TABLE OF CONTENTS

Page

ARTICLE I

PURCHASE AND SALE OF ACQUIRED ASSETS; PURCHASE PRICE

| | | |
|---|---|---|
| **SECTION 1.01.** | Purchase and Sale of Acquired Assets | 1 |
| **SECTION 1.02.** | Assets and Liabilities | 2 |
| **SECTION 1.03.** | Assignment of Contracts and Licenses | 4 |
| **SECTION 1.04.** | Bill of Sale, Assignment and Assumption Agreements | 5 |
| **SECTION 1.05.** | Purchase Price | 5 |
| **SECTION 1.06.** | Purchase Price Adjustment. | 6 |
| **SECTION 1.07.** | Allocation of Purchase Price. | 8 |
| **SECTION 1.08.** | Transfer Taxes. | 8 |

ARTICLE II

CLOSING

| | | |
|---|---|---|
| **SECTION 2.01.** | Closing; Transfer of Possession; Certain Deliveries | 9 |
| **SECTION 2.02.** | Certain Deliveries of the Sellers | 9 |
| **SECTION 2.03.** | Certain Deliveries of Buyer | 10 |

ARTICLE III

REPRESENTATIONS AND WARRANTIES
RELATING TO THE COMPANY AND THE SELLERS

| | | |
|---|---|---|
| **SECTION 3.01.** | Organization and Standing | 10 |
| **SECTION 3.02.** | Authority; Execution and Delivery; Enforceability | 11 |
| **SECTION 3.03.** | No Conflicts; Consents | 11 |
| **SECTION 3.04.** | Assets Other than Real Property Interests | 12 |
| **SECTION 3.05.** | Real Property | 12 |
| **SECTION 3.06.** | Intellectual Property | 15 |
| **SECTION 3.07.** | Contracts | 16 |
| **SECTION 3.08.** | Permits | 19 |
| **SECTION 3.09.** | Inventory | 19 |
| **SECTION 3.10.** | Assets | 20 |
| **SECTION 3.11.** | Receivables | 20 |
| **SECTION 3.12.** | Insurance | 21 |
| **SECTION 3.13.** | Taxes | 21 |
| **SECTION 3.14.** | Proceedings | 23 |
| **SECTION 3.15.** | Benefit Plans | 23 |
| **SECTION 3.16.** | Absence of Changes or Events | 27 |

i

**SECTION 3.17.**    Compliance with Applicable Laws.............................................27
**SECTION 3.18.**    Employee and Labor Matters ...................................................28
**SECTION 3.19.**    Suppliers ...................................................................................29
**SECTION 3.20.**    Customers ..................................................................................30
**SECTION 3.21.**    No Brokers .................................................................................30
**SECTION 3.22.**    Investment Company Status ......................................................30
**SECTION 3.23.**    Financial Statements..................................................................30

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

**SECTION 4.01.**    Organization, Standing and Power .............................................31
**SECTION 4.02.**    Authority; Execution and Delivery; Enforceability....................31
**SECTION 4.03.**    No Conflicts; Consents...............................................................31
**SECTION 4.04.**    Financing ...................................................................................32
**SECTION 4.05.**    No Brokers .................................................................................32
**SECTION 4.06.**    Litigation ...................................................................................32
**SECTION 4.07.**    Ability to Conduct the Business ................................................32

## ARTICLE V

## COVENANTS

**SECTION 5.01.**    Covenants Relating to Conduct of Business................................32
**SECTION 5.02.**    Schedule of Assets Used in the Business ...................................36
**SECTION 5.03.**    Access to Information.................................................................36
**SECTION 5.04.**    All Reasonable Efforts................................................................37
**SECTION 5.05.**    Supplemental Disclosure ...........................................................38
**SECTION 5.06.**    Further Assurances.....................................................................38
**SECTION 5.07.**    Confidentiality; Non Disparagement...........................................38
**SECTION 5.08.**    Assumption and Rejection of Contracts .....................................40
**SECTION 5.09.**    Service .......................................................................................40
**SECTION 5.10.**    Employees ..................................................................................40
**SECTION 5.11.**    Personally Identifiable Information ............................................42
**SECTION 5.12.**    Financing ...................................................................................42
**SECTION 5.13.**    Bid Procedures Motion and Sale Motion ...................................42
**SECTION 5.14.**    Covenant Not to Use Fortunoff Name.......................................43
**SECTION 5.15.**    Non Solicitation of Employees...................................................44
**SECTION 5.16.**    Publicity.....................................................................................44

## ARTICLE VI

## CONDITIONS PRECEDENT

**SECTION 6.01.**    Conditions to Each Party's Obligation .......................................45
**SECTION 6.02.**    Conditions to Obligations of Buyer............................................45

ii

**SECTION 6.03.**    Conditions to Obligation of the Company ................................................. 48

## ARTICLE VII

## TERMINATION, AMENDMENT AND WAIVER

**SECTION 7.01.**    Termination ......................................................................................... 49
**SECTION 7.02.**    Effect of Termination ......................................................................... 51
**SECTION 7.03.**    Break Up Fee and Expense Reimbursement ............................................. 51
**SECTION 7.04.**    Amendments and Waivers .................................................................... 51

## ARTICLE VIII

## GENERAL PROVISIONS

**SECTION 8.01.**    Expenses .............................................................................................. 52
**SECTION 8.02.**    Assignment .......................................................................................... 52
**SECTION 8.03.**    No Third Party Beneficiaries ................................................................. 52
**SECTION 8.04.**    Remedies .............................................................................................. 52
**SECTION 8.05.**    Notices ................................................................................................. 53
**SECTION 8.06.**    Interpretation; Exhibits and Schedules; Certain Definitions ..................... 54
**SECTION 8.07.**    Counterparts ........................................................................................ 60
**SECTION 8.08.**    Entire Agreement ................................................................................. 60
**SECTION 8.09.**    Severability ......................................................................................... 61
**SECTION 8.10.**    Exclusive Jurisdiction ......................................................................... 61
**SECTION 8.11.**    Governing Law ..................................................................................... 61
**SECTION 8.12.**    Waiver of Jury Trial ............................................................................ 61
**SECTION 8.13.**    Bankruptcy Court Approval .................................................................. 61

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of February 4, 2008 (this "Agreement"), is by and among H Acquisition, LLC, a Delaware limited liability company ("Buyer"), Fortunoff Fine Jewelry and Silverware, LLC, a Delaware limited liability company ("FFJS"), M. Fortunoff of Westbury, LLC, a Delaware limited liability company ("MFW"), Source Financing Corp., a Delaware corporation (the "Company", and together with FFJS and MFW, the "Sellers"), and, solely for purposes of Sections 5.14, 5.15 and 7.03(b), the other parties identified on the signature pages hereto (the "Additional Parties").

**WHEREAS**, each of the Company, FFJS and MFW are Debtors (as hereinafter defined) which commenced cases under chapter 11 of the Bankruptcy Code (as hereinafter defined) on February 4, 2008, by filing voluntary petitions with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (collectively, the "Case");

**WHEREAS**, each of the Sellers wishes to sell, or cause to be sold, to Buyer, and Buyer wishes to purchase from the Sellers, all of the Acquired Assets (as hereinafter defined) pursuant to, inter alia Sections 363 and 365 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure;

**WHEREAS,** an affiliate of Buyer intends to post a letter of credit on or about February 4, 2008 in the amount of $10 million to support the obligations of the Sellers under the DIP Facility (the "Letter of Credit") for the purpose of maintaining the Company's inventory; and

**WHEREAS**, the sale of the Acquired Assets is subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ACQUIRED ASSETS; PURCHASE PRICE

**SECTION 1.01.**    Purchase and Sale of Acquired Assets. Subject to the terms and conditions of this Agreement, at and as of the Closing, (a) the Sellers shall (and the Company shall cause each of the Sellers to) sell, assign, convey, transfer and deliver to Buyer or its designees the Acquired Assets to be purchased at the Closing, all free and clear of all mortgages, liens, security interests, charges, easements, leases, subleases, covenants, rights of way, options, claims, restrictions or encumbrances of any kind (collectively, "Liens"), other than Assumed Liens, and free and clear of all Excluded Liabilities; and (b) in exchange therefor, Buyer shall pay an amount (the "Closing Date Amount") equal to (i) the Purchase Price applicable to such Acquired Assets in accordance with Section 1.05, plus or minus (ii) an amount equal to Buyer's

good faith estimate of the amount of any adjustment to the Purchase Price pursuant to Section 1.06, and shall accept, assume and agree to pay, perform or otherwise discharge, in accordance with the respective terms and subject to the respective conditions thereof, the Assumed Liabilities assumed at the Closing.  After the Closing, Buyer shall be entitled to exercise all rights attached or accruing to the Acquired Assets purchased at the Closing.  "Assumed Liens" means the following, to the extent they would not be eliminated by the Sale Order (a) imperfections of title or encumbrances, if any, that, individually and in the aggregate, would not reasonably be expected to materially impair the continued use and operation of the assets to which they relate in the conduct of the business of the Company and its subsidiaries as presently conducted, (b) the Liens described in clauses (iii), (iv) and (v) of Section 3.05(a) and (c) Liens set forth on Schedule 1.01.  The transactions contemplated by this Agreement are referred to collectively as the "Transactions."

**SECTION 1.02.**     Assets and Liabilities.

(a)     Acquired Assets.  For purposes of this Agreement, "Acquired Assets" means (i) all of the assets, properties, leases, rights, agreements, goodwill and other interests of the Sellers of whatever kind and nature (other than Excluded Assets), whether real or personal, tangible or intangible, owned or leased, wherever located, as the same shall exist on the Closing Date.  For the avoidance of doubt, if any Acquired Asset is not sold, assigned, conveyed, transferred or delivered to Buyer or its designees on the Closing Date, such Acquired Asset shall be sold, assigned, conveyed, transferred or delivered as promptly as possible in accordance with the procedures for assumption and assignment of Contracts set forth in the Sale Order.  For the further avoidance of doubt, the Acquired Assets include, but are not limited to, all rights and interests of the Sellers in and to the following:

(i)     the inventory (including any "memo" inventory and inventory on consignment), supplies, finished goods and goods in transit, including inventory (x) in the possession of the Sellers or (y) to be delivered after the Closing by suppliers of the Sellers pursuant to letters of credit issued on behalf of the Sellers at or prior to the Closing, but in each case excluding inventory, supplies, finished goods and goods in transit of the Company that are damaged or otherwise designated as "return to vendor" (collectively, the "Inventory");

(ii)     all machinery, equipment, fixed assets, furniture, tools, spare and replacement parts, maintenance equipment, materials, computers, printers, servers and other items of personal property of every kind and description;

(iii)     the FORTUNOFF Marks, the Intellectual Property listed on Section 3.06 of the Seller Disclosure Schedules and all other rights in Intellectual Property, Technology and Software whether owned by or licensed to a Seller or one of its subsidiaries;

(iv)     all Leases and other Lease Documents in respect of all Leased Property other than (A) any Lease identified in writing by Buyer on or prior to the date that is three (3) days prior to the Auction (such date, the "Lease Designation Date") as a

2

Lease that Buyer does not intend to acquire hereunder (an "Excluded Lease") and (B) all Lease Documents in respect of any Excluded Lease.

(v)    all Contracts (other than Leases and Lease Documents) that are set forth on Schedule 1.02(a)(v) hereof, as such Schedule may be amended by the Buyer from time to time on or prior to the date that is three (3) days prior to the Auction (such date, the "Contract Designation Date"), it being understood that Buyer may add or remove any Contract from Schedule 1.02(a)(v) on or prior to the Contract Designation Date (the Contracts described in this paragraph (v) and in paragraph (iv) above are hereinafter "Assumed Contracts");

(vi)    all claims, causes of action, rights of recovery and rights of set-off of any kind relating to or arising out of the Acquired Assets or the Business, including any claims against insurance companies;

(vii)    all Improvements to any Leased Property by any Seller made by or for the benefit of the tenant; provided the Lease in respect of such Leased Property is not an Excluded Lease;

(viii)    all warranties, representations, indemnities, guarantees, claims and rights against third parties given to, assigned to or benefiting any Seller;

(ix)    all credits, prepaid expenses, deferred charges, advance payments, security deposits and prepaid items;

(x)    all rights in and to products sold or leased (including products returned after the Closing and rights of rescission, replevin and reclamation);

(xi)    all books of account, ledgers, general, financial, accounting and personnel records, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, manuals, customer and supplier correspondence (in all cases, in any form or medium);

(xii)    to the extent transferable, all Permits issued by any Governmental Entity;

(xiii)    all goodwill; and

(xiv)    cash in registers and store safes (other than registers and safes located at Leased Properties subject to Excluded Leases) as of the close of business on the Closing Date ("Closing Cash").

(b)    Excluded Assets.  The parties hereby acknowledge and agree that Buyer shall not purchase, acquire or accept from the Sellers, the following rights, properties, agreements or assets (such rights, properties, agreements and assets being referred to herein, collectively, as the "Excluded Assets"):

(i)    all Contracts other than Assumed Contracts;

3

(ii)    all Improvements of any Leased Property that is subject to an Excluded Lease;

(iii)    all receivables, including trade receivables, rebates, allowances and other receivables from suppliers; and

(iv)    cash and cash equivalents other than Closing Cash.

(c)    Assumed Liabilities.    For purposes of this Agreement, "Assumed Liabilities" means (i) all Liabilities of the Sellers that are required to be performed, and that accrue, on or after the Closing Date under the Assumed Contracts (but excluding any Liabilities of the Sellers in respect of a breach by any Seller of, or default by any Seller under, such Assumed Contracts prior to the Closing Date), to the extent such Assumed Contracts, and all rights of the Sellers thereunder, are effectively assigned to Buyer at the Closing; (ii) all Cure Amounts in respect of the Assumed Contracts; (iii) liabilities for gift cards, merchandise credits and deposits set forth on the Balance Sheet, or incurred in the ordinary course of business after the date of the Balance Sheet, in each case to the extent identified in Schedule 1.02(c), which schedule shall be updated by the Sellers at Closing ("Assumed Gift Cards, Merchandise Credits and Deposits Liabilities"), provided that such liabilities incurred prior to January 1, 2003 shall not constitute Assumed Gift Cards, Merchandise Credits or Deposit Liabilities; (iv) liabilities assumed by Buyer pursuant to Section 5.10(c) and 5.10(f) or for which Buyer is liable pursuant to Section 1.08.

(d)    Excluded Liabilities.    The parties hereby acknowledge and agree that Buyer shall not accept, assume, agree to pay, perform or otherwise discharge or satisfy or be liable for any and all Liabilities of the Sellers or any of their affiliates other than the Assumed Liabilities ("Excluded Liabilities").    Without limiting the generality of the foregoing, Excluded Liabilities includes:  (i) any trade payables; (ii) all Indebtedness of the Sellers; (iii) all liabilities related to any Company Pension Plan, including liabilities related to Fortunoff, the Source, Cash Balance Plan and any other Liabilities set forth in Section 5.10(g); (iv) any Liabilities for Taxes (including escheat Liabilities but excluding those Taxes for which Buyer is liable pursuant to Section 1.08) and any Liability for Transfer Taxes, including Transfer Taxes attributable to the June 2007 sale of the Lease for the Company's store located at 681 Fifth Avenue; and (v) all Liabilities arising from or in connection with any event or circumstance occurring or existing prior to Closing on, at or in connection with the Acquired Assets with regard to any Hazardous Materials, Environmental Laws or environmental condition.

**SECTION 1.03.**    Assignment of Contracts and Licenses.

(a)    Subject to the applicable provisions of the Sale Order (as defined in Section 5.13(a)) and the other terms and conditions of this Agreement, at the Closing the Sellers shall assume and assign to Buyer or its designees, and Buyer or its designees shall take assignment of, all of each such Seller's title, right and interest in and to each such Assumed Contract, free and clear of any and all Liens, other than Assumed Liens, and free and clear of all Excluded Liabilities.

4

(b)    Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract if, pursuant to Section 365 of the Bankruptcy Code, an assignment thereof requires the consent of a third party thereto and such consent is not obtained at or prior to the applicable Closing, in which case the provisions of Sections 5.04 (All Reasonable Efforts) and 5.06 (Further Assurances) shall apply; provided, that this sentence shall not limit or otherwise affect the terms of Section 2.02.  For the purposes of this Agreement (including all representations and warranties of the Sellers contained herein), Sellers shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Contract if, and to the extent that, pursuant to the Sale Order, the Sellers are authorized to assume and assign to Buyer the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code and any applicable Cure Amount has been satisfied as provided herein.  Pursuant to the Bid Procedures Order, each party to a proposed Assumed Contract other than the Sellers shall receive notice, at least 10 days prior to the Sale Hearing, of the Sellers' intent to assume and assign such Assumed Contract and the Cure Amounts related thereto.  Any objection to the proposed assumption, assignment or Cure Amount shall be heard and determined at the Sale Hearing.

(c)    Schedule 1.03(c) sets forth the Cure Amount in respect of (i) each Contract listed on Schedule 1.02(a)(v) and (ii) each Lease in respect of all Leased Property and shall be updated by the Sellers within 10 business days after the date hereof, and on the second Business Day prior to the Contract Designation Date, to set forth the Cure Amount in respect of any Contract which is, or which Buyer identifies as under consideration to be, identified as an Assumed Contract after the date hereof.  To the extent that any Assumed Contract is subject to a Cure Amount, Buyer shall directly pay or otherwise provide for payment of such Cure Amount; provided, however, if a cure obligation (pursuant to Section 365 of the Bankruptcy Code) is not set forth on Schedule 1.03(c), or if any Assumed Contract is subject to a Cure Amount in excess of the amount set forth next to such Assumed Contract on Schedule 1.03(c), the Sellers shall pay the amount of such cure or the excess of such cure over the amount set forth on Schedule 1.03(c), as applicable.  In the event that the Sellers fail to pay such amount(s), Buyer may, at any time at or prior to Closing, either (i) pay such amount(s) (on behalf of the Sellers) and offset such amount(s) against any amount(s) Buyer may owe the Sellers or (ii) inform the Sellers that such Contract will not be an Assumed Contract, notwithstanding that the Lease Designation Date or Contract Designation Date (as applicable) in respect of such Contract may have passed.  The Sellers and Buyer shall use all reasonable efforts to resolve all disputes with respect to Cure Amounts prior to the Sale Hearing.  The Sellers hereby agree and acknowledge that the foregoing provision is in addition to, and not in derogation of, any statutory or other remedy that Buyer may have against the Sellers.

**SECTION 1.04.**    Bill of Sale, Assignment and Assumption Agreements.  At or as of the Closing, each Seller shall, and the Company shall cause each Seller to deliver to Buyer or its designated affiliate a Bill of Sale, Assignment and Assumption Agreement in form and substance reasonably satisfactory to Buyer.

**SECTION 1.05.**    Purchase Price.  The purchase price for the Acquired Assets (the "Purchase Price") shall be an amount in cash equal to the sum of (i) $80,000,000 plus (ii) the amount advanced under the DIP Facility as of the Closing Date to the extent that the failure to repay such amount would entitle the DIP Lender to draw under the Letter of Credit pursuant to

5

the Credit Support Agreement (but not including any amount that has been drawn on the Letter of Credit on or prior to Closing) (the "L/C Amount"), subject to adjustment pursuant to Section 1.06.

**SECTION 1.06.**    Purchase Price Adjustment.

(a)    Within 60 days after the Closing Date, Buyer shall prepare and deliver to Sellers a statement (the "Statement"), setting forth Buyer's calculation of the Purchase Price Adjustment (as defined in Section 1.06(c)). At Buyer's option, a physical inventory shall be conducted by the Sellers consistent with past practice on or before the Closing Date for the purpose of determining Closing Inventory, and each of the Sellers and Buyer and their respective independent auditors shall have the right to observe the taking of such physical inventory. In addition, all Closing Cash shall be counted under the supervision of the Auditor, and each of Buyer and Seller may have their respective representatives present for such counting. Any costs or expenses incurred by the Sellers in connection with such taking of physical inventory or counting of Closing Cash shall be shared equally by the Sellers and Buyer.

(b)    During the 30-day period following Sellers' receipt of the Statement, the Sellers and their independent auditors shall be permitted to review the working papers relating to the Statement. The Statement shall become final and binding upon the parties on the 30th day following delivery thereof, unless the Sellers give written notice of their disagreement with the Statement (a "Notice of Disagreement") to Buyer prior to such date. Any Notice of Disagreement shall (i) specify in reasonable detail the nature of any disagreement so asserted, (ii) only include disagreements based on mathematical errors or based on the Purchase Price Adjustment not being calculated in accordance with this Section 1.06 and (iii) be accompanied by a certificate of the Sellers' independent auditors that they concur with each of the positions taken by the Sellers in the Notice of Disagreement. If a Notice of Disagreement is received by Buyer in a timely manner, then the Statement (as revised in accordance with this sentence) shall become final and binding upon the Sellers and Buyer on the earlier of (A) the date the Sellers and Buyer resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement or (B) the date any disputed matters are finally resolved in writing by the Auditor (as defined below). During the 30-day period following the delivery of a Notice of Disagreement, the Sellers and Buyer shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified in the Notice of Disagreement. During such period Buyer and its auditors shall have access to the working papers of the Sellers' auditors prepared in connection with their certification of the Notice of Disagreement. At the end of such 30-day period, the Sellers and Buyer shall submit to an auditing firm (the "Auditor") for arbitration any and all matters that remain in dispute and were properly included in the Notice of Disagreement. The Auditor shall be Grant Thornton LLP or, if such firm is unable or unwilling to act, such other nationally recognized collateral auditing firm as shall be agreed upon by the parties hereto in writing. The Sellers and Buyer shall use reasonable efforts to cause the Auditor to render a decision resolving the matters submitted to the Auditor within 30 days following submission. Judgment may be entered upon the determination of the Auditor in any court having jurisdiction. The cost of any arbitration (including the fees and expenses of the Auditor and reasonable attorney fees and expenses of the parties) pursuant to this Section 1.06 shall be borne by Buyer and the Sellers in inverse proportion as they may prevail on matters resolved by the Auditor, which proportionate allocations shall also be determined by the Auditor

6

at the time the determination of the Auditor is rendered on the merits of the matters submitted. The fees and disbursements of the Sellers' independent auditors incurred in connection with their review of the Statement and certification of any Notice of Disagreement shall be borne by the Sellers, and the fees and disbursements of Buyer's independent auditors incurred in connection with its review of the Statement and review of any Notice of Disagreement shall be borne by Buyer.

(c)    The Purchase Price shall be (i) increased by 70% of the amount by which Closing Inventory exceeds the sum of $84,000,000 and the L/C Amount as of the Closing Date (such sum, the "Inventory Target"), or decreased by 70% of the amount by which Closing Inventory is less than the Inventory Target; (ii) increased by the amount by which Closing Cash exceeds $1,000,000 (the "Cash Target"), or decreased by the amount by which Closing Cash is less than the Cash Target; and (iii) decreased by the amount of any payments that Sellers fail to make in accordance with Section 5.01(f) and that constitute Assumed Liabilities (such adjustment, the "Purchase Price Adjustment", and the Purchase Price as so increased or decreased, the "Adjusted Purchase Price"). If the Closing Date Amount is less than the Adjusted Purchase Price, Buyer shall, within 10 business days after the Statement becomes final and binding on the parties, pay to Sellers by wire transfer in immediately available funds the amount of such difference, together with interest thereon at a rate equal to the rate of interest from time to time announced publicly by Citibank, N.A. as its prime rate (the "Applicable Rate"), calculated on the basis of the actual number of days elapsed divided by 365, from the Closing Date to the date of payment, and the Escrow Agent shall pay the amount in the Escrow Fund to the Sellers. If the Closing Date Amount is more than the Adjusted Purchase Price, the Escrow Agent shall, within 10 business days after the Statement becomes final and binding on the parties, pay to Buyer from the Escrow Fund by wire transfer in immediately available funds the amount of such difference, together with interest thereon at the Applicable Rate, calculated on the basis of the actual number of days elapsed divided by 365, from the Closing Date to the date of payment, and the Escrow Agent shall pay any remaining amount in the Escrow Fund to the Sellers. If the payment to Buyer required by the preceding sentence exceeds the amount of the Escrow Fund, Sellers shall, within 10 business days after the Statement becomes final and binding on the parties, pay to Buyer by wire transfer in immediately available funds the amount of such difference, together with interest thereon at the Applicable Rate, calculated on the basis of the actual number of days elapsed divided by 365, from the Closing Date to the date of payment.

(d)    The term "Closing Inventory" means "Merchandise inventories, net" constituting Acquired Assets calculated in accordance with United States generally accepted accounting principles ("GAAP"). Although Closing Inventory is generally to be calculated in accordance with GAAP, if the application of GAAP at the Closing Date would result in an increase in any inventory or in a decrease in any reserve with respect thereto, over or under, as the case may be, the amount that would have resulted from the application of the Sellers' historical accounting practices (as reflected in the "Merchandise inventories, net" line of the Balance Sheet (as defined in Section 3.11)), such historical accounting practices (rather than GAAP) shall be followed in calculating such inventory. In all other instances, GAAP shall be used to calculate Closing Inventory, whether or not in accordance with the historical accounting practices of the Sellers. To the extent GAAP permits alternate treatments of any item comprising Closing Inventory, the particular treatment used in the preparation of the Balance Sheet shall also

7

be used in the preparation of the Statement.   In no event shall any "memo" inventory or inventory on consignment be included in Closing Inventory, even if ownership of such inventory is conveyed to Buyer at Closing free and clear of any Liens.

(e)    Following the Closing, Buyer shall not take any actions with respect to the accounting books and records of the Business on which the Statement is to be based that would obstruct or prevent the preparation of the Statement and the determination of Closing Inventory as provided in this Section 1.06.   During the period of time from and after the date of delivery of the Statement to the Sellers through the resolution of any adjustment to the Purchase Price contemplated by this Section 1.06, Buyer shall afford to the Sellers and any accountants, counsel or financial advisers retained by the Sellers in connection with any adjustment to the Purchase Price contemplated by this Section 1.06 reasonable access during normal business hours to the books and records of the Business (if within the control of Buyer) to the extent relevant to the adjustment contemplated by this Section 1.06).

**SECTION 1.07.**    <u>Allocation of Purchase Price</u>.   Within 15 days after the Statement becomes final and binding on the parties, Buyer shall deliver to the Sellers a schedule (the "<u>Allocation Schedule</u>") allocating the Adjusted Purchase Price (and any other items treated as consideration for United States federal income Tax purposes paid to the Sellers including the Assumed Liabilities) among the Acquired Assets and the covenant provided in Section 5.14. The Allocation Schedule shall be reasonable and shall be prepared in accordance with Section 1060 of the Code and the regulations thereunder and any applicable provision of state, local or foreign law.   Such allocation shall be deemed final unless the Sellers have notified Buyer in writing of any disagreement with the Allocation Schedule within 20 Business Days after submission thereof by Buyer.   In the event of such disagreement, the parties hereto shall use reasonable efforts to reach agreement on a reasonable allocation of consideration among the Acquired Assets.   In the event that the parties hereto do not agree to a Purchase Price allocation in accordance with this Section 1.07, the parties hereto shall submit their dispute, in writing, to the Auditor, the cost of which shall be shared equally by Buyer and the Sellers.   The Auditor shall make a determination as to each disputed item which shall be binding upon the parties. Each of the parties hereto agrees to file Internal Revenue Service Form 8594, and all United States federal, state, local and non U.S. Tax Returns, in accordance with the Allocation Schedule as finally determined by the parties or the Auditor, as the case may be.   Each of the parties hereto agrees to provide the other promptly upon written request with any other information required to complete Internal Revenue Service Form 8594.   The Sellers (and each of their affiliates) and Buyer (and its affiliates) agree to file all Tax Returns in a manner consistent with the allocation described in this Section 1.07.

**SECTION 1.08.**    <u>Transfer Taxes</u>.   Notwithstanding any other provision herein, all Transfer Taxes attributable to the Sellers' sale of the Acquired Assets and the assumption of the Assumed Contracts, as well as the cost of the filing of all necessary Tax Returns and other documentation with respect to all such Taxes, shall be borne and paid equally by the Sellers, on the one hand, and Buyer, on the other, when due, and the Sellers and Buyer shall file all necessary Tax Returns and other documentation required to be filed by them with respect to all such Taxes, and, if required by applicable law, Buyer and the Sellers will, and will cause their affiliates to, file or join in the execution of any such Tax Returns and other documentation; provided that the parties shall reasonably cooperate in availing themselves of any available

8

exemptions from any collection of (or otherwise reduce) any such Transfer Taxes, including a request (as part of the Sale Order) that the Sellers' sale of the Acquired Assets and the assumption of the Assumed Contracts be exempted from Transfer Taxes pursuant to Section 1146 of the Bankruptcy Code.

## ARTICLE II

## CLOSING

**SECTION 2.01.**    <u>Closing; Transfer of Possession; Certain Deliveries</u>.  Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to Article VII hereof, the closing of the transactions contemplated herein (the "Closing") shall take place at the New York offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, at 10:00 a.m. on the second Business Day following the satisfaction (or, to the extent permitted, the waiver) of each of the conditions set forth in Article VI (other than those conditions which, by their nature, can be fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions) or at such other place or at such other time as shall be agreed upon by Buyer and the Company.  The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

**SECTION 2.02.**    <u>Certain Deliveries of the Sellers</u>.  At the Closing, the Sellers shall deliver the following to Buyer:

(a)    All duly executed deeds, bills of sale, assignment and assumption agreements with respect to the Acquired Assets and Assumed Contracts being purchased at the Closing and such other instruments of conveyance and assignment as Buyer shall deem necessary or appropriate to vest in Buyer (or its designee, as the case may be) all right, title and interest in, to and under the Acquired Assets and the Assumed Contracts (such documents to be in recordable form where appropriate);

(b)    A certified copy of the Sale Order;

(c)    The officer's certificates required to be delivered pursuant to Section 6.02(c) hereof;

(d)    A certified copy of all required directors' resolutions;

(e)    An affidavit or affidavits dated as of the Closing Date and in the form and substance required under Section 1.1445-2(b) of the Treasury Regulations issued pursuant to Section 1445(b) of the Internal Revenue Code of 1986, as amended (the "Code"), so that Buyer is exempt from withholding any portion of the Purchase Price;

(f)    Such other documents of assumption and adequate assurance as may be required by the Sale Order that the Buyer shall have identified not later than five (5) business days prior to the Closing Date; and

(g)    Such other documents as Buyer may deem reasonably necessary or appropriate.

9

**SECTION 2.03.**    <u>Certain Deliveries of Buyer</u>.  At the Closing, Buyer shall deliver:

(a)    To the Sellers, 90% of the Closing Date Amount;

(b)    To an escrow agent selected by Buyer reasonably acceptable to the Sellers (the "<u>Escrow Agent</u>"), pursuant to an escrow agreement prepared by Buyer and reasonably acceptable to the Sellers, the balance of the Closing Date Amount (the "<u>Escrow Fund</u>");

(c)    The officer's certificate required to be delivered pursuant to Section 6.03(c) hereof; and

(d)    Such other documents of assumption and adequate assurance as may be required by the Sale Order.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## RELATING TO THE COMPANY AND THE SELLERS

Simultaneously with the execution and delivery of this Agreement, the Sellers have delivered to Buyer certain Disclosure Schedules with numbered sections corresponding to the relevant sections in this Article III (the "<u>Seller Disclosure Schedules</u>"), and any exception or qualification set forth in the Seller Disclosure Schedules with respect to a particular representation or warranty contained in this Article III shall be deemed to be an exception or qualification with respect to such section of this Article III and all other representations or warranties contained in this Article III only to the extent any description of fact regarding the event, item or matter is disclosed in such a way as to make it reasonably apparent from the face of such disclosure without further inquiry that such exception or qualification is applicable to such other Section of this Article III; <u>provided</u>, <u>however</u>, that a disclosure made with respect to Section 3.13 (Taxes) shall be deemed a qualification or exception with respect to all other representations and warranties related to Taxes.

The Sellers hereby represent and warrant to Buyer, jointly and severally, as of the date of this Agreement and as of the Closing Date as follows:

**SECTION 3.01.**    <u>Organization and Standing</u>.  Each of the Company and its subsidiaries is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or registration, as the case may be, which jurisdiction is set forth in Section 3.01 of the Seller Disclosure Schedules.  Each of the Company and its subsidiaries has full corporate power and authority to carry on its business as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, has not and would not reasonably be expected to have a Company Material Adverse Effect.  Each of the Company and its subsidiaries is duly qualified and in good standing to do business as a foreign corporation in each jurisdiction in which the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary, except such jurisdictions where the failure to be so qualified or in good standing, individually or in the aggregate, has not had and would not reasonably be expected to have a Company Material Adverse Effect.

10

**SECTION 3.02.**    Authority; Execution and Delivery; Enforceability.

(a)    The Sellers have full power and authority to execute this Agreement and, subject to the entry of the Sale Order, to consummate the transactions contemplated by this Agreement. The execution and delivery by the Sellers of this Agreement and the consummation by the Sellers of the Transactions have been duly authorized by all necessary corporate action. The Sellers have duly executed and delivered this Agreement and, assuming this Agreement constitutes a valid and binding obligation of the other parties hereto, this Agreement will, subject to the entry of the Sale Order, constitute a valid and binding obligation of each of the Sellers enforceable against it in accordance with its terms.

(b)    The board of directors of the Company, at a meeting duly called and held, and the respective managers of each of MFW and FFJS duly adopted resolutions approving this Agreement and the Transactions. Any consent, authorization or approval required under the Existing Stockholders Agreement or other shareholder approval required for the commencement of the Case, the execution and delivery of this Agreement and the consummation of the Transactions has been obtained.

**SECTION 3.03.**    No Conflicts; Consents. The execution and delivery by the Company of this Agreement does not, and the consummation of the Transactions and compliance by the Sellers with the terms hereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any of the properties or assets of the Company or any of its subsidiaries under, any provision of (i) the certificate of incorporation or by-laws of the Company or the comparable governing instruments of any of its subsidiaries, (ii) the Existing Stockholders Agreement, (iii) subject to obtaining the third party consents set forth on Section 3.03 of the Seller Disclosure Schedules to the extent required, any Contract to which the Company or any of its subsidiaries is a party or by which any of their respective properties or assets is bound or (iv) any judgment, order or decree ("Judgment") or statute, law, ordinance, rule or regulation ("Applicable Law") applicable to the Company or any of its subsidiaries or their respective properties or assets, other than, in the case of clauses (iii) and (iv) above, any such items that, individually or in the aggregate, have not had and would not reasonably be expected to have a Company Material Adverse Effect. Except for compliance with applicable requirements of the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), if required, no consent of, or registration, declaration or filing with, any Federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign (a "Governmental Entity") is required to be obtained or made by or with respect to the Company or any of its subsidiaries in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions, other than (i) the Sale Order, (ii) such filings as may be required by the Bankruptcy Court in connection with the Case, and (iii) such other items as are required solely by reason of the participation of Buyer (as opposed to any third party) in the Transactions.

**SECTION 3.04.**    <u>Assets Other than Real Property Interests</u>.

(a)    The Company or one of its subsidiaries has good and valid title to the Acquired Assets in each case free and clear of Liens, except (i) such Liens as are set forth in Section 3.04 of the Seller Disclosure Schedules, (ii) mechanics', carriers', workmen's, landlord's, repairmen's or other like Liens arising or incurred in the ordinary course of business, Liens arising under conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business but not exceeding in the aggregate $100,000 and liens for Taxes that are not due and payable or that may thereafter be paid without penalty or payment of additional interest and (iii) other imperfections of title or encumbrances, if any, that, individually and in the aggregate, do not materially impair, and would not reasonably be expected to materially impair, the continued use and operation of the assets to which they relate in the conduct of the business of the Company and its subsidiaries as presently conducted (the Liens described in clauses (i), (ii) and (iii) above, together with the Liens referred to in clauses (ii) through (v) of Section 3.05(a) are referred to collectively as "<u>Permitted Liens</u>").

(b)    This Section 3.04 does not relate to real property or interests in real property, such items being the subject of Section 3.05, or to Intellectual Property, such items being the subject of Section 3.06.

**SECTION 3.05.**    <u>Real Property</u>.

(a)    Section 3.05 of the Seller Disclosure Schedules sets forth a complete list of all material real property and interests in material real property leased by the Company or any of its subsidiaries (individually, a "<u>Leased Property</u>"). The Company or one of its subsidiaries has good and valid title to the leasehold estates in all Leased Property (Leased Property being sometimes referred to herein, individually, as a "<u>Company Property</u>"), in each case free and clear of all Liens, except (i) Permitted Liens, (ii) leases, subleases and similar agreements set forth in Section 3.05 of the Seller Disclosure Schedules, (iii) easements, covenants, rights of way and other similar restrictions of record, (iv) any conditions that may be shown by a current, accurate survey or physical inspection of any Company Property made prior to the Closing and (v) (A) zoning, building and other similar restrictions and (B) Liens that have been placed by any developer, landlord or other third party on the fee interest in real property over which the Company or any of its subsidiaries has easement rights or on any Leased Property and subordination or similar agreements relating thereto. None of the items set forth in clauses (i) through (v) above, individually or in the aggregate, materially impairs or would reasonably be expected to materially impair, the continued use and operation of the Company Property to which they relate in the conduct of the business of the Company and its subsidiaries as presently conducted.

(b)    Current copies of the documents (including the Leases, all amendments and modifications thereto and, where applicable, the REAs) under which the Leased Properties are leased or operated (the "<u>Lease Documents</u>"), correct and complete in all material respects, have been delivered or made available to Buyer and there are no other material contracts between or among the Company and any of its subsidiaries with respect to the Leased Properties or otherwise relating to the use and occupancy of the Leased Properties thereby except for those documents listed on Section 3.05 of the Seller Disclosure Schedules. Except as set forth in

12

Section 3.05 of the Seller Disclosure Schedules, with respect to each Lease Document (i) the Company and any of its subsidiaries and, to the knowledge of the Company, each other party named therein has performed all of its obligations in all material respects thereunder and is not in default (in the case of the Closing Date, other than late payments that are not past any applicable notice or cure periods) thereunder, (ii) to the knowledge of the Company, no defaults (in the case of the Closing Date, other than late payments that are not past any applicable notice or cure periods) (whether or not subsequently cured) exist thereunder, by or against either party with respect to the performance of its obligations in any material respect, and, to the knowledge of the Company, no event has occurred or failed to occur or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease Document, (iii) such Lease Document is a valid and binding obligation of the Company or one of its subsidiaries, as applicable, to the extent that any of them is a party thereto, and, to the knowledge of the Company, is a valid and binding obligation of each other party thereto, and is in full force and effect and is enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to or affecting creditors' rights generally, including the effect of statutory and other laws regarding fraudulent conveyances and preferential transfers and subject to the limitations imposed by general equitable principles (regardless whether such enforceability is considered in a proceeding at law or in equity), (iv) except as set forth on Section 3.05 of the Seller Disclosure Schedules, the Transactions do not require the consent of any other party to such Lease Document and will not result in a breach of or default under such Lease Document, or otherwise cause such Lease Document to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing, (v) neither the Company nor any of its subsidiaries owes any brokerage commissions or finder's fees with respect to such Lease Document, (vi) no material interest of the Company or any of its subsidiaries (as applicable) thereunder has been subleased, licensed, or assigned, and no person has otherwise been granted the right to use or occupy the Leased Properties or any portion thereof, (vii) the interest of the Company or any of its subsidiaries (as applicable) thereunder has not been collaterally assigned thereby nor has any other security interest in such Lease Document or any interest therein been granted thereby, (viii) there are no disputes with respect thereto and (ix) other than Permitted Liens, there are no Liens, contracts, defects, claims or exceptions on or affecting the estate or interest created thereby or pursuant thereto.

(c)    All material buildings, structures, fixtures, building systems and equipment included in the Leased Property (the "Improvements") are in operating condition and repair in all material respects, subject to reasonable wear and tear, and there are no facts or conditions affecting any of the Improvements that would, in any material respect, adversely interfere with the use or occupancy of the Improvements or any portion thereof in the operation of the business presently conducted thereon. To the knowledge of Company, the property leased pursuant to each applicable Lease Document complies with all applicable subdivision, land parcelization and local governmental taxation or separate assessment requirements, without reliance on property not constituting Leased Property. The Leased Properties are connected to and serviced by water, sewage disposal, gas and electricity facilities which are adequate for the current use of any Leased Property and all material systems (including heating, air conditioning, electrical, plumbing and fire/life safety systems), all of which run through public rights of way or private easements for the current use of any Leased Property, are operable and in good condition

13

(ordinary wear and tear excepted), except to the extent that the lack of any such system or the failure of the property to be in good condition would not be reasonably likely to be materially adverse to the use of the individual Leased Property in the Business. There is no agreement, easement or other right which is necessary to permit the lawful use and operation of all driveways, roads and other means of lawful egress and ingress to and from each Leased Property, that has not been obtained and is not in full force and effect; to the knowledge of the Company, there is no pending threat of modification or cancellation thereof and each Leased Property has sufficient parking that complies in all material respects with all REAs and all zoning requirements.

(d)    The Company and its subsidiaries have obtained all material certificates of occupancy, permits and licenses, including proofs of dedication, to use and operate the Leased Property in the manner in which the Leased Property is currently being used and operated, except for such certificates, permits and licenses that are ministerial in nature and normally issued in due course upon the application therefor without further action of the applicant or are otherwise not material to the operations of the Business or the use of Leased Properties. The Company and its subsidiaries have all approvals, permits and licenses necessary to lease and operate the Leased Properties as currently leased and operated, except for such approvals, permits and licenses that are ministerial in nature and normally issued in due course upon the application therefor without further action of the applicant or are otherwise not material to the operations of the Business.

(e)    To the knowledge of the Company, there are no zoning, building or similar laws, codes, ordinances, orders or regulations or conditions or agreements contained in any easement, restrictive covenant or any similar instrument or agreement affecting any Leased Property that are or will be violated by the continued maintenance, operation or use of any Improvements on the Leased Properties or by the continued maintenance, operation or use of the parking areas, in each case where such violation has had or would reasonably be likely to have a Company Material Adverse Effect, and neither the Company nor any of its subsidiaries has received written notice, asserting or implying to the contrary.

(f)    The Company and any of its subsidiaries have provided or made available to Buyer true and complete copies of all building condition reports regarding the Leased Properties that are, to their knowledge, in the possession of the Company or any of its subsidiaries as of the date hereof, and the Company will promptly provide Buyer with a true and complete copy of all such reports (if any) secured by the Company or any of its subsidiaries prior to Closing Date. Prior to the date hereof, the Company and any of its subsidiaries have delivered or made available to Buyer complete, accurate and current copies of all title reports, deeds, mortgages, deeds of trust, surveys, licenses, title insurance policies, certificates of occupancy, or equivalent documentation with respect to the Leased Properties and other material documents relating to or materially affecting leasehold estates in the Leased Properties, in each case, to the extent the same are in the possession of the Company or any of its subsidiaries as of the date hereof (and, to the extent the same are not in the possession of the Company or one of its subsidiaries as of the date hereof and are reasonably requested by Buyer prior to the Closing Date, the Company will (i) request copies of any such existing materials from such third parties as may have the same in their possession and (ii) upon receipt thereof, deliver such materials to Buyer; provided that the Company shall not be required to incur any material cost or expense in connection with any such request).

14

(g)    None of the Sellers or their subsidiaries have received notice of and to the knowledge of each of the Sellers, there is no condemnation, expropriation or other proceeding in eminent domain pending or threatened, affecting any of the Leased Property or any portion thereof or interest thereon.

(h)    The Company owns no real property.

**SECTION 3.06.**    Intellectual Property.

(a)    Section 3.06 of the Seller Disclosure Schedules sets forth a true and complete list of all Intellectual Property applied for, or issued or registered to the Company or any of its subsidiaries. With respect to all Intellectual Property identified on Section 3.06 of the Seller Disclosure Schedules, Section 3.06 of the Seller Disclosure Schedules sets forth a list of all jurisdictions in which such Intellectual Property is registered or registrations applied for and all registration and application numbers. Except as set forth in Section 3.06 of the Seller Disclosure Schedules, (i) the Company or one of its subsidiaries is the sole and exclusive owner of, or the Company and its subsidiaries have a valid license or otherwise have the right to use, without payment to any other person (in the case of Intellectual Property other than Technology and Software), all of the Intellectual Property, Technology and Software material to the Business, and (ii) except for such violations, conflicts or infringements that, individually or in the aggregate, have not had and would not reasonably be expected to have a Company Material Adverse Effect, the consummation of the Transactions does not and will not conflict with, alter or impair any such rights or result in the payment of any additional amounts with respect thereto or require the consent of any other person in respect thereof to permit the Company or one of its subsidiaries to own, use or hold for use any such rights. Except as set forth in Section 3.06 of the Seller Disclosure Schedules, during the past two years neither the Company nor any of its subsidiaries have received any written communication from any person asserting any ownership interest in any Intellectual Property, Technology or Software owned by the Company or any of its subsidiaries.

(b)    The Company or a subsidiary of the Company owns, and at the Closing the Buyer or one of its designees will own, all rights in and to the trademarks FORTUNOFF and THE SOURCE and, to the extent not licensed, all other trademarks used by the Company or one of its subsidiaries in association with the FORTUNOFF mark in the Business (the "FORTUNOFF Marks"); to the knowledge of Sellers no third parties have any rights to use the FORTUNOFF marks; and there is no jurisdiction in which the term "FORTUNOFF" is not available for use and registration as a Trademark by the Company or one of its subsidiaries in connection with the Business (and products or services similar thereto).

(c)    The conduct of the Business as presently conducted does not violate, conflict with or infringe the rights of any other person in Intellectual Property, Technology or Software, except for such violations, conflicts or infringements that, individually or in the aggregate, have not had and would not reasonably be expected to have a Company Material Adverse Effect. Except as set forth in Section 3.06 of the Seller Disclosure Schedules, (i) no claims are pending against the Company or any of its subsidiaries by any person with respect to the ownership, validity, enforceability, effectiveness or use in the Business of any Intellectual Property, Technology or Software and (ii) during the past two years neither the Company nor

15

any of its subsidiaries have received any written communication alleging that the Company or any of its subsidiaries violated any rights relating to Intellectual Property, Technology or Software of any person.

(d)    All Technology and Software that is material to the Business has been maintained in confidence in accordance with protection procedures customarily used in the industry to protect rights of like importance.    No former and current employees, agents, consultants and independent contractors who have contributed to or participated in the conception and development of material Intellectual Property, Technology, or Software owned by the Company (collectively, "Personnel"), have any claim against the Company or any of its subsidiaries in connection with such person's involvement in the conception and development of any such Intellectual Property, Technology or Software that arises out of the relationship between such Personnel and the Company and is material to the Business and, to the knowledge of the Company, no such claim has been asserted or is threatened.    None of the current officers and employees of the Company and its subsidiaries has any patents issued or applications pending for any device, process, design or invention of any kind now used or needed by the Company or any of its subsidiaries in the furtherance of the Business, which patents or applications have not been assigned to the Company or any of its subsidiaries with such assignment duly recorded in the United States Patent and Trademark Office.

**SECTION 3.07.**    Contracts.

(a)    Except as set forth in Section 3.07 of the Seller Disclosure Schedules, neither the Company nor any of its subsidiaries is a party to or bound by any:

(i)    written employment Contract involving payment by the Company or any of its subsidiaries of more than $100,000 per annum;

(ii)    collective bargaining agreement or other contract with any labor organization, union or association;

(iii)    covenant not to compete (other than pursuant to any radius restriction contained in any lease, reciprocal easement or development, construction, operating or similar agreement) or other covenant restricting in any material respect the development, manufacture, marketing or distribution of the products and services of the Company or any of its subsidiaries;

(iv)    Contracts (other than this Agreement and any agreement relating to real property or interests in real property) with any current or former officer, director or employee of the Company, or any of its subsidiaries (other than employment agreements covered by clause (i) above) involving the receipt or payment by the Company or its subsidiaries of more than $100,000 individually or $300,000 in the aggregate;

(v)    lease, sublease or similar Contract with any person (other than the Company or any of its subsidiaries) under which (A) the Company or any of its subsidiaries is lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by any person or (B) the Company or any of its subsidiaries is a lessor or sublessor of, or makes available for use by any person, any

16

tangible personal property owned or leased by the Company or any of its subsidiaries, in any such case which has an aggregate future liability or receivable, as the case may be, in excess of $100,000 and is not terminable by the Company or any of its subsidiaries by notice of not more than 60 days for a cost of less than $10,000;

     (vi)    (A) continuing Contract for the future purchase of materials, supplies or equipment (other than purchase contracts and orders for inventory in the ordinary course of business consistent with past practice), (B) management, service, consulting or other similar Contract or (C) advertising agreement or arrangement, in any such case which has an aggregate future liability to any person (other than the Company or any of its subsidiaries) in excess of $100,000 and is not terminable by the Company or any of its subsidiaries by notice of not more than 60 days for a cost of less than $10,000;

     (vii)    material license, sublicense, option or other agreement relating in whole or in part to the Intellectual Property, Technology or Software owned by the Company or any of its subsidiaries or used in the conduct of the Business (including any license or other agreement under which the Company or any of its subsidiaries is licensee or licensor of any material Intellectual Property, Technology or Software);

     (viii)    Contract under which the Company or any of its subsidiaries has borrowed any money from, or issued any note, bond, debenture or other evidence of indebtedness to, any person (other than the Company or any of its subsidiaries) or any other note, bond, debenture, mortgage, deed of trust, deed to secure debt, pledge or other security agreement, loan agreement, credit agreement guaranty, industrial development authority obligation, or other financing arrangement or other evidence of indebtedness of the Company or any of its subsidiaries (other than in favor of the Company or any of its subsidiaries), in each case evidencing or related to indebtedness of the Company or any of its subsidiaries in excess of $100,000;

     (ix)    Contract (including any so called take or pay or keepwell agreements) under which (A) any person, including the Company or any of its subsidiaries, has directly or indirectly guaranteed indebtedness, liabilities or obligations of the Company or any of its subsidiaries in an amount in excess of $100,000, or (B) the Company or any of its subsidiaries has directly or indirectly guaranteed indebtedness, liabilities or obligations of any person in an amount in excess of $100,000, including the Company or another one of its subsidiaries (in each case other than endorsements for the purpose of collection in the ordinary course of business);

     (x)    Contracts under which the Company or any of its subsidiaries has, directly or indirectly, made any advance, loan, extension of credit or capital contribution to, or other investment in, any person (other than the Company or any of its subsidiaries and other than extensions of trade credit in the ordinary course of business and consistent with past practice) in excess of $100,000 in the aggregate;

     (xi)    Contract granting a Lien (other than a Permitted Lien) upon any Company Property or any other material asset of the Company;

(xii)    Contract providing for indemnification by the Company or its subsidiaries of any person with respect to liabilities relating to any current or former business of the Company, any of its subsidiaries or any predecessor person;

(xiii)    a power of attorney (other than a power of attorney given in the ordinary course of business with respect to routine tax matters);

(xiv)    a Contract (including a purchase order), involving payment by the Company or any of its subsidiaries of more than $100,000, other than purchase orders entered into in the ordinary course of business and consistent with past practice;

(xv)    a Contract (including a sales order) involving the obligation of the Company or any of its subsidiaries to deliver products or services for payment of more than $100,000, other than sales orders entered into in the ordinary course of business and consistent with past practice;

(xvi)    a Contract for the sale of any material asset of the Company or any of its subsidiaries (other than inventory sales in the ordinary course of business and consistent with past practices) or the grant of any preferential rights to purchase any such material asset or requiring the consent of any party to the transfer thereof, other than any such Contract entered into in the ordinary course of business and consistent with past practices after the date of this Agreement and not in violation of this Agreement;

(xvii)    a Contract with any Governmental Entity;

(xviii)    a currency exchange, interest rate exchange, commodity exchange or similar Contract;

(xix)    a Contract for any joint venture, partnership or similar arrangement;

(xx)    a Contract providing for the services of any dealer, distributor, sales representative, franchisee or similar representative involving the payment or receipt over the life of such Contract in excess of $100,000 by the Company or any of its subsidiaries;

(xxi)    a Contract providing for the provision of advertising services and involving the payment or receipt over the life of such Contract in excess of $100,000 by the Company or any of its subsidiaries;

(xxii)    other Contract that has an aggregate future liability to any person (other than the Company or any of its subsidiaries) in excess of $100,000 and is not terminable by the Company or any of its subsidiaries by notice of not more than 60 days for a cost of less than $10,000 (other than purchase orders and sales orders); or

(xxiii)    a Contract other than as set forth above to which the Company or any of its subsidiaries is a party or by which it or any of its assets or businesses is bound or subject that is material to the Business or the use or operation of their assets.

18

(b)     Except as set forth in Section 3.07 of the Seller Disclosure Schedules, all Contracts listed (or required to be listed) in Section 3.07 of the Seller Disclosure Schedules (the "Company Contracts") are valid, binding and in full force and effect and, to the knowledge of the Company, are enforceable by the Company or the applicable subsidiary in accordance with their terms, except for such failures to be valid, binding, in full force and effect or enforceable that, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.  Except as set forth in Section 3.07 of the Seller Disclosure Schedules, the Company or the applicable subsidiary has performed all obligations required to be performed by it to date under the Company Contracts, and it is not (with or without the lapse of time or the giving of notice, or both) in breach or default in any respect thereunder and, to the knowledge of the Company, no other party to any Company Contract is (with or without the lapse of time or the giving of notice, or both), other than by the fact of the Case, in breach or default in any respect thereunder, except for such noncompliance, breaches and defaults that, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect. Neither the Company nor its subsidiaries have, except as disclosed in Section 3.07 of the Seller Disclosure Schedules, received any written notice of the current intention of any party to terminate any Company Contract prior to the expiration date of such Company Contract, except for such terminations that, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.  Materially complete and correct copies of all Company Contracts set forth on Section 3.07 of the Seller Disclosure Schedules, together with all modifications and amendments thereto, have been made available to Buyer.

**SECTION 3.08.**     Permits.  (a)  Section 3.08 of the Seller Disclosure Schedule sets forth all material certificates, licenses, permits, authorizations and approvals ("Permits") issued or granted to the Company or its subsidiaries.  Except as set forth in Section 3.08 of the Seller Disclosure Schedule, (i) all such Permits are validly held by the Company or one of its subsidiaries, and the Company or the applicable subsidiary has complied with all terms and conditions thereof except for such non compliance as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (ii) during the past two years, neither the Company nor its subsidiaries has received written notice relating to the revocation or modification of any such Permits the loss or modification of which, individually or in the aggregate, would reasonably be expected to have a Company Material Adverse Effect, and (iii) none of such Permits will be subject to suspension, modification, revocation or nonrenewal directly as a result of the execution and delivery of this Agreement or the consummation of the Transactions, except for such suspensions, modifications, revocations or nonrenewals that, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.

(b)     The Company and its subsidiaries possess or have applied for all Permits to own or hold under lease and operate their respective assets and to conduct the business of the Company and its subsidiaries as currently conducted, other than such Permits the absence of which, individually or in the aggregate, has not had and would not reasonably be expected to have a Company Material Adverse Effect.

**SECTION 3.09.**     Inventory.     Subject to any reserve therefor included in the Financial Statements, at November 25, 2007, all Inventories (including Inventory ordered but not yet received) consisted of items of a quality usable or saleable in the normal course of business

19

consistent with past practices and were in quantities reasonably sufficient for the normal operation of the Business in accordance with past practices. Since November 25, 2007, the Sellers have continued to replenish their Inventory and to dispose of out-of-season and slow-moving inventory in a normal and customary manner consistent with past practices prevailing in the business of the Sellers. The Sellers maintain policies, practices and procedures with respect to the adequate security and safeguard of Inventory and other assets (including, with respect to employee and third party theft and other loss); the Sellers have not made any material changes to such policies, practices and procedures during the year ended on the date hereof. For the purposes of this Section 3.09 only, the term "Inventory" shall include the inventories of raw materials, work-in-process (including semi-finished goods) and finished goods or products (including in-transit inventory) used, useable or otherwise saleable in the ordinary course of the business of the Sellers, calculated in accordance with the first in, first out, costing method, in accordance with GAAP. Except as set forth in Section 3.09 of the Company Disclosure Schedules, at the Closing all Inventory will be located at the Company Properties, including any Inventory that may be held or possessed by any subsidiary or affiliate of the Company on or after the date hereof.

SECTION 3.10.    Assets. The Sellers own or lease, and at the Closing will own or lease, all buildings, machinery, equipment, properties and other assets (tangible and intangible) necessary for the Company and its subsidiaries to conduct their business in the manner currently conducted and in which it has been conducted during the past 12 months, and such buildings, machinery, equipment, properties and assets are usable in the ordinary course of business and are in operating condition (subject to normal wear and tear), reasonably adequate and suitable for their current uses and to the Company's knowledge, there are no facts or conditions affecting such assets or properties that, individually or in the aggregate, would reasonably be expected to interfere in any material respect with the use or operation thereof as currently used or operated. As of the Closing Date, there will be no properties or assets (tangible or intangible) used or held for use in the Business other than those held by the Sellers; it being understood that artwork in the store offices or the headquarters not owned by the Company or its subsidiaries shall be deemed not used or held for use in the Business. The Acquired Assets, together with the Excluded Assets, comprise all the assets employed by the Company and its subsidiaries in connection with the Business. The Acquired Assets, together with the Excluded Assets, are sufficient for the conduct of Business immediately following the Closing in substantially the same manner as currently conducted. None of Fortunoff Information Services, White Plains Service Co., Woodbridge Service Co. and M. Fortunoff and Fortunoff Silver of New Jersey, and no other subsidiary of the Company, other than MFW and FFSJ, own or have any interest in any assets, properties, leases, rights, agreements, goodwill or other interests of whatever kind or nature, whether real or personal, tangible or intangible, owned or leased.

SECTION 3.11.    Receivables All accounts and notes receivable of the Company reflected on the unaudited consolidated balance sheet set forth in Section 3.11 of the Seller Disclosure Schedules (the "Balance Sheet"), to the extent uncollected on the date hereof, and the accounts and notes receivable arising subsequent to the date of the Balance Sheet of the Company and its subsidiaries, (a) arose or will arise from bona fide sales transactions in the ordinary course of business, consistent with past practice, and are payable on ordinary trade terms, (b) to the knowledge of the Company, are valid and binding obligations of the respective debtors, enforceable in accordance with their respective terms, (c) to the knowledge of the

20

Company, are not subject to any valid set offs or counterclaims and (d) are fully collectible in a manner consistent with past practice, subject to amounts reserved therefor in the Financial Statements or, with respect to those receivables that arose from and after November 25, 2007, on the books of the Company (in a manner consistent with past practice) from and after November 25, 2007. Since November 25, 2007, there have not been any material write offs as uncollectible of any of the Company's or its subsidiaries' accounts receivable, except for write offs in the ordinary course of business consistent with past practice.

**SECTION 3.12.**   Insurance. The Company and its subsidiaries maintain policies of fire and casualty, liability and other forms of insurance in such amounts, with such deductibles and against such risks and losses as are, in the Company's judgment, reasonable for the business and assets of the Company and its subsidiaries. The material insurance policies maintained with respect to the Company and its subsidiaries and their respective assets and properties are set forth on Section 3.12 of the Seller Disclosure Schedules. All such policies are in full force and effect, all premiums due and payable thereon have been paid (other than retroactive or retrospective premium adjustments that are not yet, but may be, required to be paid with respect to any period ending prior to the Closing Date), and no written notice of cancellation or termination has been received with respect to any such policy which has not been replaced on substantially similar terms prior to the date of such cancellation.

**SECTION 3.13.**   Taxes.

(a)   For purposes of this Agreement:

"Pre-Closing Tax Period" shall mean all taxable periods (or portions thereof) ending on or before the close of business on the Closing Date.

"Tax" or "Taxes" means (i) any federal, state, local or foreign net income, gross income, gross receipts, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, payroll, withholding, alternative or add on minimum, ad valorem, value added, transfer, stamp, or environmental tax (including taxes under Code Section 59A), escheat payments or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever (together with any and all interest, penalties and additions to tax imposed with respect thereto) imposed on or with respect to the Company by any Taxing Authority and (ii) liability in respect of any items described in clause (i) as a result of liability as a transferee, as a result of being a member of a consolidated, combined, affiliated or unitary group, or as a result of any obligation under any Tax sharing or Tax indemnity contract or arrangement.

"Taxing Authority" shall mean any domestic, foreign, federal, national, state, county or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi governmental body exercising tax regulatory authority.

"Tax Return" or "Tax Returns" shall mean all material returns, declarations of estimated tax payments, reports, estimates, information returns and statements, including any related or supporting information with respect to any of the foregoing, filed or to be filed with any Taxing Authority in connection with the determination, assessment, collection or administration of any Taxes.

21

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, registration and other such Taxes, any conveyance fees, any recording charges and any other similar fees and charges (including penalties and interest in respect thereof).

(b)    Except as set forth in Section 3.13 of the Seller Disclosure Schedules, (i) the Company and each of its subsidiaries, and any affiliated group, within the meaning of Section 1504 of the Code, of which the Company or any of its subsidiaries is or has been a member, has filed or caused to be filed in a timely manner (within any applicable extension periods) all Tax Returns required to be filed by the Code or by applicable state, local or foreign tax laws with respect to the Acquired Assets, (ii) all such Tax Returns are complete and accurate in all material respects and disclose all material Taxes required to be paid by the Company or any of its subsidiaries with respect to the Acquired Assets for the periods covered thereby, (iii) all material Taxes owed by the Company or any of its subsidiaries with respect to the Acquired Assets have been timely paid in full or will be timely paid in full, (iv) all material Taxes which the Company or any of its subsidiaries are required by Applicable Law to withhold or to collect for payment have been duly withheld and collected and have been paid to the appropriate Taxing Authority, and (v) there are no Liens for Taxes (other than Taxes not yet due and payable) with respect to any of the Acquired Assets.

(c)    Except as set forth in Section 3.13 of the Seller Disclosure Schedules, (i) the Tax Returns referred to in Section 3.13(b)(i) have been examined by the appropriate Taxing Authority or the period for assessment of the Taxes in respect of which each such Tax Return was required to be filed (taking into account all applicable extensions and waivers) has expired, (ii) no material deficiency for an amount of Tax has been asserted or assessed by a Taxing Authority in writing against the Company or any of its subsidiaries with respect to the Acquired Assets that has not been satisfied by payment, settled or withdrawn, (iii) neither the Company nor any of its subsidiaries is currently the beneficiary of any extension of time within which to file any Tax Return, (iv) neither the Company nor any of its subsidiaries has waived any statute of limitations in respect of Taxes with respect to the Acquired Assets which waiver is currently in effect, and (v) there are no audits, examinations, investigations or other proceedings pending or threatened in writing in respect of, or relating to, Taxes of the Company or any of its subsidiaries with respect to the Acquired Assets.

(d)    The Company has made available to Buyer for inspection (i) complete and correct copies of all material Tax Returns of the Company with respect to the Acquired Assets and (ii) complete and correct copies of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests, and any similar documents, submitted by, received by or agreed to by or on behalf of the Company or any of its subsidiaries with respect to the Acquired Assets, or, to the extent related to the Acquired Assets, submitted by, received by or agreed to by or on behalf of any affiliated group of which the Company or any of its subsidiaries is or has ever been a part, and relating to material Taxes with respect to the Acquired Assets for all taxable periods for which the statute of limitations has not yet expired.

(e)    Except as set forth in Section 3.13 of the Seller Disclosure Schedules, during the past five (5) years no claim has ever been made in writing by a Taxing Authority in a

jurisdiction where the Company or any of its subsidiaries has never paid Taxes or filed Tax Returns asserting that the Company or such subsidiary is or may be subject to Taxes assessed by such jurisdiction.

(f)    The Company and each of its subsidiaries has timely paid all Taxes due and payable by it, the non-payment of which would result in a Lien on any Acquired Assets, would otherwise have an adverse affect on the Buyer's ability to conduct the Business or would result in the Buyer becoming liable or responsible therefor.

(g)    There is no action or suit, or known investigation, audit, claim or assessment pending or proposed or threatened in writing, with respect to Taxes of the Acquired Assets or the Business.

**SECTION 3.14.**    Proceedings.  Section 3.14 of the Seller Disclosure Schedules sets forth a list and brief description of each pending or, to the knowledge of the Company, threatened Proceeding or claim with respect to which the Company or any of its subsidiaries has been contacted in writing against the Company or any of its subsidiaries or any of their assets and that (a) relates to or involves more than $100,000, (b) seeks any material injunctive relief or (c) may give rise to any legal restraint on or prohibition against the Transactions.  Except as set forth in Section 3.14 of the Seller Disclosure Schedules, none of the suits, actions or proceedings ("Proceedings") or claims listed in Section 3.14 of the Seller Disclosure Schedules as to which there is at least a reasonable possibility of adverse determination would have, if so determined, individually or in the aggregate, a Company Material Adverse Effect.  Except as set forth in Section 3.14 of the Seller Disclosure Schedules, to the knowledge of the Company, there are no unasserted claims of the type that would be required to be disclosed in Section 3.14 of the Seller Disclosure Schedules that if asserted would have at least a reasonable possibility of an adverse determination and, if so determined, would have, individually or in the aggregate, a Company Material Adverse Effect.  To the knowledge of the Company, except as set forth in Section 3.14 of the Seller Disclosure Schedules, neither the Company nor any of its subsidiaries is a party or subject to or in default under any Judgment.  Except as set forth in Section 3.14 of the Seller Disclosure Schedules, there is not any Proceeding or claim by the Company or any of its subsidiaries pending, or which the Company or any of its subsidiaries intends to initiate, against any other person.  Except as set forth in Section 3.14 of the Seller Disclosure Schedules, to the knowledge of the Company, there is no pending or threatened investigation of or affecting the Company or any of its subsidiaries.

**SECTION 3.15.**    Benefit Plans.

(a)    Section 3.15 of the Seller Disclosure Schedules contains a list and brief description of each "employee pension benefit plan" (as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) (a "Pension Plan"), "employee welfare benefit plan" (as defined in Section 3(1) of ERISA) (a "Welfare Plan"), and each other plan, arrangement or policy (written or oral) relating to stock options, stock purchases, compensation, deferred compensation, severance, fringe benefits or other employee benefits, in each case maintained or contributed to, or required to be maintained or contributed to, by the Company or any of its subsidiaries or any other person or entity that, together with the Company, is or was treated as a single employer under Section 414(b), (c), (m) or (o) of the Code (each,

23

together with the Company, a "Commonly Controlled Entity") for the benefit of any present or former officers, employees, agents, directors or independent contractors of the Company or any of its subsidiaries (all the foregoing being herein called "Benefit Plans"). The Company has made available to Buyer materially true, complete and correct copies of (i) each Benefit Plan (or, in the case of any unwritten Benefit Plans, descriptions thereof), (ii) the three most recent annual reports on Form 5500 (including all schedules and attachments thereto) filed with the Internal Revenue Service with respect to each Benefit Plan (if any such report was required by Applicable Law), (iii) the most recent summary plan description (or similar document) for each Benefit Plan for which such a summary plan description is required by Applicable Law or was otherwise provided to plan participants or beneficiaries and (iv) each trust agreement and insurance or annuity contract or other funding or financing arrangement relating to any Benefit Plan. To the knowledge of the Company, each such Form 5500 and each such summary plan description (or similar document) was as of its date complete and correct in all material respects.

(b)    Each Benefit Plan has been administered in all material respects in accordance with its terms. With respect to the Benefit Plans, the Company, its subsidiaries and all the Benefit Plans are in compliance in all material respects with the applicable provisions of ERISA, the Code, all other Applicable Laws and the terms of all applicable collective bargaining agreements. All reports, returns and similar documents with respect to the Benefit Plans required to be filed with any Governmental Entity or distributed to any Benefit Plan participant have been duly and timely filed or distributed and, to the knowledge of the Company, all reports, returns and similar documents actually filed or distributed were true, complete and correct in all material respects. Except as set forth in Section 3.15 of the Seller Disclosure Schedules, there are no investigations by any Governmental Entity, termination proceedings or other claims (except routine claims for benefits payable under the Benefit Plans) or Proceedings against or involving any Benefit Plan or asserting any rights to or claims for benefits under any Benefit Plan that would reasonably be likely to give rise to any material liability, and there are not any facts or circumstances that would reasonably be likely to give rise to any material liability in the event of any such investigation, claim or Proceeding.

(c)    Except as set forth in Section 3.15 of the Seller Disclosure Schedules, (i) all contributions to, and payments from, the Benefit Plans that may have been required to be made in accordance with the terms of the Benefit Plans, any applicable collective bargaining agreement and, when applicable, Sections 302, 303, 304 and 305 of ERISA or Sections 412, 430, 431 and 432 of the Code, have been timely made, (ii) there has been no waiver or application for waiver of the minimum funding standards imposed by Sections 412, 430, 431 and 432 of the Code with respect to any Benefit Plan that is a Pension Plan (a "Company Pension Plan") and (iii) no Company Pension Plan (A) has or had at any time during the current plan year an "accumulated funding deficiency" within the meaning of Section 412(a) of the Code, or (B) failed to satisfy the minimum funding standard applicable to the plan for such plan year within the meaning of Section 412(a)(2) of the Code as applicable to the plan year beginning after December 31, 2007.

(d)    Except as set forth in Section 3.15 of the Seller Disclosure Schedules, each Company Pension Plan that is intended to be a tax qualified plan has been the subject of a determination letter from the Internal Revenue Service to the effect that such Company Pension Plan and related trust is qualified and exempt from federal income taxes under Sections 401(a)

24

and 501(a), respectively, of the Code; no such determination letter has been revoked, and, to the knowledge of the Company, revocation has not been threatened; no event has occurred and no circumstances exist that would adversely affect the tax qualification of such Company Pension Plan; and such Company Pension Plan has not been amended since the effective date of its most recent determination letter in any respect that would reasonably be likely to adversely affect its qualification, materially increase its cost or require security under Section 307 of ERISA. The Company has delivered to Buyer a copy of the most recent determination letter received with respect to each Company Pension Plan for which such a letter has been issued, as well as a copy of any pending application for a determination letter. The Company has also provided to Buyer a list of all Company Pension Plan amendments as to which a favorable determination letter has not yet been received.

(e)    Except as set forth in Section 3.15 of the Seller Disclosure Schedules: (i) no "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) has occurred that involves the assets of any Benefit Plan; (ii) no prohibited transaction has occurred that could subject the Company, any of its subsidiaries, any of their employees, or, to the knowledge of the Company, a trustee, administrator or other fiduciary of any trust created under any Benefit Plan to the tax or sanctions on prohibited transactions imposed by Section 4975 of the Code or Title I of ERISA; (iii) no Company Pension Plan has been terminated or has been the subject of a "reportable event" (as defined in Section 4043 of ERISA and the regulations thereunder), and no Company Pension Plan is reasonably expected to be terminated; and (iv) none of the Company, any of its subsidiaries or, to the knowledge of the Company, any trustee, administrator or other fiduciary of any Benefit Plan or any agent of any of the foregoing has engaged in any transaction or acted in a manner that would reasonably be likely to, or has failed to act so as to, subject the Company, any of its subsidiaries or any trustee, administrator or other fiduciary to any material liability for breach of fiduciary duty under ERISA or any other Applicable Law with respect to the Benefit Plans.

(f)    Except as set forth in Section 3.15(f) of the Seller Disclosure Schedules, as of the most recent valuation date for each Company Pension Plan that is a "defined benefit plan" (as defined in Section 3(35) of ERISA (a "Defined Benefit Plan")), there was not any amount of "unfunded benefit liabilities" (as defined in Section 4001(a)(18) of ERISA) under such Defined Benefit Plan, and the Company has no knowledge of any facts or circumstances that would materially change the funded status of any such Defined Benefit Plan. The Company has furnished to Buyer the most recent actuarial report or valuation with respect to each Defined Benefit Plan. The information supplied to the plan actuary by the Company and any of its subsidiaries for use in preparing those reports or valuations was complete and accurate in all material respects and the Company has no reason to believe that the conclusions expressed in those reports or valuations are incorrect in any material respect.

(g)    No Commonly Controlled Entity has incurred any material liability to a Pension Plan (other than for contributions not yet due) or to the Pension Benefit Guaranty Corporation (other than for the payment of premiums not yet due), which liability has not been fully paid as of the date hereof.

(h)    No Commonly Controlled Entity has (i) engaged in a transaction described in Section 4069 of ERISA that would be reasonably likely to subject the Company to material

liability at any time after the date hereof or (ii) acted in a manner that would be reasonably likely to, or failed to act so as to, result in material fines, penalties, taxes or related charges under (x) Section 502(c), (i) or (1) of ERISA, (y) Section 4071 of ERISA or (z) Chapter 43 of the Code.

(i)    Neither the Company nor any of its subsidiaries is required to contribute to any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).  No Commonly Controlled Entity has announced an intention to withdraw, but has not yet completed withdrawal, from a multiemployer plan; and, to the Company's knowledge, no action has been taken, and no circumstances exist, that has resulted or could, with the passage of time, reasonably be expected to result in either a partial or complete withdrawal from such a multiemployer plan or any material liability under Title IV of ERISA by any Commonly Controlled Entity.

(j)    Section 3.15 of the Seller Disclosure Schedules discloses whether each Welfare Plan is (i) unfunded, (ii) funded through a "welfare benefit fund", as such term is defined in Section 419(e) of the Code, or other funding mechanism or (iii) insured.  The Company and its subsidiaries are in material compliance with the applicable requirements of Section 4980B(f) of the Code with respect to each Benefit Plan that is a group health plan, as such term is defined in Section 5000(b)(1) of the Code.

(k)    No employee of the Company or any of its subsidiaries will be entitled to any additional benefits or any acceleration of the time of payment or vesting of any benefits under any Benefit Plan as a result of the Transactions.

(l)    During the period beginning on the end of the plan year covered by the most recent actuarial report and ending on the date of this Agreement, there has been no material change, except as required by Applicable Law, (i) in any actuarial or other assumption used to calculate funding obligations with respect to any Company Pension Plan or (ii) in the manner in which contributions to any Company Pension Plan are made or the basis on which such contributions are determined.

(m)    Any amount that could be received (whether in cash or property or the vesting of property) as a result of any of the Transactions by any employee, officer, director or independent contractor of the Company or any of its affiliates who is a "disqualified individual" (as such term is defined in proposed Treasury Regulation Section 1.280G 1) under any employment, severance or termination agreement, other compensation arrangement or Benefit Plan currently in effect would not be characterized as an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code).  Section 3.15 of the Seller Disclosure Schedules sets forth (i) the maximum amount that could be paid to each executive officer of the Company as a result of the Transactions under all employment, severance and termination agreements, other compensation arrangements and Benefit Plans currently in effect and (ii) the "base amount" (as such term is defined in Section 280G(b)(3) of the Code) for each such executive officer calculated as of the date of this Agreement.

(n)    The amount of the Welfare Claims (as defined in Section 5.10(f)) shall not exceed the amount set forth on Schedule 3.15(n) of the Seller Disclosure Schedules.

26

(o)    The amount of the liability for the Benefit Days (as defined in Section 5.10(c)) shall not exceed the amount set forth in Section 3.15(o) of the Seller Disclosure Schedules.

**SECTION 3.16.**    <u>Absence of Changes or Events</u>.    Except (i) as set forth in Section 3.16 of the Seller Disclosure Schedules, and (ii) for the commencement of the Case, since November 25, 2007 (the "<u>Balance Sheet Date</u>"):

(a)    there have not been any changes, events or developments that have had or would reasonably be expected individually or in the aggregate to have a Company Material Adverse Effect;

(b)    the Business has been conducted in the ordinary course and in substantially the same manner as previously conducted; and

(c)    neither the Company nor any of its subsidiaries has taken any action that, if taken after the date of this Agreement, would constitute a violation of any of:  (A) clauses (iv), (viii), (ix), (x), (xii) and (xiv) of Section 5.01; (B) clause (x) to the extent relating to Assumed Contracts; or (C) clause (xviii) to the extent it relates to the foregoing (A) and (B).

**SECTION 3.17.**    <u>Compliance with Applicable Laws</u>.

(a)    Except as set forth in Section 3.17 of the Seller Disclosure Schedules, the Company and its subsidiaries are in compliance with all Applicable Laws, including those relating to occupational health and safety, other than where the failure to be in compliance, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.  Except as set forth in Section 3.17 of the Seller Disclosure Schedules, neither the Company nor its subsidiaries have received any written communication during the past two years from a Governmental Entity that alleges that the Company or any of its subsidiaries is not in material compliance with any Applicable Law.  To the knowledge of the Company, the current use by the Company and its subsidiaries of the stores, offices and other facilities located on the Company Properties does not violate any local zoning or similar land use or government regulations in any material respect.

(b)    Except as set forth in Section 3.17 of the Seller Disclosure Schedules: (i) during the past two years, neither the Company nor its subsidiaries has received any written communication from a Governmental Entity or any other person that (x) alleges that the Company or any of its subsidiaries is not in compliance with any Environmental Law (as defined below), is subject to liability under any Environmental Law, is liable in connection with a Release (as defined below), (y) seeks any information under 42 U.S.C. Section 9604(e) or any equivalent state Environmental Law, or (z) states that the Company or any of its subsidiaries is subject to any investigation under any Environmental Law; (ii) the Company and its subsidiaries hold, and are in compliance with, all material Permits required for the Company and its subsidiaries to conduct their respective businesses under Environmental Laws as conducted on the Closing Date, and are in compliance in all material respects with all Environmental Laws; (iii) the Company has no knowledge of any environmental reports that disclose actual or potential material environmental liabilities of the Company or its subsidiaries; (iv) the Company

and its subsidiaries have not entered into or agreed to any court decree, order or settlement, and are not subject to any Judgment, relating to compliance with any Environmental Law or to any Hazardous Material (as defined below); (v) to the knowledge of the Company, neither the Company nor any of its subsidiaries has any contingent liabilities including any assumed, whether by contract or operation of law, liabilities or obligations, in connection with any Hazardous Materials or arising under any Environmental Laws in connection with its business or any formerly owned or operated divisions, subsidiaries, or companies, that, individually or in the aggregate, would reasonably be expected to have a Company Material Adverse Effect; (vi) to the Company's knowledge, there are no known or suspected material quantities of asbestos containing materials or vessels containing polychlorinated biphenyls on, at or under any Company Property; (vii) there have not been any Releases on, at or under (y) any of the Company Properties or any other property or facility formerly owned, leased or operated by the Company, any of its subsidiaries or any of their respective predecessors or (z) to the Company's knowledge, on, at or under any location at which the Company arranged for the disposal of Hazardous Materials, that in either case would be reasonably likely to result in a material claim or liability individually or in the aggregate against the Company or any of its subsidiaries; (viii) neither the execution of this Agreement nor the consummation of the Transactions will trigger any obligations under any Environmental Property Transfer Law (as defined below); and (ix) to the Company's knowledge, neither the Company nor any of its subsidiaries currently owns or operates any underground storage tanks.

(c) The term "Environmental Laws" means any and all Applicable Laws, Judgments and Permits issued, promulgated or entered into by or with any Governmental Entity, relating to the environment, preservation or reclamation of natural resources, or to the protection of human health as it relates to the environment, including Applicable Laws relating to noise levels. The term "Hazardous Materials" means any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any Environmental Laws or that could reasonably be expected to have a negative impact on human health or the environment, including petroleum and petroleum products, asbestos and asbestos containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables, explosives, mold, mycotoxins, and volatile organic compounds. The term "Release" means any spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching, dumping, pouring, emanation or migration of any Hazardous Material in, into, onto, or through the environment (including ambient air, surface water, ground water, soils, land surface and subsurface strata) or within any building, structure, facility or fixture. The term "Environmental Property Transfer Law" means the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K 6, et. seq. and the Connecticut Property Transfer Law, Conn. Gen. Stat § 22a 134, et. seq.

**SECTION 3.18.**    Employee and Labor Matters.

(a) Except as set forth in Section 3.18 of the Seller Disclosure Schedules: (i) there is not any, and during the past two years there has not been any, labor strike, dispute, work stoppage or lockout pending, or, to the knowledge of the Company, threatened, against or affecting the Company or any of its subsidiaries; (ii) to the knowledge of the Company, no union organizational campaign is in progress with respect to the employees of the Company or any of

28

its subsidiaries and no question concerning representation of such employees exists; (iii) to the knowledge of the Company, neither the Company nor any of its subsidiaries is engaged in any unfair labor practice; (iv) there are not any unfair labor practice charges or complaints against the Company or any of its subsidiaries pending, or, to the knowledge of the Company, threatened, before the National Labor Relations Board; (v) there are not any pending, or, to the knowledge of the Company, threatened, union grievances against the Company as to which there is a reasonable possibility of adverse determination and that, if so determined, individually or in the aggregate, would reasonably be expected to have a Company Material Adverse Effect; (vi) there are not any pending, or, to the knowledge of the Company, threatened, charges against the Company or any of its subsidiaries or any of their current or former employees before the Equal Employment Opportunity Commission or any state or local agency responsible for the prevention of unlawful employment practices; and (vii) neither the Company nor any subsidiary has received written or oral communication during the past two years of the intent of any Governmental Entity responsible for the enforcement of labor or employment laws to conduct an investigation of or affecting the Company or any of its subsidiaries and, to the knowledge of the Company, no such investigation is in progress.

(b)    Section 3.18 of the Seller Disclosure Schedules sets forth a list of all officers and other employees of and consultants to the Company and its subsidiaries whose current annual salary is $100,000 or more, together with the current job title or relationship to the Company and its subsidiaries and, except with respect to officers, the terms of whose employment is governed by a Contract listed in Section 3.07 of the Seller Disclosure Schedules, the current annual salary (including bonus) for each such person, including a description of applicable bonus or benefit plans (other than those listed in Section 3.07 of the Seller Disclosure Schedules applicable to such persons).

(c)    No employee of the Company and its subsidiaries is, to the knowledge of the Company, a party to or bound by any Contract, or subject to any Judgment that may interfere with the use of such person's reasonable best efforts to promote the interests of the Company and its subsidiaries, which may conflict with the Company and its subsidiaries or the Transactions or that has had or would reasonably be expected to have a Company Material Adverse Effect. To the knowledge of the Company, no activity of any employee of the Company or any of its subsidiaries as or while an employee of the Company or any of its subsidiaries has caused a violation of any employment contract, confidentiality agreement, patent disclosure agreement or other Contract to which such employee was a party. To the knowledge of the Company, neither the execution and delivery of this Agreement nor the consummation of the Transactions will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any Contract under which any such employee is now obligated.

**SECTION 3.19.**    Suppliers.    Section 3.19 of the Seller Disclosure Schedules lists the names of the top 20 suppliers and vendors, by volume in dollars of purchases from such suppliers and vendors, for each of (a) jewelry and (b) housewares and domestics and tabletop and indoor and outdoor furniture product lines of the business of the Company, for each of the last two annual fiscal periods of and the aggregate expenditures attributable to each in such periods.

29

SECTION 3.20.    Customers.  Neither the Company nor any of its subsidiaries has any customer (other than the Company or any of its subsidiaries) to whom it made more than 1% of its total sales during the most recent full fiscal year.

SECTION 3.21.    No Brokers.  No broker, investment banker or other person is entitled to any broker's, finder's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Company.

SECTION 3.22.    Investment Company Status.  The Company is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.23.    Financial Statements.

(a)    Section 3.23 of the Seller Disclosure Schedules sets forth (i) the unaudited consolidated balance sheets, consolidated statements of operations, consolidated statements of cash flows and consolidated statements of shareholders' (deficit) equity of the Company as of and for the year ended January 28, 2007 and (ii) the unaudited Balance Sheet, consolidated statement of operations, consolidated statement of cash flows and consolidated statements of shareholders' equity of the Company as of and for the ten month period ended November 25, 2007 ((i) and (ii) collectively, the "Financial Statements").  The Financial Statements have been prepared from the books and records of the Company in conformity with GAAP consistently applied (except in each case as described in the notes thereto) and on that basis fairly present in all material respects (subject, in the case of the unaudited statements, to normal, recurring year end audit adjustments and to the absence of notes) the consolidated financial condition, results of operations and cash flows of the Company as of the respective dates thereof and for the respective periods indicated.

(b)    The Company maintains internal control over financial reporting and, except as set forth in Section 3.23(b) of the Seller Disclosure Schedules, such internal control over financial reporting is in all material respects effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP consistently applied and includes policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company and its subsidiaries, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company and its subsidiaries are being made only in accordance with authorizations of management and directors of the Company, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets of the Company or any of its subsidiaries that could have a material effect on its financial statements.

(c)    To the knowledge of the Company, neither the Company nor any of its subsidiaries has received any material complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any of its subsidiaries or their respective internal accounting controls, including any complaint, allegation, assertion or claim that any of the Company or its subsidiaries has engaged in questionable accounting or auditing practices.

30

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Simultaneously with the execution and delivery of this Agreement, Buyer has delivered to the Company certain Disclosure Schedules with numbered sections corresponding to the relevant sections in this Article IV (the "Buyer Disclosure Schedules"). Buyer represents and warrants to the Sellers that, except as set forth in the Buyer Disclosure Schedules, as of the date of this Agreement and as of the Closing Date as follows:

**SECTION 4.01.**    Organization, Standing and Power.    Buyer is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation. Buyer has full limited liability company or other power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease, operate or otherwise hold its properties and assets and to carry on its business as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, has not had and would not reasonably be expected to have a Buyer Material Adverse Effect. Buyer is duly qualified and in good standing to do business as a foreign limited liability company in each jurisdiction in which the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary, except such jurisdictions where the failure to be so qualified or in good standing, individually or in the aggregate, has not had and would not reasonably be expected to have a Buyer Material Adverse Effect.

**SECTION 4.02.**    Authority; Execution and Delivery; Enforceability.

(a)    Buyer has full power and authority to execute this Agreement and, subject to the entry of the Sale Order, to consummate the Transactions. The execution and delivery by Buyer of this Agreement and the consummation by Buyer of the Transactions have been duly authorized by all necessary limited liability company action. Buyer has duly executed and delivered this Agreement, and assuming this Agreement constitutes valid and binding obligations of the other parties hereto this Agreement will, subject to the entry of the Sale Order, constitute a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) general equitable principles.

(b)    To Buyer's knowledge, no state takeover statute or similar statute or regulation applies or purports to apply to Buyer with respect to this Agreement or any the Transactions.

**SECTION 4.03.**    No Conflicts; Consents.

(a)    The execution and delivery by Buyer of this Agreement do not, and the consummation of the Transactions and compliance by Buyer with the terms hereof will not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation

31

or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any of the properties or assets of Buyer or any of its subsidiaries under, any provision of (i) organizational documents of Buyer or any of its subsidiaries, (ii) any Contract to which Buyer or any of its subsidiaries is a party or by which any of their respective properties or assets is bound or (iii) subject to the filings and other matters referred to in Section 4.03(b), any Judgment or Applicable Law applicable to Buyer or any of its subsidiaries or their respective properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that, individually or in the aggregate, have not had and would not reasonably be expected to have an Buyer Material Adverse Effect.

(b)    Except for compliance with applicable requirements of the HSR Act, if required, no consent of, or registration, declaration or filing with any Governmental Entity is required to be obtained or made by or with respect to Buyer or any of its subsidiaries in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions, other than (i) such filings as may be required by the Bankruptcy Court in connection with the Case, and (ii) such other items those that may be required solely by reason of the participation of the Company (as opposed to any other third party) in the Transactions.

**SECTION 4.04.**    Financing.  Buyer will have funds on hand as of the Closing Date (the "Equity Financing") which together with the proceeds of an asset based loan of not less than $60 million (the "ABL Financing") will be sufficient to pay the Closing Date Amount.  One or more affiliates of Buyer have existing borrowing facilities that are sufficient to provide the Equity Financing.

**SECTION 4.05.**    No Brokers.  No broker, investment banker or other person is entitled to any broker's, finder's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Buyer.

**SECTION 4.06.**    Litigation.  There are not any (a) outstanding Judgments against or affecting Buyer, (b) Proceedings pending or threatened against or affecting Buyer, or (c) investigations by any Governmental Entity that are pending or threatened against or affecting Buyer that, in each case, individually or in the aggregate, would reasonably be expected to have a Buyer Material Adverse Effect.

**SECTION 4.07.**    Ability to Conduct the Business.  To Buyer's knowledge, Buyer has, or does not have any impediment preventing Buyer from promptly obtaining, all licenses, permits, certificates of authority, authorizations, approvals or consents required to conduct the Business from and after the Closing.

## ARTICLE V

## COVENANTS

**SECTION 5.01.**    Covenants Relating to Conduct of Business.

(a)    Except for matters set forth in Section 5.01 of the Seller Disclosure Schedules or otherwise expressly permitted by the terms of this Agreement, from the date of this

32

Agreement to the Closing, taking into account that the Sellers are involved in a bankruptcy proceeding, the Company shall, and shall cause its subsidiaries to, (A) conduct their respective businesses in the usual, regular and ordinary course in substantially the same manner as previously conducted, and (B) use all reasonable efforts to keep intact their respective businesses, keep available the services of their current employees and preserve their relationships with customers, suppliers, licensors, licensees, distributors and others with whom they deal, in the ordinary course and consistent with their practices in place as of the Balance Sheet Date. From the date of this Agreement to the Closing, the Company shall not, and shall not permit any of its subsidiaries to, take any action that would, or that would reasonably be expected to, result in any of the conditions to Closing set forth in Article VI not being satisfied. In addition (and without limiting the generality of the foregoing), except as set forth in Section 5.01 of the Seller Disclosure Schedules or otherwise expressly permitted or required by the terms of this Agreement, the Company shall not, and shall not permit any of its subsidiaries to, do any of the following without the prior written consent of Buyer, which consent shall not be unreasonably withheld, delayed or conditioned:

(i)     amend its certificate of incorporation or by-laws (or other comparable organizational or governing documents);

(ii)     enter into, adopt, amend, extend (beyond the Closing Date) or renew any Company Pension Plan (or any plan that would be a Company Pension Plan if adopted) except as required by Applicable Law;

(iii)     (A) other than in the ordinary course of business consistent with past practice, materially modify, amend, terminate or provide any consent or waiver under any Company Contract (other than an advertising or promotional Contract) or enter into, modify or amend any Contract that is, or would, by virtue of such modification or amendment be, required to be set forth as a Company Contract in Section 3.07 of the Seller Disclosure Schedules or (B) materially modify, amend, terminate or provide any consent or waiver under any advertising or promotional Contract or enter into or materially modify or amend any advertising or promotional Contract that is, or would, by virtue of such modification or amendment be, required to be set forth as a Company Contract in Section 3.07 of the Seller Disclosure Schedules;

(iv)     (A) grant to any executive officer or employee any increase in compensation or benefits, (B) except, in the ordinary course of business and consistent with past practice, with respect solely to non key employees whose annual compensation is less than (and will not, as a result of such action, exceed) $100,000, enter into, adopt, establish, amend, extend, renew or terminate any employment, consulting, retention, severance, change in control, collective bargaining, bonus or other incentive compensation, profit sharing, deferred compensation, pension, retirement, vacation, stock option or other equity, health or other welfare, or other compensation or benefit plan, policy, agreement, trust, fund or arrangement with, for or in respect of any shareholder, officer, employee, director, consultant or affiliate or any collective bargaining agreement or other contract with any labor organization, union or association, or (C) take any action to accelerate any rights or benefits, or make any material determinations not in the ordinary course of business consistent with prior practice, under any collective bargaining

33

agreement or Company Benefit Plan; in each case other than (x) as required by Applicable Law, (y) as required pursuant to the terms of Contracts in effect on the date hereof or (z) as are otherwise in the ordinary course of business consistent with past practice and are not in the aggregate material;

(v)    incur or assume any indebtedness for borrowed money or guarantee any obligations or indebtedness of any other person, other than in the ordinary course of business consistent with past practice; provided, however, that in no event shall the Company or any of its subsidiaries (A) incur or assume any long term indebtedness for borrowed money or (B) guarantee any liability, obligation or indebtedness of any affiliates;

(vi)    permit, allow or suffer any of its assets to become subjected to any Lien (other than Permitted Liens and Liens set forth in Section 3.04 and 3.05 of the Seller Disclosure Schedules) of any nature whatsoever that would have been required to be set forth in Section 3.04 or 3.05 of the Seller Disclosure Schedules if existing on the date of this Agreement;

(vii)    cancel any material indebtedness (individually or in the aggregate) or waive any claims or rights of substantial value;

(viii)    pay, loan or advance any amount to, or sell, transfer or lease any of its assets to, or enter into any agreement or arrangement with any affiliates, except for (A) transactions among the Company and its subsidiaries and (B) intercompany transactions in the ordinary course of business consistent with past practices;

(ix)    make any change in any method of accounting or accounting practice or policy other than those required by GAAP or Applicable Law;

(x)    acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire any assets (other than inventory) that are material;

(xi)    make or incur any capital expenditure that, individually, is in excess of $250,000 or make or incur any such capital expenditures which, in the aggregate, are in excess of amounts specified in the cash flow forecast provided to Buyer in writing prior to the date hereof (the "Cash Flow Forecast");

(xii)    directly or indirectly (through any merger, consolidation, reorganization, issuance of securities or rights, license, lease, encumbrance or otherwise), sell, assign, convey, transfer, license, lease or otherwise dispose of any Acquired Assets or assets of the Business or any interest therein, except inventory sold in the ordinary course of business and consistent with past practice;

(xiii)    enter into any lease, license, concession agreement, franchise or similar agreement in connection with real property, except any renewals of existing leases in the ordinary course of business and consistent with past practice or leases of

34

under 15,000 square feet providing for annual rents of less than $250,000 and terms no longer than 5 years;

(xiv)    modify, amend, supplement, restate, terminate or permit the lapse of any lease or sublease of, or reciprocal easement agreement, operating agreement or other material agreement or contract relating to, real property (except modifications or amendments associated with renewals of existing leases in the ordinary course of business and consistent with past practice and except for the lapse of any lease set forth in Section 3.05 of the Seller Disclosure Schedules in accordance with its terms);

(xv)    make any revaluations of any amount of its assets that are material, taken as a whole, including write downs of inventory, goodwill or intangible assets or write offs of accounts receivable other than as required by GAAP or Applicable Law;

(xvi)    (A) pay, discharge or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice or in accordance with their terms, of liabilities reflected or reserved against in, or contemplated by, the Financial Statements or incurred in the ordinary course of business consistent with past practice, or (B) cancel any material indebtedness owed to the Company or any of its subsidiaries (individually or in the aggregate) or waive any claims or rights of substantial value owed to the Company or any of its subsidiaries;

(xvii)    except as required by this Agreement, enter into, modify, amend, terminate or provide any consent or waiver under, any Contract, arrangement, transaction or understanding between the Company and its subsidiaries, on the one hand, and affiliates (other than the Company and its subsidiaries), on the other hand; or

(xviii)    authorize any of, or commit or agree to take, whether in writing or otherwise, to do any of, the foregoing actions, or request the Bankruptcy Court to approve or authorize the Sellers to take or omit to take any action which would breach the Sellers' covenants under or any other provisions of this Agreement, or consent to any such approval or authorization

(b)    Advise of Changes.  The Sellers shall use all reasonable efforts to promptly advise the Buyer orally (to be followed promptly by written confirmation) of the occurrence of any matter or event that is material to the Acquired Assets, taken as a whole.

(c)    Consultation.  In connection with the continuing operation of the business of the Company and its subsidiaries, between the date of this Agreement and the Closing, the Company shall use all reasonable efforts to consult in good faith on a regular basis with Buyer to report material operational developments and the general status of ongoing operations pursuant to procedures reasonably requested by Buyer.  The Company acknowledges that any such consultation shall not constitute a waiver by Buyer of any rights it may have under this Agreement, and that Buyer shall not have any liability or responsibility for any actions of the Company or any of its officers or directors with respect to matters that are the subject of such consultations.

35

(d)   Insurance.  The Company shall use all reasonable efforts to keep, or cause to be kept, all insurance policies set forth in Section 3.12 of the Seller Disclosure Schedules, or suitable replacements therefor, in full force and effect through the close of business on the Closing Date.

(e)   Use of Letter of Credit.  The Company agrees that it will not use any funds drawn under the DIP Facility that are supported by the Letter of Credit for any purpose other than the purchase of Inventory of a type and nature purchased in the ordinary course of business consistent with the past practice and in no event shall the Company use more than $3 million of such funds per week.

(f)   Compliance with Budget.  Sellers shall comply with the Cash Flow Forecast and shall pay all expenses that if not paid would constitute Assumed Liabilities and other items in accordance with such Cash Flow Forecast.

**SECTION 5.02.**   Schedule of Assets Used in the Business.  As promptly as practicable after the date hereof but in any event within ten (10) business days after the date hereof, the Company shall deliver to Buyer a reasonably detailed schedule setting forth the owner and a specific identification of all assets of the Sellers that are anticipated to be Acquired Assets or that Buyer may pursuant to the provisions of this Agreement request to have included in the Acquired Assets.  The Company shall, also within such ten (10) business days, provide to Buyer a list of all Contracts under which any person, including the Sellers or any of their subsidiaries, has directly or indirectly, guaranteed obligations in connection with any Lease Document.

**SECTION 5.03.**   Access to Information.  During the period prior to Closing, the Company shall, and shall cause its subsidiaries to, permit the officers, employees and authorized representatives of Buyer and its accountants, counsel and other representatives (i) to conduct such reasonable investigation of the condition (financial or otherwise), business, assets, properties, or operations of the Company and its subsidiaries and their respective businesses as Buyer shall deem appropriate (which investigation may include interviews with representatives of the Company and its subsidiaries as well as sampling) and (ii) reasonable access, upon reasonable notice during normal business hours, to all the offices, properties, books, contracts, commitments, Tax Returns and business and financial records (including computer files, retrieval programs and similar documentation) of the Company and its subsidiaries, and, during such period shall furnish reasonably promptly to Buyer any information concerning the condition (financial or otherwise), business, assets, properties, or operations of the Company or its subsidiaries as Buyer may reasonably request; provided, however, that such investigation or access shall not materially or unreasonably disrupt or interfere with the operations of the Company or its subsidiaries and that in no event shall the Company or any of its subsidiaries be obligated to provide any access or information if the Company reasonably determines that providing such access or information may (x) violate Applicable Law, (y) cause the Company or any subsidiary to breach a confidentiality obligation by which it is bound or (z) jeopardize any privilege available to the Company or its subsidiaries; provided further that the foregoing clause (y) shall be inapplicable unless the Company (unless prohibited by the terms of such agreement) has provided notice to Buyer that such information exists but is not being disclosed because the disclosure thereof would constitute a breach of such confidentiality obligation to a third party,

36

the identity of such third party is set forth in such notice (if such identity is not otherwise confidential) and the Company uses all reasonable efforts to obtain the consent of such third party to permit the Company or its subsidiary to disclose such information to Buyer.

**SECTION 5.04.**    <u>All Reasonable Efforts</u>.    Upon the terms and subject to the conditions herein provided, Buyer, on the one hand, and each of the Sellers, on the other hand, shall (and each Seller shall cause its subsidiaries to) use its respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under Applicable Laws and regulations to ensure that the conditions set forth in this Agreement are satisfied and to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including, without limitation, the following:

(a)    Buyer, on the one hand, and each of the Sellers, on the other hand, shall (and each Seller shall cause its subsidiaries to) use its reasonable best efforts (including, in the case of the Sellers, petitioning the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code) to obtain, at its own expense, any and all approvals, authorizations, consents and other actions by Governmental Entities, administrative agencies, courts and other Persons necessary or appropriate (above and beyond the entry of the Sale Order) for such party to consummate the transactions contemplated hereby including as soon as practicable after the date, if any, on which it is determined that such filings are required making its respective filings, and thereafter making any required submissions, under the HSR Act.  The parties agree to determine as soon as practicable after the date hereof whether any filings are required under the HSR Act. Without limiting the generality of the foregoing, each Seller shall (and shall cause its Subsidiaries to) use its reasonable best efforts, considering the operation, force and effect of the Sale Order in authorizing such transfers, to obtain, at its own expense, any approvals, authorizations, consents and other actions by all parties necessary for the Sellers to transfer to Buyer, as applicable, and Buyer to receive, all assets associated with the Business which are Acquired Assets.

(b)    Each of the Sellers shall take all actions, including appropriate service and notice of pleadings, in form and substance reasonably satisfactory to Buyer, needed to obtain a Sale Order that authorizes, orders and effects a sale of all of the Acquired Assets free and clear of all Excluded Liabilities and Liens, other than Assumed Liens, and the other orders contemplated herein.

(c)    The Sellers shall notify, as required by the Bankruptcy Code and all rules promulgated thereunder, all parties entitled to notice of all motions, notices and orders referenced in this Agreement, as modified by any orders issued by the Bankruptcy Court.  The Sellers shall timely notify all parties to the Assumed Contracts of the Cure Amounts for each such contract or license, so as to enable any such party to object to the proposed Cure Amounts and the Bankruptcy Court to determine such amounts at or prior to the Sale Hearing;

(d)    Each Seller shall cooperate fully, following entry of the Sale Order approving the sale of the Acquired Assets to Buyer or its designee, in the arrangements for the transfer of the Acquired Assets from the Sellers to Buyer in an orderly fashion, free and clear of and from any and all Excluded Liabilities and Liens, other than Assumed Liens and otherwise in

37

accordance with the terms, provisions and conditions of this Agreement and all other agreements, documents and instruments executed and/or delivered in connection herewith, including to the extent reasonably practical, entering into any ancillary insolvency, restructuring or similar proceedings in any relevant non-U.S. jurisdiction.

(e)    Sellers shall facilitate discussions between Buyer and landlords in respect of Leased Property, including by permitting Buyer, on behalf of Sellers to discuss and negotiate such amendments to Leases as Buyers may request.

(f)    Sellers will take all reasonable actions to transfer the Permits to Buyer and, if there are Permits that cannot be legally transferred, Sellers will take all reasonable actions to assist Buyer in applying for new Permits.

(g)    Without limiting the generality of the foregoing, the parties hereto shall furnish to each other such necessary information and reasonable assistance, as each may request in connection with each Seller's preparation and filing of applications, motion papers and filings, including the Sale Motion needed to obtain Bankruptcy Court approval of the transactions contemplated by this Agreement, and any filing or submission under the HSR Act, and shall execute any additional instruments necessary to consummate the transactions contemplated hereby, whether before or after the Closing.

(h)    Subject to Applicable Law and the instructions of any Governmental Entity, the Sellers and Buyer each shall keep the other apprised of the status of matters relating to completion of the Transactions, including promptly furnishing the other with copies of notices or other communications received by Buyer or the Sellers, from any third party and/or any Governmental Entity with respect to such Transactions.

(i)    The Sellers shall use all reasonable efforts to obtain the signatures of any Additional Party that has not signed this Agreement on the date hereof.

(j)    Not fewer than five (5) days prior to Closing or such earlier date as prescribed by Applicable Law, Sellers shall obtain all approvals and certificates (including tax clearance certificates) required by any Governmental Entity and shall deliver all notices required by any Governmental Entity in connection with the sale of the Acquired Assets except to the extent that any such approval certificate is not required by entry of the Sale Order.

**SECTION 5.05.**    Supplemental Disclosure.  Each party shall promptly notify the other parties of, and furnish such other parties with any information such other parties may reasonably request with respect to, the occurrence to such party's actual knowledge of any event or condition or the existence to such party's actual knowledge of any fact that would reasonably be expected to cause any of the conditions set forth in Article VI to not be satisfied.

**SECTION 5.06.**    Further Assurances.  From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Transactions.

**SECTION 5.07.**    Confidentiality; Non Disparagement.

38

(a)    Each of the Sellers agrees that until the second anniversary of the Closing, it shall (and the Sellers will cause each of their Subsidiaries, respective officers, directors, and Representatives to) hold in confidence all Confidential Information and, from and after the Closing Date, shall not use Confidential Information in any way except, to the extent applicable, it relates to the ongoing business of the Company or its subsidiaries. For the purposes of this Agreement, "Confidential Information" shall mean any and all proprietary information of or about the Company or its subsidiaries or the Business which is not publicly available. The Sellers acknowledge and agree that the term "Confidential Information" includes all information regarding the following (to the extent not publicly available): products, supplier lists and agreements, services, customer and lead lists (including names, addresses and telephone numbers), purchasing criteria and habits of customers, business plans, methods and procedures, accounting data, contract forms, commission structures, business and financial models, files and accounting and financial data of the Company and its subsidiaries. Without limiting the generality of the foregoing, the Sellers acknowledge and agree that all the Confidential Information is a trade secret under Applicable Law and derives independent economic value, actual or potential, from not being generally known to the public or other persons which can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, the applicable provisions of this Agreement being an example of such efforts. Notwithstanding the foregoing, nothing in this Agreement shall prohibit any person from making truthful statements when required by Law or by order of any Governmental Entity having jurisdiction to legally compel such statements, or as otherwise may be required by Applicable Law or legal process; provided that, in such event such person shall, if not prohibited by Applicable Law and to the extent reasonably practicable: (a) promptly notify Buyer of the existence, terms and circumstances surrounding such requirement, (b) consult with Buyer on the advisability of taking legally available steps, at Buyer's expense, to resist or narrow such requirement and reasonably cooperate with any efforts of the disclosing party to resist or narrow such requirement, and (c) if disclosure of such Confidential Information is required to prevent such person from being held in contempt or subject to other penalty or from violating Applicable Law, furnish only such portions of the Confidential Information as, based on the advice of such person's legal counsel, such person is legally compelled to disclose and exercise its reasonable efforts (without having to institute any litigation or other proceeding) to ensure that any such Confidential Information so disclosed will be accorded confidential treatment by such Governmental Entity through protective orders, filings under seal and other appropriate means.

(b)    Each Seller agrees that it shall not make, participate in the making of, or knowingly encourage any other person to make, any statement, whether written or oral, that disparages or defames the Business.

(c)    Each of the Sellers agrees that Buyer would suffer irreparable harm from a breach of any of the covenants and/or agreements contained in this Section 5.07. In the event of an alleged or threatened breach by a Seller of any of the provisions of this Section 5.07, Buyer or its successors and assigns may, in addition to all other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (including the extension of the duration of the applicable covenant by a period equal to the duration of the breach of this Section 5.07).

39

(d)    If any provision of this Section 5.07 is found not to be enforceable in accordance with its terms because of the duration of such provision or the scope of activities covered thereby, the parties agree that the judge or other entity making such determination will have the power to reduce the duration or scope of such provision, and in its reduced form such provision shall be enforceable.

**SECTION 5.08.**    <u>Assumption and Rejection of Contracts</u>.    Unless and until this Agreement is terminated in accordance with its terms, the Sellers shall not (and shall cause their subsidiaries not to) assume, reject or amend any Contract in any bankruptcy proceeding following the date hereof unless Buyer's prior written consent is obtained.

**SECTION 5.09.**    <u>Service</u>. Each of the Sellers shall (and shall cause its Subsidiaries to) timely serve notice of the Sale Motion and the Sale Notice on all persons legally entitled to such notices and in a manner otherwise consistent with Applicable Law.

**SECTION 5.10.**    <u>Employees</u>.

(a)    The parties hereto intend that there will be continuity of employment for substantially all employees of the Business (the "<u>Business Employees</u>") following the Closing Date (other than Business Employees located at Leased Properties subject to Excluded Leases). In order to effectuate such transfer of employment as of the Closing Date, except as otherwise provided herein, Buyer shall make a general offer of employment through a general notice of transfer to each Business Employee (other than Business Employees located at Leased Properties subject to Excluded Leases) (each an "<u>Offer Employee</u>").    Such general offer of employment will be deemed accepted by each Offer Employee unless (i) expressly rejected by the Offer Employee prior to the Closing Date or (ii) the Offer Employee otherwise indicates by his or her actions that such offer of employment has not been accepted (each Offer Employee who acts under (i) or (ii), a "<u>Non-Acceptance Offer Employee</u>").    For purposes of this Agreement, "<u>Transferred Employee</u>" shall mean each Offer Employee other than a Non-Acceptance Offer Employee; <u>provided</u> that, in the case of Offer Employees on short term disability or other approved leaves of absence, such employees must commence service with Buyer prior to the six-month anniversary of the Closing Date to become Transferred Employees.    Any Business Employee who does not commence employment with Buyer as described above shall not be treated as a Transferred Employee. Except as otherwise provided in this Section 5.10, all Transferred Employees will cease to accrue benefits under and cease to participate as active participants in all Benefit Plans as of the Closing Date.  The parties will cooperate to comply with legal and regulatory requirements to accomplish the employment transfers described in this Section 5.10, including without limitation any requirements for the Company to terminate the employment of any Business Employee and for Buyer to make a specific employment offer to such Business Employees, and the Company will transfer any work permits or passes applicable to the Business Employees.

(b)    For not less than 9 months following the Closing, Buyer shall provide to Transferred Employees compensation and employee benefits substantially comparable, in the aggregate, to the compensation and employee benefits provided by Sellers to Transferred Employees as of immediately prior to the Closing (excluding any defined benefit pension plan benefits and any equity or equity-like compensation).    Except as otherwise provided in this

40

Section 5.10 or under the terms of any employee benefit plans of Buyer providing benefits to Transferred Employees (the "Buyer Benefit Plans") or applicable Law, Buyer shall be entitled to modify, amend, suspend, terminate or supplement any Buyer Benefit Plans, and to terminate the employment of any Transferred Employee, in its sole discretion.

(c)    The Buyer Benefit Plans shall credit such Transferred Employees (and their dependents) for any deductibles and out-of-pocket expenses paid under the applicable Benefit Plans in the year of initial participation in the applicable Buyer Benefit Plans that are group health plans (within the meaning of Section 5000(b)(1) of the Code). Buyer shall provide each Transferred Employee with credit for the same number of vacation and sickness benefit days he or she has accrued but not used in the calendar year in which the Closing occurs (the "Benefit Days"), provided, that, to the extent required by law, such amount shall be paid by Buyer in cash.

(d)    Buyer shall permit each Transferred Employee who is a participant in the Fortunoff, The Source Merged 401(k) Plan (the "Seller 401(k) Plan"), and who elects to transfer his or her account balance under the Seller 401(k) Plan, to roll over his or her account balance (including any outstanding loans thereunder) to a qualified defined contribution plan with a Section 401(k) feature sponsored by Buyer or one of its affiliates, which may be an existing plan or a plan to be established by Buyer or one of its affiliates (the "Buyer Qualified Plan"), as soon as practicable following the Closing Date in accordance with the terms of the Buyer Qualified Plan. The Company agrees to use and to cause the Sellers to use their best efforts to cooperate with Buyer, its agents and designees to ensure a smooth transfer of accounts, records and recordkeeping to effect the transfers described in the previous sentence. The Company further agrees to take and to cause the Sellers to take such actions as are necessary, including securing the cooperation of the recordkeeper, trustee and other service providers of Seller 401(k) Plan, to effect such transfers.

(e)    Buyer will pay and provide to Transferred Employees whose employment terminates on or within twelve months after the Closing severance benefits under conditions and in amounts that are no less favorable to the employee than those provided to Transferred Employees as of immediately prior to the Closing under the Company's severance policies set forth on Schedule 5.10(e). Solely for purposes of determining eligibility, vesting and benefit accruals under the Buyer severance plans (and not for any other purpose), Buyer shall credit each Transferred Employee with his or her years of service with the Sellers, and any predecessor entities, to the same extent as such Transferred Employee was entitled to credit for such service under any similar Benefit Plan prior to the Transferred Employee's commencement of participation in the Buyer Benefit Plan, except that Transferred Employees shall receive no such credit to the extent that such credit would result in a duplication of benefits.

(f)    Buyer shall assume liability for all claims under any Welfare Plan sponsored or maintained by the Company or any of its subsidiaries which are incurred by any Transferred Employees prior to or on the date that such Transferred Employee becomes a Transferred Employee and any other current or former employee of the Company (and covered dependents and COBRA beneficiaries) (the "Welfare Claims"). For purposes of this paragraph, the following welfare benefit claims shall be deemed to be incurred as follows:  (a) life, accidental death and dismemberment and business travel accident insurance benefits, upon the death or accident giving rise to such benefits; (b) health, dental and/or prescription drug benefits

41

(included in health benefits), upon the provision of services, materials or supplies relating to such claim; and (c) short-term disability and long-term disability benefits, upon the date on which an individual becomes disabled under the applicable disability plan.

(g)   Notwithstanding any provision of this Agreement to the contrary, Buyer shall not assume any liability with respect to any defined benefit pension plan or cash balance pension plan sponsored, maintained or contributed to by the Company or any ERISA Affiliate, and Buyer shall have no obligation to adopt or provide benefits under any such plan.

**SECTION 5.11.**   Personally Identifiable Information.  Buyer shall adopt the Sellers' privacy policies with respect to personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) of the Sellers' customers whose customer accounts are conveyed to Buyer.

**SECTION 5.12.**   Financing.  Buyer shall use commercially reasonable efforts to obtain a commitment letter, in form and substance satisfactory to it in its sole discretion, and with conditions to initial funding reasonably satisfactory to the Sellers, from one or more credit worthy financial institutions (the "ABL Commitment Letter") within 15 business days after the date hereof.  Sellers shall cooperate and assist with the efforts of the Buyer to obtain the ABL Commitment Letter and with any efforts of Buyer or one of its affiliates to obtain additional equity or debt financing in connection with the Transactions, which efforts shall include (i) participation in meetings, presentations and due diligence sessions; (ii) providing information to be included in materials, offering documents, private placement memoranda, bank information memoranda, prospectuses and similar documents, required in connection with the ABL Financing or any additional equity or debt financing; (iii) using all reasonable efforts to furnish any sources of financing with financial and other pertinent information regarding the Company as they may reasonably request; and (iv) using commercially reasonable efforts to obtain accountants' comfort letters, customary certificates, legal opinions, surveys and title insurance reasonably required by any sources of financing.

**SECTION 5.13.**   Bid Procedures Motion and Sale Motion.

(a)   On the Petition Date, the Sellers will file:   (A) a motion (the "Bid Procedures Motion") for entry of an order, in a form and substance reasonably acceptable to Buyer, (i) authorizing the Sellers to enter into this Agreement for the sale of the operations of the Company and the assumption and assignment of certain executory contracts and unexpired leases; (ii) establishing notice, bidding and sale procedures (such sale procedures being the "Auction" and the procedures being the "Bid Procedures"); (iii) approving Buyer's bid protection; and (iv) setting a sale hearing (such order, the "Bid Procedures Order"); (B) a motion for entry of an order, in form and substance acceptable to Buyer (the "Sale Motion"), authorizing and approving the Acquisition Agreement and the sale of the Business (the "Sale Order"); and (C) a motion for entry of an order, in form and substance acceptable to Buyer (the "DIP Motion"), authorizing and approving the DIP Facility, which financing shall include up to $10 million of financing available for the purchase of inventory, for which Buyer shall provide the Letter of Credit as credit support (the "DIP Order").  The DIP Order shall authorize the Sellers to grant to the Buyer Liens in all of the Collateral, junior only to the Liens of the Senior Agent and ahead, pursuant to section 364(d) of the Bankruptcy Code, of the Liens of the Term D Lenders.  The Sellers shall

42

use their reasonable best efforts to schedule a hearing to consider the Bid Procedures Order and a hearing to consider the Sale Order (the "Sale Hearing") as soon as possible so as to obtain the entry by the Bankruptcy Court of the Bid Procedures Order no later than February 13, 2008, and entry by the Bankruptcy court of the Sale Order no later than February 28, 2008. The Sellers shall use their reasonable best efforts to obtain interim approval of the DIP Order on the Petition Date or if the Petition Date is not a Business Day then on the following Business Day.

(b)    The Bid Procedures Motion shall seek approval of, and the Bid Procedures Order shall approve, Bid Procedures that are in form and substance substantially similar to Exhibit A hereto.

(c)    The Sellers shall use reasonable efforts to obtain, through entry of the Bidding Procedures Order, prompt Bankruptcy Court approval of a fee in the amount of $2.25 million (the "Break Up Fee") payable to Buyer in cash, by wire transfer of immediately available funds to an account designated by Buyer, upon the occurrence of a termination of this Agreement in which the Break Up Fee is payable as and when provided in Section 7.03, plus a reimbursement of all Buyer's and its affiliates' expenses including legal, accounting, appraisal, investment advisers and other consultants and all reasonably documented internal expenses incurred by the Buyer or any of its affiliates in connection with the due diligence and auditing of the Business and the assets of the Sellers, negotiation, execution and consummation of this Agreement and the Transaction and in connection with any other proposed transaction involving a potential acquisition of the Company or its assets or any interest in the Company or its assets (the "Reimbursement Amount"), payable to Buyer in cash, by wire transfer of immediately available funds to an account designed by Buyer, as and when provided in Section 7.03 hereof, provided, that the Reimbursement Amount shall be less than or equal to $1 million (the "Reimbursement Cap"). Any payment of the Break Up Fee and Reimbursement Amount shall be deemed to be an administrative expense, with priority over any and all claims of the kind specific in Sections 503(b) and 507(b) of the Bankruptcy Code, and shall have the Liens in favor of the Buyer as described in Section 7.03. The Bid Procedures Order and/or the DIP Order, as appropriate, shall provide for such super-priority administrative expense and lien rights in form and substance satisfactory to Buyer. The Break Up Fee and the Reimbursement Amount shall not be due and payable except in the circumstances set forth in Section 7.03 (Break Up Fee and Expense Reimbursement).

(d)    Buyer and the Sellers shall cooperate with filing and prosecuting the Bidding Procedures Motion, the Sale Motion and the DIP Motion, and obtaining entry of the Bid Procedures Order, the Sale Order and the DIP Order, and the Sellers shall deliver to Buyer prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Buyer and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other papers to be filed by the Sellers in connection with such motions and relief requested therein.

**SECTION 5.14.**    Covenant Not to Use Fortunoff Name. None of the Sellers, the Additional Parties or their respective affiliates shall use or authorize others to use the "Fortunoff" name or the FORTUNOFF Marks or any variations, derivations or formatives thereof or any confusingly similar names, marks, logos or designs (collectively, the "Fortunoff Name") in commerce (including as part of any business, product or service) or as part of any trademark,

43

service mark, trade name or domain name, or in connection with any endorsement, affiliation, sponsorship, representation or advertisement (including on an Internet website (or similar or successor system) or any other similar commercial activity); provided that the foregoing shall not apply to uses of the "Fortunoff" name by any Additional Parties or their respective affiliates whose last name is "Fortunoff" (i) in such capacity as an employee or officer of the Buyer or any of its subsidiaries and for the exclusive benefit of the Buyer and its subsidiaries, (ii) for personal (i.e., non-commercial) purposes or (iii) for the services by such individual in a professional capacity (where such use is of the full name or incorporates the full name (i.e., first and last name) without emphasis on the "Fortunoff" portion of the name) other than in connection with the Business or any other retail business (the foregoing clauses (i), (ii) and (iii), collectively, "Permitted Uses").   Nothing in this Section 5.14 shall be deemed or construed to prevent any Additional Party who is an individual from earning or making a living or otherwise benefiting from his or her talents or abilities, provided that the Fortunoff Name is not used in commerce in connection therewith (other than Permitted Uses).   Nothing in this Section 5.14 shall affect any provision of the Use of Name and Non-Competition Agreement, dated July 22, 2005, between any such individual and the Company (if any) it being understood that such use of name and Non-Competition Agreement constitutes an Assumed Contract as of the Closing and all benefits that accrue to the Company or its affiliates thereunder shall accrue to the Buyer and its affiliates. Each Seller and each Additional Party shall be liable for any breach of this Section 5.14 by its affiliates.

**SECTION 5.15.**    Non Solicitation of Employees.

(a)    For a period of one (1) year from the Closing Date, each of the Sellers and the Additional Parties, on behalf of itself and its affiliates, agrees that it shall not, directly or indirectly, hire, offer to hire or solicit for employment any of the Transferred Employees, except that this Section 5.15 shall not prohibit the Sellers or the Additional Parties opportunities to solicit the public generally in any newspaper, trade journal or other publication, or any Internet website posting, (ii) participating in any third party hiring fair or similar event open to the public, (iii) seeking employees via a third party recruiting firm utilizing efforts not targeted at any of the Transferred Employees or its subsidiaries or (iv) hiring any person as a result solely of the actions described in clauses (i), (ii) and (iii).

(b)    For a period of one (1) year from the Closing Date, each of the Sellers and the Additional Parties on behalf of itself and its affiliates, agrees that it shall not knowingly, directly or indirectly, solicit, induce, or attempt to solicit or induce, any customers, clients, suppliers or landlords of the Buyer or its subsidiaries to terminate his, her or its respective relationship with the Buyer or its subsidiaries, as the case may be, for any purpose.

**SECTION 5.16.**    Publicity.   From the date hereof through the Closing Date, no public release or announcement concerning the Transactions shall be issued by any party without the prior consent of Buyer and the Sellers (which consent shall not be unreasonably withheld), except as such release or announcement may be required by law, in which case the party required to make the release or announcement shall allow the other parties reasonable time to comment on such release or announcement in advance of such issuance; provided, however, that the Sellers and Buyer may, in consultation with each other, make internal announcements to their respective

44

employees that are consistent with the parties' prior public disclosures regarding the Transactions after reasonable prior notice to and consultation with the other.

## ARTICLE VI

## CONDITIONS PRECEDENT

**SECTION 6.01.**    Conditions to Each Party's Obligation.  The respective obligation of each party to effect the Transactions is subject to the satisfaction or waiver on or prior to the Closing of the following conditions:

(a)    Governmental Approvals.  All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Entity necessary for the consummation of the Transactions shall have been obtained or filed or shall have occurred, as applicable.

(b)    HSR Approval.  Any applicable waiting period under the HSR Act relating to the Transactions shall have expired or been terminated.

(c)    No Injunctions or Restraints.  No Applicable Law or injunction enacted, entered, promulgated, enforced or issued by any Governmental Entity or other legal restraint or prohibition preventing the consummation of the Transactions shall be in effect.

(d)    Bankruptcy Court Orders. The Bankruptcy Court shall have entered the Sale Order and any other orders necessary to permit and consummate the transactions contemplated hereby, each such other order to be in form and substance reasonably satisfactory to Buyer and all such orders shall be Final Orders; provided, that it shall be a condition only to the obligations of Buyer, and shall not be a condition to the obligations of Sellers, that any order, including the Sale Order, be a Final Order.

**SECTION 6.02.**    Conditions to Obligations of Buyer.  The obligations of Buyer to effect the Transactions are further subject to the satisfaction (or waiver by Buyer) on or prior to the Closing Date of the following conditions:

(a)    Representations and Warranties of the Sellers.  The representations and warranties of the Sellers in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date), without regard to any materiality or "Company Material Adverse Effect" qualifiers contained in such representations and warranties, in each case except for failures of such representations and warranties to be true and correct that, (i) individually or in the aggregate, have not had and would not reasonably be expected to have a Company Material Adverse Effect; or (ii) relate solely to liabilities which are Excluded Liabilities or assets which are Excluded Assets.

(b)    Performance of Obligations.  The Sellers shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Sellers at or prior to the Closing.

45

(c)    Officer's Certificate.  Buyer shall have received a certificate, dated the Closing Date, of an officer of the Company to the effect that the conditions specified in Section 6.02(a) and (b) above have been fulfilled.

(d)    Required Consents.  All consents, approvals or conditions that are not eliminated by the Sale Order and that are required for the assignment and assumption of (i) the Leases relating to the stores of the Sellers located in Westbury, NY, Wayne, NJ, Woodbridge NJ and White Plains, NY and the related Lease Documents, and (ii) the Leases related to the other stores of the Sellers and the related Lease Documents, in each case of (i) and (ii), to the extent that such Leases do not constitute Excluded Leases, shall have been obtained or satisfied; provided that this condition shall be deemed satisfied with respect to such consents, approvals and conditions referenced in the foregoing clause (ii) if such consents, approvals or conditions are not obtained or satisfied with respect to no more than three (3) stores referenced in the foregoing clause (ii).  The consents, approvals or conditions required to be obtained or satisfied pursuant to this Section 6.02(d) are referred to herein as "Required Consents".

(e)    Documents; Actions.  At the Closing, and contemporaneously with all other actions provided for herein, the appropriate Sellers shall have executed and delivered the documents referenced in Section 2.02.

(f)    Computer Files and Related Data.  The Sellers shall have transferred to Buyer or its designees all electronic data relating to the operation of the Business (including data relating to customers, sales history, inventory, accounts receivable, vendors, employees and accounts payable) that is located or stored on computer files of any of the Sellers or their affiliates; provided that, the Sellers may retain copies of any such electronic records (i) to the extent relating to the operation of the businesses of the Sellers or their affiliates as contemplated to be conducted after the Closing, or (ii) to the extent required for regulatory or reporting purposes.  Such electronic records shall be provided in the format then maintained by the Sellers or their affiliates, provided that Buyer may request that the Sellers, at Buyer's cost and expense, convert such electronic data to a format reasonably requested by Buyer.

(g)    No Company Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred any changes, events or developments that have had, or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(h)    Sale Order.  The Sale Order shall be a Final Order or Final Orders entered by the Bankruptcy Court in form and substance acceptable to the Buyer in its sole discretion that provides, inter alia the following:

(i)    Specific findings of fact and conclusions of law:

(A)    Buyer will not consummate the transactions contemplated by the Agreement unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of Buyer or its affiliates, members or shareholders or the Acquired Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity,

46

whether by payment, setoff or otherwise, directly or indirectly, any Lien or Excluded Liability;

(B)    Buyer is a good-faith purchaser of the Acquired Assets pursuant to Section 363(m) of the Bankruptcy Code;

(C)    The Sellers gave due and proper notice of this Agreement and the transactions contemplated hereby to all persons entitled thereto;

(D)    Buyer is not holding itself out to the public as a continuation of the Sellers;

(E)    The consideration to be paid by Buyer under this Agreement constitutes reasonably equivalent value (as that term is defined in each of the Uniform Fraudulent Transfer Act and Section 548 of the Bankruptcy Code) and fair consideration for the Acquired Assets;

(F)    Neither Buyer nor the Sellers are entering into the transactions contemplated by this Agreement fraudulently;

(G)    The Sellers have provided adequate assurances to all parties to the Assumed Contracts which are to be assigned on any Closing Date;

(H)    All defaults under the Assumed Contracts which are to be assigned on any Closing Date are deemed cured; and

(I)    As of the Closing Date, (a) the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Acquired Assets to Buyer and shall vest Buyer with title to such assets free and clear of all Liens and Excluded Liabilities, and (b) this Agreement and the transactions and instruments contemplated hereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Sellers or any chapter 11 trustee of the Sellers and their applicable estate.

(ii)    Specific Orders of the Bankruptcy Court:

(A)    Approving this Agreement and all of the terms and conditions hereof in all respects, and approving and authorizing the Sellers to consummate the transactions contemplated by this Agreement, including the sale of the Acquired Assets free and clear of all Liens and Excluded Liabilities;

(B)    Ordering that none of Buyer or its affiliates, members or shareholders or the Acquired Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Lien or Excluded Liability;

47

(C)    Retaining core jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2) (2005), over resolution of any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 8.10 of the Agreement;

(D)    Extending, as and to the extent necessary the time period under Section 365 of the Bankruptcy Code by which the Sellers must assume (or assume and assign) or reject any Contract to at least the last date under which Buyer shall have the option to include such Contract in the Acquired Assets;

(E)    Ordering that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry;

(F)    Approving the Sellers' assumption of all Assumed Contracts which are to be assigned on the Closing Date pursuant to Section 365 of the Bankruptcy Code, and their assignment to Buyer or its designee, as the case may be;

(G)    Approving and authorizing the Sellers to take all other and further actions necessary to implement the transactions contemplated by this Agreement; and

(H)    (1) Obligating the Buyer to pay all Cure Amounts relative to the Contracts to be assigned on the Closing Date and providing that none of Seller or its affiliates shall have any obligation to pay, or any Liability for, any such Cure Amounts, and (2) enjoining and forever barring the non-Seller party or parties to each Assumed Contract which is to be assigned on the Closing Date from asserting against Buyer, any of its affiliates or any of the Acquired Assets: (i) any default existing as of the Closing Date, and (ii) any objection to the assumption and assignment of such non-Seller party's Assumed Contract.

(i)    ABL Financing.  Buyer shall have obtained the $60 million to be provided at Closing under the ABL Financing.

For the avoidance of doubt, the parties acknowledge that Buyer's knowledge of the existence of facts, events, conditions or circumstances shall not in any way prevent Buyer from exercising all of its rights hereunder and requiring that all conditions in Sections 6.02(a) and (b) be satisfied in full.

SECTION 6.03.    Conditions to Obligation of the Company.  The obligations of the Company to effect the Transactions are subject to the satisfaction (or waiver by the Company) on or prior to the Closing Date of the following conditions:

(a)    Representations and Warranties.  The representations and warranties of Buyer in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true

48

and correct on and as of such earlier date), without regard to any materiality or "Buyer Material Adverse Effect" qualifiers contained in such representations and warranties, in each case except for failures of such representations and warranties to be true and correct that, individually or in the aggregate, have not had and would not reasonably be expected to have a Buyer Material Adverse Effect.

(b)    <u>Performance of Obligations of Buyer</u>.    Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer by the time of the Closing.

(c)    <u>Officer's Certificate</u>. The Sellers shall have received a certificate, dated the Closing Date, of an officer of Buyer to the effect that the conditions specified in subsections 6.03(a) and (b) above have been fulfilled.

## ARTICLE VII

## TERMINATION, AMENDMENT AND WAIVER

**SECTION 7.01.**    <u>Termination</u>.

(a)    Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(i)    by mutual written consent of the Sellers and Buyer;

(ii)    upon written notice, by either Buyer or the Sellers, if the Closing shall not have occurred on or before March 3, 2008 (the "<u>Drop Dead Date</u>"); <u>provided</u>, <u>however</u>, that, if the Closing shall not have occurred on or before the Drop Dead Date due to a material breach of this Agreement by Buyer or the Sellers, the breaching party may not terminate this Agreement pursuant to this Section 7.01(a);

(iii)    by the Sellers, if Buyer shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.01 or 6.03, as applicable, and (ii) cannot be or has not been cured prior to the date that is five (5) days from the date that Buyer is notified by the Company of such breach or failure to perform; <u>provided</u>, <u>however</u>, that the Sellers shall not have a right to terminate this Agreement under this Section 7.01(a)(iii) if any Seller is then in material breach of this Agreement;

(iv)    by Buyer, if the Sellers shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.01 or 6.02, as applicable, and (ii) cannot be or has not been cured prior to the date that is five (5) days from the date that the Seller is notified by Buyer of such breach or failure to perform; <u>provided</u>, <u>however</u>, that Buyer shall not have a right to terminate this Agreement under this Section 7.01(a)(iv) if Buyer is then in material breach of this Agreement;

49

(v)    by Buyer or Sellers if the Sellers determine that an alternative proposal constitutes the "highest and best" bid at the Auction;

(vi)    by Buyer, upon written notice to the Sellers, if (i) the Bid Procedures Order is not entered on or before February 13, 2008, or is stayed, reversed, amended or vacated, (ii) the Sale Order, in form and substance reasonably satisfactory to Buyer, has not been entered within forty-five (45) days after the entry of the Bid Procedures Order, or if after such entry, such Sale Order has not, within eleven (11) days after its entry, become final, non appealable and no longer subject to appeal, reconsideration or stay, or (iii) the DIP Order, approving (A) the Credit Support Agreement, (B) the Letter of Credit and (C) the lien rights of Buyer in respect of the Payment Obligations and the Letter of Credit, has not been approved on or promptly following the Petition Date and in any event on or before February 13, 2008, or (iv) if, prior to the Closing Date, Sellers' case is converted to a case under chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed in the Debtors' chapter 11 case or the Debtors' chapter 11 case is dismissed or if a motion is filed seeking any of the foregoing;

(vii)    by the Sellers prior to the Auction if Buyer shall not have obtained the ABL Commitment Letter within 15 Business Days after the date hereof or if such Commitment Letter is obtained but the initial funding thereunder is subject to conditions that are unsatisfactory to the Sellers acting reasonably;

(viii)    by Buyer prior to the Auction if Buyer shall not have obtained the ABL Commitment Letter in form and substance satisfactory to Buyer in its sole discretion within 15 Business Days after the date hereof;

(ix)    by either the Sellers or Buyer, if an Applicable Law or injunction which shall have become final and nonappealable is in effect preventing the consummation of the Transactions; or

(x)    by Sellers, if the DIP Order has not been approved on or promptly following the Petition Date and in any event on or before February 13, 2008.

(b)    In the event of termination by the Company or Buyer pursuant to this Section 7.01, written notice thereof shall forthwith be given to the other parties and the Transactions shall be terminated, without further action by any party.  If the Transactions are terminated as provided herein:

(i)    Buyer shall, upon request, return to the Company or destroy all documents and other material received from the Sellers relating to the Transactions, whether so obtained before or after the date hereof; and

(ii)    all confidential information received by Buyer with respect to the business of the Company and its subsidiaries shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

50

**SECTION 7.02.**    Effect of Termination.  If this Agreement is terminated and the Transactions are abandoned as described in Section 7.01(a), (a) this Agreement shall become null and void and of no further force and effect, except for the provisions of this Article VII; and (b) except as set forth in clause (a) of this Section 7.02, and Section 7.03 below, there shall be no liability hereunder on the part of Buyer, the Sellers, or their respective officers, directors, shareholders, managers, members or partners, provided that no termination shall relieve any party of liability for any material breach of any provision of this Agreement occurring prior to such termination.

**SECTION 7.03.**    Break Up Fee and Expense Reimbursement.

(a)    If this Agreement has not been terminated prior to the Auction, and the Sellers determine that an alternate proposal is the "highest and best" bid at the Auction, then the Sellers may accept such alternate proposal only if the Sellers terminate this Agreement and pay to Buyer the Break Up Fee and the Reimbursement Amount, and thereafter Sellers shall have no further liability with respect to this Agreement or the transactions contemplated hereby to Buyer (provided that nothing herein shall release any party from liability for intentional breach or fraud), such payment to be made concurrently with the termination of this Agreement.  No Break Up Fee or Reimbursement Amount shall be paid by the Sellers if the Sellers terminate this Agreement prior to the Auction pursuant to Section 7.01(a)(iii), 7.01(a)(vii) or 7.01(a)(ix).

(b)    The Sellers' obligation to pay the Breakup Fee and the Reimbursement Amount pursuant to this Section 7.03 shall survive termination of this Agreement and shall constitute an administrative expense (which shall be a super priority administrative expense claim senior to all other administrative expense claims and payable out of Sellers' cash or other collateral securing Sellers' obligations to its senior secured lenders, prior to any recovery by such Lenders) of Sellers under Section 364(c)(1) of the Bankruptcy Code.  Without limiting the generality of the foregoing, as security for the payment and performance of (i) the obligations to pay the Breakup Fee and the Reimbursement Amount pursuant to this Section 7.03 and (ii) the obligations of the Sellers under the last sentence of Section 1.06(c) (collectively, (i) and (ii), the "Payment Obligations"), the Sellers hereby grant a security interest to the Buyer in all of the Collateral, which security interest shall be subject only to the security interest in favor of the Senior Agent to secure the Senior Obligations, and prior, pursuant to section 364(d) of the Bankruptcy Code, to the security interest in favor of the Term D Lenders based on the consent of the required Term D Lenders to the payment of the Payment Obligations in priority to, and before any payment to the Term D Lenders, and shall constitute a senior secured claim payable out of Sellers' cash or other Collateral, subject only to the prior payment of the Senior Obligations.

**SECTION 7.04.**    Amendments and Waivers.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.  By an instrument in writing, Buyer may waive compliance by the Sellers with any term or provision of this Agreement that the Sellers were or are obligated to comply with or perform.  By an instrument in writing, the Sellers may waive compliance by Buyer with any term or provision of this Agreement that Buyer was or is required to comply with or perform.

51

## ARTICLE VIII

## GENERAL PROVISIONS

**SECTION 8.01.** <u>Expenses</u>. Except as set forth in this Agreement (including Section 7.03 hereof) and whether or not the transactions contemplated hereby are consummated, each party shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby.

**SECTION 8.02.** <u>Assignment</u>. This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any party without the prior written consent of the other parties hereto; <u>provided</u>, <u>however</u>, that, Buyer may assign its rights and obligations hereunder, in whole or in part, to one or more designees of Buyer, provided that no such assignment shall relieve Buyer of its liabilities and obligations hereunder if such assignee does not perform such obligations and, <u>provided</u>, <u>further</u>, that this Agreement may be assigned to one or more trustees appointed by the Bankruptcy Court to succeed to the rights of the Sellers; provided, however, that any such assignment shall not affect Buyer's rights hereunder (including under Section 7.01(a)(vi) hereof). Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, and except as otherwise expressly provided herein, no other Person shall have any right, benefit or obligation hereunder.

**SECTION 8.03.** <u>No Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

**SECTION 8.04.** <u>Remedies</u>. Except as otherwise expressly provided in this Agreement, any and all remedies expressly conferred upon a party to this Agreement shall be cumulative with, and not exclusive of, any other remedy contained in this Agreement, at law or in equity and the exercise by a party to this Agreement of any one remedy shall not preclude the exercise by it of any other remedy. In addition, the parties agree that irreparable damage would occur in the event that the parties fail to perform their obligations in accordance with the terms of this Agreement and each party shall be entitled to specific performance in such event, in addition to any other remedy at law or in equity. Notwithstanding anything to the contrary that may be expressed or implied in this Agreement or in any document or instrument delivered in connection herewith, the Sellers covenant, agree and acknowledge, on behalf of themselves and their affiliates, that no person other than Buyer has any obligations hereunder and that, notwithstanding that Buyer is a limited liability company, the Sellers and their affiliates have no right of recovery or claim under this Agreement or any document or instrument delivered in connection herewith against, and no personal liability shall attach to, the former, current or future equity holders, controlling persons, directors, officers, employees, agents, affiliates (including Lord & Taylor LLC, NRDC Equity Partners, LLC, and any fund or managed account managed by either such person), members, managers or assignees of any of Buyer or any former, current or future stockholder, controlling person, director, officer, employee, general or limited partner, member, manager, affiliate, agent or assignee of any of the foregoing (collectively, but not including Buyer, each a "<u>Non-Recourse Party</u>"), whether seeking recovery through Buyer or

52

otherwise, whether by or through attempted piercing of the corporate veil or "alter-ego" or similar theory, by or through a claim by or on behalf of Buyer against any Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or Applicable Law or otherwise.

　　　　**SECTION 8.05.**　　　<u>Notices</u>.　　　All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile or sent by overnight courier service and shall be deemed given when so delivered by hand, or after one Business Day in the case of overnight courier service or, if faxed, on the day confirmation of successful facsimile transmission is obtained by the sender thereof, as follows:

　　　　　　　　(a)　　　if to Buyer,
　　　　　　　　　　　H Acquisition, LLC
　　　　　　　　　　　c/o NRDC Equity Partners, LLC
　　　　　　　　　　　3 Manhattanville Road
　　　　　　　　　　　Purchase, NY  10577

　　　　　　　　　　　Attention:　　Donald Watros
　　　　　　　　　　　Fax:　　　　　(914) 272-8088

　　　　　　　　　　　with a copy to:

　　　　　　　　　　　Sidley Austin LLP
　　　　　　　　　　　787 Seventh Avenue
　　　　　　　　　　　New York, NY 10019

　　　　　　　　　　　Attention:　　Lee S. Attanasio
　　　　　　　　　　　　　　　　　　Gabriel Saltarelli
　　　　　　　　　　　Fax:　　　　　(212) 839-5599

　　　　　　　　　　　and

　　　　　　　　(b)　　　if to the Sellers,

　　　　　　　　　　　Source Financing Corp.
　　　　　　　　　　　M. Fortunoff of Westbury, LLC
　　　　　　　　　　　Fortunoff Fine Jewelry and Silverware, LLC
　　　　　　　　　　　c/o Trimaran Capital Partners
　　　　　　　　　　　1325 Avenue of the Americas, 34th Floor
　　　　　　　　　　　New York, NY

　　　　　　　　　　　Attention:　　Dean Kehler
　　　　　　　　　　　Fax:　　　　　(212) 616-3701

　　　　　　　　　　　with a copy to:

53

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

Attention:    J. Gregory Milmoe
              Marc S. Gerber
Fax:          (212) 735-2000

**SECTION 8.06.**    <u>Interpretation; Exhibits and Schedules; Certain Definitions</u>.

(a)    The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.    Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement.    When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.

(b)    For all purposes hereof:

"<u>affiliate</u>" of any person means another person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first person.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code.

"<u>Business</u>" means, collectively, the respective businesses, activities and operations of the Company and any of its subsidiaries, as currently conducted and consistent with past practices, in each case, including the sale, distribution and marketing of all items, merchandise and goods which are currently sold or currently contemplated to be sold, offered or conveyed by the Company or any of its subsidiaries through the ownership and/or operation of retail department, specialty, seasonal and outdoor furniture, jewelry and online stores and goodwill associated therewith.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or any other day on which banks in New York, NY are authorized or required by law or executive order to remain closed.

"<u>Buyer Material Adverse Effect</u>" means the occurrence of a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

"<u>Collateral</u>" has the meaning set forth in the Term D Loan Agreement.

"<u>Company Material Adverse Effect</u>" means the occurrence of a material adverse effect (A) on the business, assets, financial condition or results of operations of the Company and its subsidiaries taken as a whole or (B) on the ability of the Sellers to perform their obligations under this Agreement, other than, in the case of clause (A), any effect resulting from changes,

54

events or developments (i) in the financial or securities markets or the economy in general, (ii) in the jewelry and housewares retail industry generally, (iii) arising out of, resulting from or attributable to (1) changes in GAAP, (2) the announcement of this Agreement or the Transactions, (3) acts of God or other calamities, national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof, and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack, or earthquakes, hurricanes, tornadoes or other natural disasters, (4) the commencement of the Case, or (5) any action taken by the Company or its subsidiaries that is required by this Agreement or with the prior written consent of Buyer; provided, in the case of each of clauses (i), (ii) and (iii), that such change, event or development does not disproportionately impact the Company and its subsidiaries taken as a whole as compared to other companies operating in the jewelry and housewares retail industry.

"Confidentiality Agreement" means the Confidentiality Agreement between NRDC Equity Partners, LLC and Source Financing Corp., dated September 24, 2007, as subsequently supplemented and as amended by a letter agreement, dated January 9, 2008.

"Contract" means all contracts, agreements, leases (whether of real or personal property, including all Leases), licenses, indentures, notes, bonds, mortgages, deeds of trust, loan agreements, credit agreements, pledges, encumbrances, guarantees, reciprocal easement agreements, financing agreements, commitments, conditional sales contracts, collective bargaining agreements, permits, instruments, bids, orders, proposals and other legally binding arrangements, whether written or oral.

"Credit Support Agreement" means the Credit Support Agreement dated on or about February 4, 2008 between Lord & Taylor LLC, the DIP Lender and the Sellers.

"Cure Amount" means, with respect to any Assumed Contract, (i) with respect to any Debtor, (x) any amounts required by Section 365(b)(1) of the Bankruptcy Code to cure any defaults under such Assumed Contract and to pay any actual or pecuniary losses that have resulted from such defaults under such Assumed Contract, and (y) any amounts owing to, or accrued in favor of, any counterparty to any Seller party to such Assumed Contract under such Assumed Contract in respect of the period on or after the filing of the relevant bankruptcy petition and prior to the applicable Closing Date, and (ii) with respect to any Person other than a Debtor, any amount owing to, or accrued in favor of, any counterparty to any Seller party to such Assumed Contract under such Assumed Contract in respect of the period prior to the Closing Date.

"Debtors" means Source Financing Corp., M. Fortunoff of Westbury, LLC and Fortunoff Fine Jewelry and Silverware, LLC.

"DIP Facility" means the Debtor-in-Possession Credit Agreement, dated on or about February 4, 2008, among M. Fortunoff of Westbury, LLC, as Debtor, Debtor-in-Possession and Lead Borrower, Fortunoff Fine Jewelry and Silverware, LLC, as Debtor, Debtor-in-Possession and Borrower, Source Financing Corp., as Debtor, Debtor-in-Possession and Facility Guarantor, the Revolving Lenders party thereto and Bank of America, N.A., as Issuing Bank, Administrative Agent and Collateral Agent, as amended from time to time.

55

"DIP Lender" means Bank of America, N.A., as Issuing Bank, Administrative Agent and Collateral Agent under the DIP Facility.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) which is under common control or treated as a single employer with either of the Companies under Section 414(b), (c), (m) or (o) of the Code.

"Existing Stockholders Agreement" means that certain Amended and Restated Stockholders Agreement, dated as of July 21, 2006, by and among the Company and the stockholders of the Company listed therein.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"including" means including, without limiting the generality of the foregoing.

"Indebtedness" of any Person means, without duplication, (i) all indebtedness for borrowed money (including all principal, interest, premiums, penalties, and breakage fees), (ii) all obligations evidenced by notes, bonds, debentures or similar instruments or pursuant to any guaranty (excluding, in any event, the amounts covered in clause (i) and trade payables), (iii) all obligations (including breakage costs) payable under interest rate protection agreements, and (iv) all obligations under capital leases or for deferred purchase of property or services.

"Intellectual Property" means any patent (including all reissues, divisions, continuations and extensions thereof), patent application, patent right, trademark, trademark registration, trademark application, service mark registration, application to register a trademark or service mark, Internet domain name, trade dress, trade name, business name, brand name, copyright, copyrightable work, copyright registration, application to register a copyright, design, design registration, or any right to any of the foregoing.

"knowledge" of the Sellers or the Company means the actual knowledge, after reasonable investigation, of each of the persons listed in Schedule 8.06.

"Lease" means any lease, sublease license, concession agreement or other occupancy agreement, in each case as amended from time to time, relating to real property to which the Company or any of its subsidiaries is a party or by which any of them is otherwise bound, and any modifications thereof and supplements thereto.

"Liabilities" means, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities and obligations of any kind or nature whatsoever, direct, indirect, absolute or

contingent, matured or unmatured of such Person, whether accrued, vested or otherwise, whether known or unknown, foreseen or unforeseen, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"Petition Date" means February 4, 2008.

"REA" means any reciprocal easement agreement, supplemental agreement or similar instrument, in each case as amended from time to time, relating to real property to which the Company or any of its subsidiaries is a party or is otherwise bound.

"Representative" means, with respect to any Person, such Person's officers, directors, employees, agents and representatives (including any lender, investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person, its subsidiaries or its representatives).

"Sale Notice" means the notice given pursuant to the Bid Procedures Order.

"Senior Agent" has the meaning set forth in the Term D Loan Agreement.

"Senior Obligations" has the meaning set forth in the Term D Loan Agreement.

"Software" means computer programs (whether in source code, object code, or other form), databases, compilations and documentation supporting the foregoing.

"subsidiaries" of any person means another person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its Board of Directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first person or by another of its subsidiaries.

"Technology" means all trade secrets, confidential information, unpatented inventions, know how, formulae, processes, procedures, research records, records of inventions, test information, market surveys and marketing know how.

"Term D Lenders" has the meaning set forth in the Term D Loan Agreement.

"Term D Loan Agreement" means that certain Term D Loan Agreement, dated as of February 23, 2007, among M. Fortunoff of Westbury, LLC, as Lead Borrower for Fortunoff Fine Jewelry and Silverware, LLC and M. Fortunoff of Westbury, LLC, as Borrowers, Source Financing Corp., as Facility Guarantor, the Term D Lenders party thereto, and Trimaran Fund Management, L.L.C., as Administrative Agent, and as Collateral Agent as amended by that certain Amendment to Term D Loan Agreement, dated as of May 23, 2007, among M. Fortunoff of Westbury, LLC and Fortunoff Fine Jewelry and Silverware, LLC as Borrowers, Source Financing Corp., as Facility Guarantor, the Term D Lenders party thereto, the Additional Term D Lenders party thereto, and Trimaran Fund Management, L.L.C., as Administrative Agent, and as

Collateral Agent; that certain Second Amendment to Term D Loan Agreement, dated as of June 22, 2007, among M. Fortunoff of Westbury, LLC and Fortunoff Fine Jewelry and Silverware, LLC as Borrowers, Source Financing Corp., as Facility Guarantor, the Required D Lenders party thereto, and Trimaran Fund Management, L.L.C., as Administrative Agent, and as Collateral Agent; and that certain Third Amendment to Term D Loan Agreement, dated as of August 13, 2007, among M. Fortunoff of Westbury, LLC and Fortunoff Fine Jewelry and Silverware, LLC as Borrowers, Source Financing Corp., as Facility Guarantor, the Term D Lenders party thereto, and Trimaran Fund Management, L.L.C., as Administrative Agent, and as Collateral Agent.

(c)   The following terms are defined in the following Sections:

| **Term** | **Section** |
| --- | --- |
| ABL Commitment Letter | 5.12 |
| ABL Financing | 4.04 |
| Acquired Assets | 1.02(a) |
| Additional Parties | Preamble |
| Adjusted Purchase Price | 1.06(c) |
| Agreement | Preamble |
| Allocation Schedule | 1.07 |
| Applicable Law | 3.03 |
| Applicable Rate | 1.06(c) |
| Assumed Contracts | 1.02(a)(v) |
| Assumed Gift Cards, Merchandise Credits and Deposits Liabilities | 1.02(c) |
| Assumed Liabilities | 1.02(c) |
| Assumed Liens | 1.01 |
| Auction | 5.13(a) |
| Auditor | 1.06(b) |
| Balance Sheet | 3.11 |
| Balance Sheet Date | 3.16 |
| Bankruptcy Court | Recitals |
| Benefit Days | 5.10(c) |
| Benefit Plans | 3.15(a) |
| Bid Procedures | 5.13(a), 8.06(b) |
| Bid Procedures Motion | 5.13(a) |
| Bid Procedures Order | 5.13(a) |
| Break Up Fee | 5.13(c) |
| Business Employee | 5.10(a) |
| Buyer | Preamble |
| Buyer Benefit Plan | 5.10(b) |
| Buyer Disclosure Schedules | Article IV |
| Buyer Qualified Plan | 5.10(d) |
| Case | Recitals |
| Cash Flow Forecast | 5.01(a)(xi) |

| **Term** | **Section** |
|---|---|
| Cash Target | 1.06(c) |
| Closing | 2.01 |
| Closing Cash | 1.02(a)(xiv) |
| Closing Date | 2.01 |
| Closing Date Amount | 1.01 |
| Closing Inventory | 1.06(d) |
| Code | 2.02(e) |
| Commonly Controlled Entity | 3.15(a) |
| Company | Preamble |
| Company Contracts | 3.07(b) |
| Company Pension Plan | 3.15(c) |
| Company Property | 3.05(a) |
| Confidential Information | 5.07(a) |
| Contract Designation Date | 1.02(a)(v) |
| Defined Benefit Plan | 3.15(f) |
| Drop Dead Date | 7.01(a)(ii) |
| Environmental Laws | 3.17(c) |
| Environmental Property Transfer Law | 3.17(c) |
| Equity Financing | 4.04 |
| ERISA | 3.15(a) |
| Escrow Agent | 2.03(b) |
| Escrow Fund | 2.03(b) |
| Excluded Assets | 1.02(b) |
| Excluded Lease | 1.02(a)(iv) |
| Excluded Liabilities | 1.02(d) |
| FFJS | Preamble |
| Financial Statements | 3.23(a) |
| FORTUNOFF Marks | 3.06(b) |
| Fortunoff Name | 5.14 |
| GAAP | 1.06(d) |
| Governmental Entity | 3.03 |
| Hazardous Materials | 3.17(c) |
| HSR Act | 3.03 |
| Improvements | 3.05(c) |
| Inventory | 1.02(a)(i) |
| Inventory Target | 1.06(c) |
| Judgment | 3.03 |
| L/C Amount | 1.06(c) |
| Lease Designation Date | 1.02(a)(iv) |
| Lease Documents | 3.05(b) |
| Leased Property | 3.05(a) |
| Letter of Credit | Recitals |
| Liens | 1.01 |
| MFW | Preamble |

59

| **Term** | **Section** |
|---|---|
| Non-Acceptance Offer Employee | 5.10(a) |
| Non-Recourse Party | 8.04 |
| Notice of Disagreement | 1.06(b) |
| Offer Employee | 5.10(a) |
| Payment Obligations | 7.03(b) |
| Pension Plan | 3.15(a) |
| Permits | 3.08 |
| Permitted Liens | 3.04(a) |
| Permitted Uses | 5.14 |
| Personnel | 3.06(d) |
| Pre-Closing Tax Period | 3.13(a) |
| Proceedings | 3.14 |
| Purchase Price | 1.05 |
| Purchase Price Adjustment | 1.06(c) |
| Reimbursement Amount | 5.13(c) |
| Reimbursement Cap | 5.13(c) |
| Release | 3.17(c) |
| Required Consents | 6.02(d) |
| Sale Hearing | 5.13(a) |
| Sale Motion | 5.13(a) |
| Sale Order | 5.13(a) |
| Seller 401(k) Plan | 5.10(d) |
| Seller Disclosure Schedules | Article III |
| Sellers | Preamble |
| Statement | 1.06(a) |
| Tax Return(s) | 3.13(a) |
| Tax(es) | 3.13(a) |
| Taxing Authority | 3.13(a) |
| Term D Loan Agreement | 7.03(b) |
| Transactions | 1.01 |
| Transfer Taxes | 3.13(a) |
| Transferred Employee | 5.10(a) |
| Welfare Claims | 5.10(f) |
| Welfare Plan | 3.15(a) |

**SECTION 8.07.**    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties (other than the Additional Parties) and delivered to the other parties (other than the Additional Parties).  This Agreement shall become effective with respect to each Additional Party when a counterpart has been signed by such Additional Party and delivered to Buyer.

**SECTION 8.08.**    Entire Agreement.  This Agreement and the Confidentiality Agreement, along with the Schedules and Exhibits thereto, contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede

60

all prior agreements and understandings relating to such subject matter.  None of the parties shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein or in the Confidentiality Agreement.

SECTION 8.09.    Severability.  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other persons or circumstances.

SECTION 8.10.    Exclusive Jurisdiction.    The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, including with respect to any Assumed Contracts.  Any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 8.05 hereof.

SECTION 8.11.    Governing Law.  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

SECTION 8.12.    Waiver of Jury Trial.  Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or any Transaction.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section 8.12.

SECTION 8.13.    Bankruptcy Court Approval.  This Agreement shall not be binding on the Sellers until the Sale Order is entered, other than Article V (other than covenants to be performed after the Closing), Section 7.03 and Article VIII, which shall be binding upon entry of the Bid Procedures Order.

[SIGNATURE PAGE FOLLOWS]

61

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

**SOURCE FINANCING CORP.**

By: _____
       Name:
       Title:

**FORTUNOFF FINE JEWELRY AND SILVERWARE, LLC**

By: _____
       Name:
       Title:

By: Source Financing Corp., as sole member

**M. FORTUNOFF OF WESTBURY, LLC**

By: _____
       Name:
       Title:

By: Source Financing Corp., as sole member

**H ACQUISITION, LLC**

By: NRDC Fund V, LLC, its Managing Member

    By: NRDC Equity Partners, LLC
       its Managing Member

        By: _____
           Name:
           Title:

62

The undersigned hereby agrees to be bound by the provisions of Sections 5.14, 5.15 and 7.03(b) in its capacity as an Additional Party to this Agreement:

**COMPANY SHAREHOLDERS:**

**FORTUNOFF FINE JEWELRY AND SILVERWARE, INC.**

By: _____

    Name:
    Title:

**M. FORTUNOFF OF WESTBURY CORP.**

By: _____

    Name:
    Title:

**TRIMARAN FUND II, L.L.C.**

By: _____
    Name:
    Title:

**TRIMARAN PARALLEL FUND II, L.P.**

By: _____
    Name:
    Title:

**TRIMARAN CAPITAL, L.L.C.**


By: _____

    Name:
    Title:

**CIBC EMPLOYEE PRIVATE EQUITY PARTNERS (TRIMARAN)**


By: _____

    Name:
    Title:

**CIBC MB, INC.**


By: _____

    Name:
    Title:

**TRIMARAN FUND MANAGEMENT, L.L.C.,**
as Administrative Agent and Collateral Agent
for the Term D Lenders


By: _____

    Name:
    Title:

**FAMILY MEMBERS:**

_____
Isidore Mayrock


_____
Elliot Mayrock


_____
Rachel Sands


_____
Louis Fortunoff


_____
Ruth Fortunoff


_____
David Fortunoff


_____
Esther Fortunoff


_____
Andrea Fortunoff


_____
Rhonda Fortunoff


_____
Helene Fortunoff

# EXHIBIT B

## Auction and Hearing Notice

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Sally McDonald Henry (SMH 0839)
J. Gregory Milmoe (JGM 0911)

Proposed Counsel for Debtors and
  Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FORTUNOFF FINE JEWELRY AND | : | Case No. 08-[_____] (____) |
| SILVERWARE, LLC, et al. | : | |
| | : | |
| | : | |
| Debtors. | : | Jointly Administered |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF SALE OF THE ASSETS OF SOURCE FINANCING CORP., FORTUNOFF FINE JEWELRY
AND SILVERWARE, LLC AND M. FORTUNOFF OF WESTBURY, LLC**

Please be advised that Debtors Source Financing Corp., Fortunoff Fine Jewelry and Silverware, LLC and M. Fortunoff of Westbury, LLC (the "Sellers") propose to enter into an Asset Purchase Agreement dated as of February 3, 2008 (the "Agreement"), pursuant to which Sellers propose to sell to the buyer (the "Buyer") who will be identified following an auction held on February 26, 2008 (the "Auction"), substantially all of the Sellers' assets free and clear of liens and other interests with all such liens, claims, interests and other encumbrances attaching the same validity and priority as the sale proceeds (the "Assets").

Under the Agreement, the Buyer shall assume certain liabilities of the Sellers including, *inter alia*, (1) cure amounts for assumed contracts, (2) post closing liabilities under assumed contracts, and (3) liabilities for gift cards, merchandise credits and deposits incurred on or after January 1, 2003 (4) one half the transfer taxes, (5) transferred employees, (6) welfare plans and (7) claims for welfare plans.

On [February ___, 2008], in response to Sellers' Motion dated February 3, 2008, seeking the *Entry of (I) an Order (A) Approving Bid Procedures for the Debtors' Assets, (B) Authorizing Debtors to Offer Certain Bid Protections and (C) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof, and (II) Order Authorizing and Approving (A) the Sale of Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases to Successful Bidder(s) at Auction* (the "Sale Motion"), the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order *(A) Approving Bid Procedures for the Debtors' Assets (B) Authorizing Debtors to Offer Certain Bid Protections and (C) Scheduling Final Sale Hearing Approving Form and Manner of Notice Thereof* (the "Bid Procedures Order"). The Bankruptcy Court scheduled a hearing on the Sale Motion and the contemplated sale of the Acquired Assets for [_____ __, 2008], at One Bowling Green, New York, New York 10004-1408, in courtroom [____], at [_____] [__].m (the "Sale Hearing"). In addition, the Bankruptcy Court required that any objections to the relief requested in the Sale Motion and any objections to the proposed sale of the Assets contemplated by the Purchase Agreement be filed with the Bankruptcy Court and served on the parties identified in

1

the Bid Procedures Order on or before [____] [_].m. on [February __, 2008]. Failure to timely object to the Sale Motion shall be deemed a consent to the relief requested therein, and to the entry of the Sale Order.

The Sale Motion proposes the following key dates in connection with the sale of the Assets:

| Event | Date |
|---|---|
| Deadline to object to proposed Bidding Procedures | Tuesday, February 12, 2008 at 4:00 p.m. |
| Debtor files and serves a list of executory contracts potentially to be assumed and assigned and associated proposed cure amounts | Wednesday, February 13, 2008 |
| Hearing to Approve Bidding Procedures | Wednesday, February 13, 2008 |
| Deadline for potential buyers to submit bids | Tuesday, February 12, 2008 at 12:00 p.m. |
| Deadline to object to proposed cure amounts on executory contracts or the sale of the Assets to the highest and best bidder at the Auction | Monday, February 25, 2008 at 12:00 p.m. |
| Auction | Tuesday, February 26, 2008 at 10:00 a.m. |
| Deadline to object to adequate assurance of future performance on executory contracts to be assumed and assigned in connection with successful bid | Tuesday, February 26, 2008 at 5:00 p.m. |
| Hearing to approve sale to highest bidder at Auction | Thursday, February 28, 2006 |

In the event that you wish to explore the possibility of submitting a Qualified Bid, please contact Kevin Regan of FTI Consulting, Inc. at (212) 499-3604 (kevin.regan@fticonsulting.com) who will provide you with a copy of the Bid Procedures Order and information concerning how to obtain access to due diligence materials.

Please be further advised that the Agreement contemplates, and the Sale Order, if approved, shall authorize the assumption and assignment of various executory contracts and unexpired leases that are the property of the Sellers (the "Assumed Contracts"). Additional individual notices setting forth the proposed cure amounts for such contracts will be given to all counterparties to Assumed Contracts

Copies of the Sale Motion, the Bid Procedures Order, the Sale Order, the Agreement and all exhibits related to each of the foregoing may be obtained at http://www.nysb.uscourts.gov/ or www.loganandco.com. Questions may be directed to: Sally McDonald Henry or Shana A. Elberg at Skadden, Arps, Slate, Meagher & Flom LLP.

Dated:  New York, New York
February ___, 2008

> SKADDEN, ARPS, SLATE, MEAGHER
> & FLOM LLP
>
> By:    _____
>        Sally McDonald Henry (SMH 0839)
>        J. Gregory Milmoe (JGM 0911)
>        Shana A. Elberg (SE 4453)
> Four Times Square
> New York, New York 10036
> (212) 735-3000
>
> Proposed Counsel for Debtors and
>   Debtors in Possession

2